M3F6CORO

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x
    UNITED STATES OF AMERICA,
3
                v.                              11 CR 205(AKH)
4                                               Oral Argument
    CLIVER ANTONIO ALCALA
5   CORDONES,
6                   Defendant.
    ------------------------------x
7                                               New York, N.Y.
                                                March 15, 2022
8                                               2:30 p.m.
    Before:
9                   HON. ALVIN K. HELLERSTEIN,

10                                              District Judge

11                              APPEARANCES

12  DAMIAN WILLIAMS,
         United States Attorney for the
13       Southern District of New York
    BY:  KYLE WIRSHBA
14       Assistant United States Attorney

15  CESAR de CASTRO
         Attorney for Defendant
16
    –and–
17
    ADAM KAUFMAN
18       Attorney for Defendant

19  –and–

20  VALERIE GOTLIB
         Attorney for Defendant
21
    –and–
22
    DIANE CAMACHO
23       Attorney for Defendant

24  Also Present:
    ERIKA DE LOS RIOS, Spanish Interpreter
25  HUMBERTO GARCIA, Spanish Interpreter

M3F6CORO

1          (Case called)

2          DEPUTY CLERK:  Counsel, please state your appearances

3    for the record.

4          MR. WIRSHBA:  Good afternoon, your Honor.

5    Kyle Wirshba for the government.

6          MR. DE CASTRO:  Good afternoon, your Honor.  For

7    General Cliver Antonio Alcala Cordones, Cesar de Castro,

8    Valerie Gotlib, Christian Francos, and Diane Camacho.  It's

9    good to see you in person.

10          THE COURT:  Thank you.  It's good have to this in

11    person.

12          Since we're speaking into the mics, I think it's

13    better that we keep seated.  So let's not stand, and let's

14    speak in a seated position into the mic.  Okay?

15          Can I ask the people on the phone --

16          DEPUTY CLERK:  Em, can you hear him?

17          LAW CLERK:  Yes.

18          THE COURT:  Okay.  And I think there's a reporter from

19    the Associate Press.

20          DEPUTY CLERK:  He's on.

21          THE COURT:  Okay.  We'll take the motion to dismiss

22    first.  And who's going to argue for the defendant?

23          MR. DE CASTRO:  Oh, I'm sorry.  Mr. de Castro.

24          THE COURT:  Okay, Mr. De Castro.  Let's go.

25          MR. DE CASTRO:  So thank you, your Honor.  May it

M3F6CORO

| | |
|---|---|
| 1 | please the Court:  I think that I don't have terribly too much |
| 2 | to add to our briefing.  I think the briefing was clear and |
| 3 | it's straightforward.  It was from the defense's perspective |
| 4 | that this indictment -- well, first, I should say that |
| 5 | General Acala Cordones should be entitled to foreign sovereign |
| 6 | immunity. |
| 7 | This indictment alleges, essentially, that Venezuela |
| 8 | is a narco-state; that it, at its highest levels -- that it's |
| 9 | policies to engage in narcotics trafficking, that it is |
| 10 | partners with the FARC, that the United States designates as a |
| 11 | drug trafficking organization, and as we made clear of that, |
| 12 | and I am sure the government would concede Venezuela does not |
| 13 | designate that as a terrorist organization. |
| 14 | And our position is that this isn't the -- as the |
| 15 | government argues that the defendants as charged in this case |
| 16 | are corrupting legitimate institutions.  The government here, |
| 17 | the United States government, has been saying since the late |
| 18 | '90s that there are no legitimate institutions in the Venezuela |
| 19 | government; that is it is a narco-state. |
| 20 | THE COURT:  What's consequences? |
| 21 | MR. DE CASTRO:  Well, the consequence is if it's |
| 22 | policy and it asks -- if the president, the head of defense, |
| 23 | whoever, asks a general, a uniformed general to go have a |
| 24 | meeting, and that meeting, in the eyes of the United States |
| 25 | government, is deemed criminal in some sort because they're |

M3F6CORO

1    engaging or talking to what the United States deems a terrorist

2    organization, well, they should be entitled to immunity.

3    That's an official act.

4            THE COURT:  And there could be instruction doing

5    criminal acts?

6            MR. DE CASTRO:  I'm sorry, Judge?

7            THE COURT:  Can there be an instruction to perform a

8    criminal act?  Supposing President Maduro would call up

9    Mr. Alcala Cordones and say, General, I want you to kill ten

10   innocent people just to terrorize the population.  Official

11   act?

12           MR. DE CASTRO:  Well, official act.

13           THE COURT:  Yes?

14           MR. DE CASTRO:  Official act.

15           THE COURT:  Out of the sovereignty --

16           MR. DE CASTRO:  Violates the sovereign immunity,

17   violates humanitarian law, international law, lots of things,

18   war crimes potentially, depending on who that is.

19           THE COURT:  So a rogue state performing rogue

20   functions is entitled to sovereign immunity?

21           MR. DE CASTRO:  They are entitled to --

22           DEPUTY CLERK:  They are having trouble hearing you,

23   the interpreters.

24           THE COURT:  We have too much stuff here.

25           DEPUTY CLERK:  It's not that.  Move that microphone

M3F6CORO

```
1    closer and tap it so I can see which one it is and I can turn

2    it up.

3              THE COURT:  So I'm asking -- I'm instructing Gary to

4    kill 6 million Jews.  Is Germany — Gary — entitled to an act of

5    state immunity?

6              MR. DE CASTRO:  I'm not arguing that people are not

7    responsible for their criminal conduct, it's just that the

8    United States government can't bring the case here.  So in the

9    example you gave of Maduro ordering maybe --

10             THE COURT:  So when Israel reached out and kidnapped

11   Eichmann and brought him to trial in Israel, is that entitled

12   to sovereign immunity?

13             MR. DE CASTRO:  Let me answer that with also another

14   hypothetical.  If the current Russian state decided to arrest

15   our advisers or generals that are shipping arms to the

16   Ukrainians, that it considers -- it -- the Russian government

17   considers terrorists, would our government say we are entitled

18   to immunity, and the answer is, yes, I think unequivocally.

19             THE COURT:  It would be an act of war; would it not?

20             MR. DE CASTRO:  Potentially.  Potentially.

21             THE COURT:  I don't think it's sovereign immunity.

22   How do you invoke sovereign immunity?

23             MR. DE CASTRO:  How do you invoke it?

24             THE COURT:  How do you invoke it?

25             MR. DE CASTRO:  That's a good question.  I think we're
```

M3F6CORO

1    invoking it by making this motion.  There's I think --

2              THE COURT:  Doesn't the executive invoke the motion?

3              MR. DE CASTRO:  It can in what is in a lot of these

4    civil cases, you can see that maybe the executive -- what the

5    government is arguing here is that, well, you know, we're

6    entitled to deference that Mr. General Alcala Cordones is not

7    entitled to because we say so.

8              We apparently have done that analysis, but we're not

9    going to tell you what that analysis it, and we're going to

10   tell you that he's not entitled to sovereign immunity because

11   our evidence that you're not entitled to see until right before

12   trial says so.

13             THE COURT:  So what you're saying is that the

14   government, through its own processes, which have not been

15   transparent, has said, go ahead and try, General Alcala

16   Cordones?

17             MR. DE CASTRO:  That is my understanding.

18             THE COURT:  And the government doesn't have that

19   power?  They don't have the power to bring a criminal case?

20             MR. DE CASTRO:  They do have the power to do that, but

21   it is not without review.

22             And when the actor is not a head of state — and we're

23   talking about acts done — then it is not entitled to that

24   deference.

25             So, for example, if you look *Dogan v. Barak*, and if

M3F6CORO

```
1    we're talking about status-based, generally, the case law will
2    say, head of state, that's generally deference to the
3    executive.  But when we're talking about duty-based or just
4    this conduct-based immunity, there's no deference.  An analysis
5    is done, and that's why you see cases doing the analysis.
6            If you follow the government's logic that they're just
7    entitled to this decision-making process, well, it would
8    eliminate immunity all together, and it wouldn't apply ever in
9    a criminal case because if they chose to bring charges and
10   present a case to a grand jury, then they've spoken and they've
11   analyzed it.  But that does not mean that you are bound by that
12   analysis, just like you are not bound by analysis in a plea
13   agreement of the parties.  You decide at the end of the day if
14   that party is entitled to immunity or not.
15           THE COURT:  What are the criteria for this
16   conduct-based immunity?
17           MR. DE CASTRO:  So, generally from a sort of overview,
18   we're talking about official or agent of the foreign state,
19   which, at the time of this indictment, General Alcala Cordones,
20   and the government concedes, I think, that he was acting as a
21   general during that whole time of his involvement -- his
22   alleged involvement in this conspiracy.  So I would say that
23   first element would be satisfied.
24           The next issue that seems to be very much at issue is
25   whether his conduct -- and we've discussed this a little -- was
```

M3F6CORO

 1    in his official capacity as a general.  I've addressed that

 2    generally, which is that our position with respect to the

 3    official capacity piece is that the indictment -- we're talking

 4    about dismissing the indictment, the face of this indictment.

 5    The government has chosen in its response to provide additional

 6    facts it did not include in its indictment.  I don't think

 7    those help the analysis because all of the facts the government

 8    alleges, General Alcala Cordones was a uniformed member of the

 9    military.  He was --

10            THE COURT:  Committing criminal acts against the

11    United States.

12            MR. DE CASTRO:  That's what the government alleges.

13    And the only reason they say in their response --

14            THE COURT:  -- the purpose of the analysis; I accept

15    that as true.

16            MR. DE CASTRO:  You can, in terms of the fact --

17            THE COURT:  -- whether you can't enjoy sovereign

18    immunity, where someone in a foreign country commits criminal

19    acts against the United States.

20            MR. DE CASTRO:  If it's pursuant in their official

21    capacity as a member of the government military, and they were

22    an agent of that foreign state, the answer is yes, Judge.  And

23    the reason the answer is yes is because, in this case, you have

24    to look at the face of the indictment.  They are saying that he

25    had meetings as a general that he was ordered to have.  He had

M3F6CORO

1    meetings.  The government is going to say, no, he was acting

2    really as a member of the cartel sometimes and then he's been

3    acting as a member of the military other times.  However, the

4    premise of their entire indictment is that but for him being a

5    military member, he would not be part of the, quote/unquote,

6    cartel.  The cartel that is, as many politicians would probably

7    agree with me, and the United States, a subdivision of the

8    Venezuela state.  They have argued -- that brings me back to my

9    original point -- that this cartel is just the state.

10             THE COURT:  So if a rogue state has its officials

11   performing criminal acts against another sovereign, are you

12   saying that sovereign cannot get individuals performing those

13   acts, the criminal laws of its country?

14             MR. DE CASTRO:  Correct.

15             THE COURT:  That's your position.  Do you agree with

16   that, Mr. Wirshba?

17             MR. WIRSHBA:  Not in this case, your Honor, certainly.

18             THE COURT:  Well, tell me.

19             MR. WIRSHBA:  Of course, your Honor.  In this case,

20   we're not just talking about an individual who is acting in

21   their professional capacity going back, being a general in

22   another sovereign.  We're talking about an individual who is

23   acting in his private capacity as part of a cartel to do

24   something that is illegal, even under that foreign sovereign's

25   laws.

M3F6CORO

1          THE COURT:  Well, supposing the president of the

2     country said, let's do this cartel, let's organize this Cartel

3     De Los Soles.

4          MR. WIRSHBA:  Yes, sir.

5          THE COURT:  Not with FARC, and there's such a great

6     market in the United States, we'll give you planes and you can

7     take them to the United States.  People doing that are doing

8     that officially; are they not?

9          MR. WIRSHBA:  No, they're not, your Honor.

10          THE COURT:  Why not?

11          MR. WIRSHBA:  And the reason you know that is because

12     it's illegal in Venezuela to traffic narcotics, and that's

13     exactly what we're talking about here.  We're talking about a

14     conspiracy to traffic narcotics.

15          THE COURT:  So if an official of a foreign government

16     does illegal acts, not only in the United States, but also

17     against the laws of his own country, he's no longer an

18     official?

19          MR. WIRSHBA:  He's an official, your Honor, but he's

20     certainly not acting within his official capacity.

21          THE COURT:  Is it because we make an assumption that

22     one can't operate in an official capacity to do criminal

23     things?

24          MR. WIRSHBA:  It's not an assumption, your Honor.

25     That's the analysis.

M3F6CORO

1          THE COURT:  It's not that he's acting as a private

2     citizen.  It's that we won't recognize his official status

3     because he is engaged in criminal conduct, both under the laws

4     of his own country, and our laws.

5          MR. WIRSHBA:  He's an official, but he's engaged in

6     private conduct.  And just as here, we can have officials who

7     engage in official action, and those who do other things when

8     they're acting in their private capacity.  So to with foreign

9     officials.

10          THE COURT:  How do we tell that he is acting in his

11     private capacity?

12          MR. WIRSHBA:  Well, one of the ways, your Honor, is

13     because he's conducting illegal activity, even according to the

14     laws of the nation in which he's acting.  But there are other

15     ways as well.

16          THE COURT:  If a person is engaging in criminal

17     conduct, does he lose his official status?

18          MR. WIRSHBA:  I think it would depend on the analysis,

19     but the analysis here is much clearer than that.  And there are

20     two other ways that your Honor can know that are very clear

21     that the defendant was not acting as a public official.

22          So the first is, as your Honor highlighted when

23     speaking with defense counsel, it's that the executive branch

24     of our government is typically afforded a certain manner of

25     deference in conducting this analysis.  And we've gone through

M3F6CORO

1    that in our brief, and we've explained to you how it is the

2    case that here, because we're bringing this prosecution, the

3    executive branch of the United States has spoken clearly in

4    saying that the United States does not believe that the general

5    was acting in his public capacity, his official capacity, but

6    in his private capacity.

7            And in addition to that, your Honor, we have the fact

8    that Venezuela, the country that for whom the sovereign

9    immunity belongs, it is their sovereign immunity.  They have

10   not come forth and asked the state department to give a

11   suggestion of immunity on the defendant's part.

12           And the defendant, in their reply brief, they raise

13   that there's the Maduro government and there's another

14   government that is officially recognized by the United States,

15   but that's a red herring.

16           The bottom line, your Honor, is that no government,

17   neither the official nor the de facto government, has come

18   forth and made a suggestion of immunity.  And as your Honor

19   knows from reading the case law, it is often the case that the

20   government is prosecuting individuals from states for which the

21   diplomatic relations are not ideal, but those countries will

22   still come forth and make suggestion of immunity where it's

23   appropriate, and as the DC Circuit recently found in of the

24   *Broidy* case, that speaks volumes.

25           THE COURT:  How do you respond to that?

M3F6CORO

```
 1              MR. DE CASTRO:  Well, I respond in a couple ways.
 2      First, this argument that the government is making that they
 3      made in their opposition and they're making today that -- and
 4      it goes directly to your questioning, which is, well, he's
 5      committing illegal acts, arguably, so that means it's not his
 6      official capacity.  Well, that's easy; it's been rejected.
 7      Okay.  Geraldo v. Drummond rejected it.  The DC Circuit case,
 8      the actual argument the plaintiff made was that illegal acts
 9      are not within official immunity, rejected.  It was rejected in
10      that decision.  It was rejected in Belhas.  And so I dispense
11      with that.
12              The issue that whether Venezuela has asked for
13      immunity in this case is a red herring, it's preposterous.
14      This United States government does not recognize the current
15      government, and they've indicted the president.  So the thought
16      that even if --
17              THE COURT:  So it can't ask --
18              MR. DE CASTRO:  Even if it did, this government is not
19      listening to it.  And, second, even if the ousted government
20      were to ask, this government is not listening to that
21      government either, as evidenced by the fact that we're sending
22      envoys down to Venezuela regarding oil now, given the current
23      crisis.
24              THE COURT:  Do we give sovereign immunity to a state
25      that's not recognized as a state?
```

M3F6CORO

1          MR. DE CASTRO:  They're still -- well, I can tell you

2     this:  Even if the answer to that question was "maybe not," the

3     United States government, who is meeting with the Venezuela

4     government regarding oil, it sounds like we're recognizing

5     them.  At least that's what the reporting is.  And that's not

6     visiting with the ousted government; that's apparently

7     representatives of the current regime that it has indicted and

8     charged with felonies.

9          The position the government has taken is that they

10    keep saying he's acting privately, he's acting privately.  So I

11    ask the Court to look at the indictment, not all the language

12    and the conclusions that the government is making now.  I'm,

13    unfortunately, in a very difficult position because the

14    government has provided no discovery, zero, that I can say, oh,

15    look, now I see what they're talking about.  The indictment is

16    actually very clear in terms of someone gave thought to

17    alleging the personal gain aspects of it as it relates to

18    Maduro.

19          If you look at the indictment at Page 10, which has

20    Paragraph 15 from the prior page, it talks about specific

21    dollars, $5 million that was allegedly laundered and paid to

22    Maduro, to him personally, talking about the personal gain.

23    The indictment, as it relates to General Alcala Cordones, has

24    none related to his personal gain, no allegations of elicit

25    payments, no allegations that he laundered funds, no

M3F6CORO

1   allegations that he even gave orders regarding personal gain or

2   money.  They are very specific about Maduro.  Literally nothing

3   with respect to my client.

4          Furthermore, the discovery has nothing either, from

5   what we can say and what we've been toiling through, which is

6   just general references to people get paid to allow drugs into

7   the country.  That just doesn't do it.  And so this claim that

8   he's acting privately is just not borne out in the pleadings,

9   and that's what's important.  And they're also not alleged --

10  and this goes to the point of someone being official and

11  potentially committing crimes.  If you look at *Chiudian*.

12          THE COURT:  Commercial case?

13          MR. DE CASTRO:  Yes.  It talks --

14          THE COURT:  Do you have a criminal case?

15          MR. DE CASTRO:  No.  I'd say this is the first

16  briefing I've done with the government where we're both citing

17  mostly civil cases.

18          But that talks about conduct, and it talks about it

19  being completely, completely outside someone's governmental

20  authority.  And the facts as alleged in this indictment that

21  this is a narco-state sending its generals -- the cartel is

22  ironically named, according to the government, based on the

23  insignia of the actual military, so they are implying and

24  saying explicitly this is a government war against the

25  United States, this is the Venezuela government committing --

M3F6CORO

```
 1    well, what does it say in the indictment?  They allege
 2    coconspirators say we are at war to flood the United States
 3    with narcotics.
 4             Horrible.  But a general acting in furtherance of his
 5    state's foreign policy to have a meeting with an organization
 6    that his government did not deem a terrorist organization is
 7    not a criminal case in the United States.  It could be a
 8    criminal case there; it could be a criminal case perhaps in
 9    Colombia, if there was jurisdiction, but it is not here.
10             THE COURT:  What is it not here?
11             MR. DE CASTRO:  A criminal case does not, should not
12    be pursued here on these facts.
13             THE COURT:  Why not?
14             MR. DE CASTRO:  Because he is acting --
15             THE COURT:  We're being harmed.
16             MR. DE CASTRO:  Excuse me?
17             THE COURT:  Drugs are being brought into this country.
18             MR. DE CASTRO:  They do.  That does not mean any drugs
19    brought in here can be prosecuted by anybody.  The government
20    would have to concede --
21             THE COURT:  We're doing that all the time.  A person
22    outside the country is bringing drugs into the United States;
23    we find that person and we prosecute them.
24             MR. DE CASTRO:  But are they acting in their official
25    capacity?
```

M3F6CORO

1          THE COURT:  The status-base situation you're arguing.

2          MR. DE CASTRO:  And this is the first indictment I've

3     seen where the government is essentially alleging that the

4     state of Venezuela is attacking the United States by engaging

5     in drug dealing, by flooding the United States, not a

6     for-profit, the profit is helpful, but it is their stated

7     foreign policy.

8          THE COURT:  I catch your point.

9          Any more, Mr. Wirshba?

10         MR. WIRSHBA:  Briefly in response to that

11    specifically.

12         The government is not alleging that the state itself

13    and the individuals in their official capacity are committing

14    the acts alleged in the indictment.  But the government is

15    saying is that individuals that, yes, are in the government in

16    Venezuela are part of another organization, a criminal

17    organization, a drug cartel, that is sending cocaine to the

18    United States, and have been for some time.

19         THE COURT:  In violation of the laws of Venezuela and

20    the United States?

21         MR. WIRSHBA:  Yes, your Honor.

22         THE JUDGE:  And freeing seized narcotics in Venezuela?

23         MR. WIRSHBA:  That's exactly right.  And the defendant

24    did that in particular, as noted in the government's brief.

25         THE COURT:  I think I've got both points.

M3F6CORO

1          MR. WIRSHBA:  Understood, your Honor.

2          THE COURT:  The motion to dismiss is denied.

3          Customary international law distinguishes between two

4     types of immunities:  Status-based immunity, afforded the same

5     heads of state, and conduct-based immunity, afforded to foreign

6     officials, past or present, acting on behalf of a foreign

7     government.

8          The defendant makes much in the fact that his acts

9     were taken pursuant to his high ranking military position.  If

10    that's a status-based immunity, you can't free his

11    conduct-based immunity.  Conduct-based immunity focuses on the

12    acts, not the status.  Therefore the question is whether the

13    alleged acts are conceivably attributable to the state.

14         The Second Circuit has ruled that acts that flagrantly

15    violate a foreign state's own laws cannot, at the same time,

16    constitute official acts entitled to deference.

17         Defendant is charged with engaging in conduct

18    violating both the United States and Venezuela law.  For

19    example, the government alleges that the defendant gave

20    security to Marin and helped free FARC, a Colombian official

21    engaged in the drug trafficking, not an official member of

22    FARC.  The organization in Colombia, which long has been in

23    opposition to the government and upbringing it as a

24    revolutionary force.

25         The government alleges that the defendant gave

M3F6CORO

1    security to Marin and helped free FARC cocaine seized by

2    Venezuela officials in violation of Venezuela law.  And he

3    helped to move this cocaine, these narcotics, across Venezuela,

4    and eventually into the United States.  And this circumvents

5    both the laws of Venezuela and the United States.

6           Sovereign immunity does not protect the rogue state or

7    rogue officials.  We're not dealing with ordinary criminal

8    conduct.  We're dealing with criminal conduct at the highest

9    level of government.  Even if Alcala Cordones were acting

10   quasi-officially, the government, our government, could

11   prosecute him criminally for his acts done against the laws of

12   the United States.  And that's what's happening here.

13          A more thorough opinion should be issued in a few

14   days, but the motion to dismiss is denied.

15          We have a motion for a bill of particulars.  Would you

16   like to argue that?

17          MR. DE CASTRO:  Yes, Judge.  Thank you.

18          So, I think our briefing is clear on this as well, but

19   I think --

20          THE COURT:  I may not need any oral argument because I

21   don't think you need particulars.

22          I have been noticed of what's happening.  You want the

23   names of various coconspirators that will be extended

24   discovery, which gives you additional information.  You know

25   what you're being charged with, and there's no need for

M3F6CORO

1   particulars.  There will be more clarity when we get together

2   to finally have a final pretrial conference.

3           MR. DE CASTRO:  Well, Judge, if I could give a little

4   bit of color as to what sort of underscores the request.

5           THE COURT:  Go ahead.

6           MR. DE CASTRO:  I've done many cases in this

7   courthouse with voluminous discovery.  It almost seems like

8   every case has voluminous discovery, even the most garden

9   variety case.

10          But in those cases, in many of those cases, there's

11  something tieing, there's something connected to the defendant

12  in that material, and there are some materials here that we

13  have been going through and going through, but none of it

14  relates to criminal conduct.

15          Yes, you are correct, Judge, that the indictment

16  alleges a very general part of his conduct.  But yet now the

17  government in response to our motions has said, oh, there's all

18  this other conduct.  Now what the government is proposing is

19  that we'll receive the 3500 Jencks Act material 30 days before

20  trial.

21          And what I suggest to the Court is what that means is

22  that 30 days before trial is when we're really going to start

23  being able to investigate.  You're going to be seeing requests

24  from us to have to travel to Colombia or wherever else because

25  this conspiracy alleges that its been in existence since 1999.

M3F6CORO

1    I think if you ask the government, and I'd ask the Court to ask

2    the government, if they were to make a list of unindicted

3    coconspirators in this case, how many names would be on that

4    list.  That I, bet you, would be hundreds.

5             THE COURT:  What does this have to do with the bill of

6    particular?

7             MR. DE CASTRO:  Who is our client alleged to have been

8    participating with and conspiring and engaging with?

9             THE COURT:  That's a factual interrogatory.  It's not

10   a bill of particulars, which is supposed to give clarity to a

11   complaint.

12            MR. DE CASTRO:  Courts in this district and others

13   have ordered particulars and have ordered that the government

14   be required to provide the names of unindicted coconspirators.

15   I tried a case in this courthouse where months and months

16   before, we were given a list by the government and the

17   Department of Justice of all the unindicted coconspirators, and

18   it was enormously helpful.  There was no securities --

19            THE COURT:  It would be helpful, but it's not

20   required.

21            MR. DE CASTRO:  It's not required, but in our view

22   it's required in a case where we have very little particulars.

23   You're talking about 20-plus years that we're supposed to now

24   recreate and figure out.  And what it's creating is a scramble

25   to trial, when we have a trial date, that the government is not

M3F6CORO

1   required to provide any information until 30 days before.

2          In fact, they're not required to until right before

3   trial, and they've at least agreed to do 30 days in their

4   briefing here.

5          And I suggested in our reply brief that I think the

6   government has acknowledged how difficult it is for defense

7   counsel in this case to get our hands around the facts and the

8   sheer volume of material as well as how large the conspiracy is

9   alleged to have been.  As your Honor just stated, it's alleged

10  to be at the highest levels of a rogue state.

11         THE COURT:  The motion is denied for the bill of

12  particulars.

13         And the last part of the motion has to do with when

14  you get 404 Act information, and the government has agreed to

15  give it to you 30 days before trial.  That's what the law

16  requires.  Okay.

17         So the motions are now disposed of.  They're denied.

18         The next issue I want to address is your request to

19  meet in camera with me and present the defense in a way of

20  helping me decide what material I should hold back or put in

21  summary fashion because of government secrets.  That motion is

22  granted.

23         What conditions apply?  You'll come to chambers, we'll

24  have a sealed record, the government will be present, there

25  will be -- we will get what we call the part of the Department

M3F6CORO

of Justice that deals with the courts and confidential

material.  Okay.  They will be there as well.

          MR. DE CASTRO:  I'm sorry, Judge.  I just want to be

clear.  I'm not sure I heard it because our request is that it

be *ex parte*.

          THE COURT:  *Ex parte*.

          MR. DE CASTRO:  I think you mentioned the government

would be there.  My understanding is that they would consent.

I'll let Mr. Wirshba speak for himself.  They would consent to

us having it *ex parte* because obviously the concern that we'd

be disclosing defense strategy.

          THE COURT:  Mr. Wirshba?

          MR. WIRSHBA:  The government would consent to the

defense having an *ex parte* discussion with the Court in order

to allow the Court to evaluate the government's Section 4, and

that be can in chambers.  And as I understand it, the defense

does not contemplate the discussion of any classified material,

none has been disclosed so far, and so this specialized DOJ

employee and a cleared reporter would not be required.

          If the Court wish to speak with the government *ex
parte* about Section 4 in a Section 2 conference, the

government, of course, would be happy to do that in that

circumstance because presumably, we would be discussing

classified material, so the specialized employees would be

required.

M3F6CORO

```
1            THE COURT:  I will take it one step at a time.  I'll
2     grant your request for an *ex parte* presentation, and we'll
3     schedule it.
4            How soon would you want that?
5            MR. DE CASTRO:  I would just work with the Court's
6     schedule.  One member of our team is just out of the country,
7     and I want him to be back.
8            THE COURT:  Just tell me when you want to do that.
9            MR. DE CASTRO:  Can I get back to you on that, Judge,
10    after I talk with the team?
11           THE COURT:  Yes.  Be in touch with my law clerk.
12           MR. DE CASTRO:  Will do.
13           THE COURT:  And we'll schedule a date.
14           MR. DE CASTRO:  Thank you.
15           THE COURT:  But an hour?
16           MR. DE CASTRO:  That should work.
17           THE COURT:  Do you need an hour?
18           MR. DE CASTRO:  May not need that long.
19           THE COURT:  We'll schedule an hour.
20           DEPUTY CLERK:  I thought we scheduled it for the 29th.
21           THE COURT:  Did we?
22           MR. DE CASTRO:  I think that's the government's.
23           MR. WIRSHBA:  29?
24           MR. DE CASTRO:  I don't know.
25           DEPUTY CLERK:  Oh, we didn't tell you about it.  We
```

M3F6CORO

1    didn't tell them about it, but Em and I had scheduled it.

2              THE COURT:  Do you want to schedule it March 29?  Is

3    that doable?

4              DEPUTY CLERK:  2:30.

5              MR. DE CASTRO:  I have a status conference.

6              DEPUTY CLERK:  Never mind.

7              MR. DE CASTRO:  Before Judge Oetken.

8              THE COURT:  Let's go off the record.

9              (Discussion off the record)

10             THE COURT:  Back on the record.

11             The *ex parte* conversation will take place March 29 at

12   2:30.

13             Should I have a reporter?

14             MR. WIRSHBA:  The government's position is a court

15   reporter should be present.

16             THE COURT:  I'm asking Mr. de Castro.

17             MR. WIRSHBA:  I apologize.

18             MR. DE CASTRO:  Yes, Judge.  That's fine.

19             THE COURT:  We should have a reporter.  I agree.  I

20   would require it.

21             MR. DE CASTRO:  Yes.

22             THE COURT:  Okay.  And the record will be sealed.

23             Is there anything else?

24             MR. DE CASTRO:  The only thing else that the defense

25   has is as the Court is aware, and I know the Court has

M3F6CORO

1    commented on it in the past, General Alcala Cordones has been

2    detained for I think close to two years now, and you know, he

3    very much wants his day in court, and was wondering if the

4    Court can give us some idea -- I know there are a lot of moving

5    parts, but when we're thinking a trial in this case might be

6    scheduled.

7            THE COURT:  I generally do not schedule trials until

8    discovery is over, and we've got a number of things to do in

9    time.

10           I think when I dispose of the government's motion for

11   dealing with the classified materials, I'll have a better idea

12   of when the trial will occur.

13           There's a limited number of courtrooms for trials.  I

14   think this case probably has a high priority, so when we're

15   ready, I think we'll get a date.

16           Anything else?

17           MR. DE CASTRO:  No, your Honor.  Thank you.

18           THE COURT:  Mr. Wirshba?

19           MR. WIRSHBA:  No, your Honor.  The government would

20   seek to exclude time, which I don't believe is currently

21   excluded in this case until the next status conference.

22   Perhaps we can set a control date or a status conference for

23   which the parties can come together before the Court.

24           THE COURT:  We have March 29, and there will be

25   another date after that.  Why don't we exclude time until

M3F6CORO

| 1 | April 30? |

2             Is there an objection?

3             MR. DE CASTRO:  That's fine, your Honor.

4             THE COURT:  So ordered.

5             Anything else?

6             MR. WIRSHBA:  Nothing from the government, your Honor.

7             MR. DE CASTRO:  Nothing from the defense.

8             THE COURT:  Thank you all.

9             I'd like another date scheduled.  I don't know how to

10    do that.

11            MR. WIRSHBA:  We can schedule a status conference

12    whenever is convenient for the Court.

13            DEPUTY CLERK:  Hold on.  April 28 at 10:30.

14            MR. WIRSHBA:  Fine for the government, your Honor.

15            MR. DE CASTRO:  That's fine, your Honor.

16            THE COURT:  Motion to exclude time to April 28.

17            MR. WIRSHBA:  That's fine.  Thank you, your Honor.

18            THE COURT:  Oh, it will be May 3, 2:30.  I'm sorry for

19    not giving you enough decisivenesses.

20            The motion to exclude time will be until May 3.

21    That's granted.

22            All right.  Thank you.

23            (Adjourned)

24

25