UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>V.<br><br>HUGO ARMANDO CARVAJAL BARRIOS,<br><br>DEFENDANT. | 11 Cr. 205 (AKH) |

**REPLY MEMORANDUM OF LAW IN FURTHER
SUPPORT OF DEFENDANT'S MOTION TO COMPEL**

ZMO Law PLLC
353 Lexington Avenue, Suite 900
New York, NY 10016
(212) 685-0999
zach@zmolaw.com

*ATTORNEYS FOR DEFENDANT HUGO ARMANDO CARVAJAL BARRIOS*

# TABLE OF CONTENTS

RESPONSE TO GOVERNMENT'S FACTUAL ASSERTIONS ..................................... 3

ARGUMENT ............................................................................................................... 4

    I.   THE GOVERNMENT'S ANALYSIS MISSTATES THE CONTROLLING CASE LAW, WHICH PROTECTS DEFENDANTS' RIGHTS TO EXCULPATORY EVIDENCE. ............................................................................................. 6

        A.   The Second Circuit has never adopted the restrictive definition of "prosecution team" advocated by the government and applied by some district courts. ............................................................................................ 6

        B.   Cases cited by the government do not permit the prosecutors here to ignore exculpatory evidence that the defense has identified. ................. 8

   II.   THE GOVERNMENT HAS VIOLATED ITS DISCOVERY AND *BRADY* OBLIGATIONS THROUGH DELAY. ............................................................. 10

  III.   THE DEFENSE HAS MADE A SUFFICIENT SHOWING OF MATERIALITY TO WARRANT REVIEWS OF FILES RELATING TO THE CHARGED CONSPIRACY. ...................................................................................... 12

CONCLUSION ........................................................................................................ 14

In September 2020, the Hon. Allison Nathan rebuked the United States Attorney's Office for the Southern District of New York ("USAO-SDNY") for failing to disclose exculpatory material, strategizing about how best to "bury" an exculpatory document when the failure was discovered mid-trial, and, when caught, making a misrepresentation to the Court. *See U.S. v. Ali Sadr Hashemi Nejad*, 487 F.Supp.3d 206 (S.D.N.Y. 2020). According to Judge Nathan, repeated discovery violations in that case were caused by systemic factors, including the sheer number of prosecutors who appeared, failures to coordinate among law enforcement, and insufficient training and supervision regarding government disclosure obligations. *Id*. at 213-14. The scandal was so serious that Judge Nathan, later elevated to the Second Circuit Court of Appeals, ordered the Acting U.S. Attorney to "ensure that all current AUSAs and SAUSAs read this Opinion." *Id*. at 226. Shortly after the opinion in *Nejad* was published, the Due Process Protection Act became law and prosecutors since have routinely been "reminded" of their *Brady* obligations. *See* Fed. R. Crim. P. 5(f). In this case, the Court ordered the government, without any objection, to turn over any favorable information in the possession of "all current or former federal, state, and local prosecutors, law-enforcement officers, and other officials who have participated in the investigation that led to, or prosecution of, *the offense or offenses* with which the defendant is charged," and admonished that, "the Government has an

1

affirmative *obligation* to seek from such sources all information subject to disclosure under this Order." ECF No. 40: October 20, 2020 Order at 2 (emphasis added).[1]

The Government's Memorandum of Law in Opposition to Defendant's Motion to Compel filed in this case, ECF No. 160 (hereinafter "Opp."), suggests that the cultural change envisioned by Judge Nathan's analysis in *Nejad*, Rule 5(f) and the Court's October 2020 Order has not occurred.

Rather than take steps to gather clearly discoverable and likely exculpatory evidence regarding the sprawling two-decade conspiracy alleged in this case and at least four other cases in three separate districts, the government has expended its resources on a thoroughgoing misreading of applicable law to make excuses not to comply with its obligation to ensure a fair trial for the defendant. Despite its assent to the Court's *Brady* order and months of discussions with the defense, the government now claims that the current prosecution team has "no obligation" to coordinate with other offices, including the Drug Enforcement Administration ("DEA") that brought them the case and another federal prosecutor's office prosecuting *the same defendant for the same crime*. Opp. at 7. The government's approach evinces a misunderstanding of Rule 16 of the Federal Rules of Criminal Procedure and the due process principles articulated in *Brady v. Maryland*, 373 U.S. 83 (1963) and *Kyles v. Whitley*, 514, U.S. 419, 437 (1995) ("individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the

---

[1] The government also asserts a Rule 5(f) order was issued at Gen. Carvajal's presentment on July 20, 2023. While an oral order may have issued, no such order is reflected on the docket.

government's behalf in the case, including the police"). Accordingly, the government should be ordered specifically to make a thorough search of all DEA, Southern District of Florida, and Eastern District of New York files going back to the beginning of the investigation and immediately turn over to the defense all material related to the "offenses with which the defendant is charged[.]" ECF No. 40.[2]

### RESPONSE TO GOVERNMENT'S FACTUAL ASSERTIONS

The government failed to submit any affidavit or sworn facts regarding its efforts to comply with its discovery obligations. Opp. at 6-11.

Although this case was first indicted on March 11, 2011, the government relies on an unsworn proffer in its opposition brief, which appears to have been drafted by an assistant U.S. attorney who entered his notice of appearance four months ago, in October 2023, ECF No. 127, a few weeks after we began requesting the discovery sought here informally and three days before we submitted our formal discovery demand, ECF No. 156-12: October 19, 2023 Letter. While there are three prosecutors' names listed on the brief, Opp. at 27, there is no indication that the author spoke to any of the seven *other*

---

[2] In its Preliminary Statement, the government misstated the defense's position with respect to the scope of the government's disclosure obligations, claiming, incorrectly, that we agreed that they are "limited to materials within the possession of the prosecution team." Opp. at 1. That is *not* our position; our position is that the Constitution requires the government to turn over *all* materially exculpatory evidence. There is an open legal question as to whether the Second Circuit's "jurisprudence circumscribing the 'prosecution team' [is] adequate to protect Defendants' rights" under the Due Process Clauses. ECF No. 157: Memorandum of Law in Support of Defendant's Motion to Compel (hereinafter "Mot.") at 14, *quoting U.S. v. Hunter*, 32 F.4th 22, 38 (2d Cir. 2022).

3

AUSAs who have entered appearances since 2011. The brief only has an "s-slash" signature and does not indicate which AUSA is responsible for its content.

The Opposition describes "a search of DEA investigative files across the entire agency for records that contained references to or variations of the defendant's name." Opp. at 7. It goes on to deny, in conclusory fashion, that it "undertook any joint investigative activities with prosecutors from" the other offices prosecuting Gen. Carvajal and his alleged co-conspirators. *Id*. It specifies that "USAO-SDNY did not participate in joint witness interviews with those USAOs," but goes on to say that SDNY did "sit in" on proffer meetings. *Id*. f.n. 7. It denies that the SDNY made "strategic decisions" with the other offices but admits that it shared documents and engaged in "deconfliction discussions" regarding the other prosecutions of Gen. Carvajal. *Id*. at 7-8, f.n. 5. The statement of facts does not specify the source of any of this information.

Finally, in the Argument section of its brief, the government contends it has no obligation to "collect and review for *Giglio* and Jencks Act disclosures relevant materials for any cooperating witnesses that it anticipates calling at the defendant's trial known to have been prosecuted by other USAOs" but that it will do so voluntarily. In other words, the government refuses to ask the Eastern District of New York and the Southern District of Florida for material relevant to Gen. Carvajal's *substantive* guilt or innocence but is willing to ask for impeachment evidence relating to its testifying witnesses.

## **ARGUMENT**

The government's unsworn facts tend to confirm our contentions that:

- the prosecution team in this case includes the Southern District of Florida, the Eastern District of New York, and the DEA, and

- the individual prosecutors who signed the Opposition Memo have access to additional evidence regarding "the offense or offenses with which the defendant is charged," which must be searched and—if exculpatory or material to the preparation of the defense—must be disclosed.

Throughout its legal analysis, the government intersperses controlling Second Circuit cases requiring broad interpretation of the *Brady* obligation with district court decisions denying disclosures on the basis that another agency was in possession of the material sought. The district court cases do not control the outcome here and, even if they did, they would not provide much support to the government's position because none of them permits the government to withhold exculpatory evidence in a complex case coordinated among three U.S. attorneys' offices and within the DEA where the defendant faces indictments for identical crimes in two separate districts and the government has publicly presented evidence regarding a half-dozen alleged co-conspirators publicly prosecuted in the three districts for the offenses alleged in the indictment.

As a factual matter, the defense has shown that the prosecution team worked with prosecutors in the Southern District of Florida and the Eastern District of New York and with agents throughout the DEA, all of which are components of the Department of Justice ("DOJ") and under the direction of the Attorney General of the United States.[3] But as to

---

[3] The Treasury Department, the Department of Homeland Security, and the Department of State were also, apparently, involved in the investigation according to publicly available sources. We are not aware of specific exculpatory material in their possession but, to the extent the government is aware of such information we respectfully submit that it has a constitutional obligation to provide it to the defense.

the inner workings of DOJ, the defense has access only to what the government chooses to make public: in order to adduce additional information about the vast mutli-office prosecution team prosecuting Gen. Carvajal for the past thirteen years, an evidentiary hearing would be required.

I. **The government's analysis misstates the controlling case law, which protects defendants' rights to exculpatory evidence.**

   A. **The Second Circuit has never adopted the restrictive definition of "prosecution team" advocated by the government and applied by some district courts.**

Both parties cite to the most recent controlling case in the Second Circuit, *U.S. v. Hunter*, 32 F.4th 22 (2022), which examined the reach of the "prosecution team" jurisprudence. *See* Opp. at 12, 15, 22, *but see id.* at 22, f.n. 10. The other published Second Circuit cases cited by the government relating to disclosure*, Avellino, Locascio, Hutcher,* and *Quinn* (*see* Opp. at 10-15) all stand for the uncontroversial proposition that:

> knowledge on the part of persons employed by a different office of the government *does not in all instances* warrant the imputation of knowledge to the prosecutor, for the imposition of an *unlimited* duty on a prosecutor to inquire of other offices not working with the prosecutor's office on the case in question would inappropriately require us to adopt a monolithic view of government that would condemn the prosecution of criminal cases to a state of paralysis.

*U.S. v. Avellino*, 136 F.3d 249, 255 (2d Cir. 1998) (emphasis added); *accord U.S. v. Hunter*, 32 F.4th at 34.

But as we noted in our opening brief, despite the government's cherry-picked reading, the Second Circuit has never articulated a test to decide when knowledge of *Brady* material should be imputed from one agency to another. *See* Mot. at 13. *See also Hunter*,

32 F.4th at f.n. 70, *citing U.S. v. Zagari,* 111 F.3d 307, 320 n. 13 (2d Cir. 1997) ("The extent to which knowledge may be imputed from one federal investigative agency to another for *Brady* purposes is as yet unclear."); *U.S. v. Morgan*, 302 F.R.D. 300, 304 (S.D.N.Y. 2014) ("There is no clear test to determine whether or not an individual or agency is a member of the prosecution team."); *U.S. v. Meregildo*, 920 F. Supp. 2d 434, 441 (S.D.N.Y. 2013) (same); *U.S. v. Bin Laden*, 397 F. Supp. 2d 465, 484 (S.D.N.Y. 2005) (noting the Second Circuit is "lacking a clearly articulated imputation test"); *Chandras v. McGinnis*, No. 01 Civ. 2519 (LBS), 2002 WL 31946711 at *7 (E.D.N.Y. Nov. 13, 2002) ("[T]he exact point at which government agents can fairly be categorized as acting on behalf of the prosecution … is uncertain."). The Circuit has never adopted the five-factor analysis urged by the government. *See* Opp. at 13 (citing district court cases).

Rather, the Court in *Hunter* made clear that while no whole-of-government search is necessary, government offices that maintain relevant materials are part of the "prosecution team" for the government to comply with its *Brady* obligations. *U.S. v. Hunter*, 32 F.4th at 35-38. Indeed, in *Hunter,* the Court stated that a government entity trying to keep information from the U.S. attorney's office via a proposed protective order in fact had an obligation to turn over material evidence: "We strongly question whether—had the withheld information been material—our jurisprudence circumscribing the 'prosecution team' would have been adequate to protect Defendants' rights in the circumstances presented here." *Id*. at 38.

### B. Cases cited by the government do not permit the prosecutors here to ignore exculpatory evidence that the defense has identified.

The thrust of the cases relied on by the government is that the government should not be penalized for failing to engage in unwieldy, limitless searches for records across the entire government. *See e.g. U.S. v. Hunter*, 32 F.4th at 37 (seeking to avoid an "unworkable encumbrance on the system of justice"). But none of the circuit cases cited by the government addresses prosecutors' pre-trial failure to check specific law enforcement files identified by the defense for exculpatory evidence. *See U.S. v. Hunter*, 32 F.4th at 25-26 (material disclosed after trial by order of appeals court); *U.S. v. Avellino*, 136 F.3d 249 (2d Cir. 1998) (purportedly exculpatory evidence arose after entry of plea—but if evidence had been material, remand would have been required to determine "the question of the AUSAs' knowledge, actual or constructive"); *U.S. v. Locascio*, 6 F.3d 924, 948-950 (2d Cir. 1993) (prosecutors immediately turned over impeachment evidence they discovered after sentencing); *U.S. v. Hutcher*, 622 F.2d 1083, 1088 (1980) (false affidavits signed by a trial witness were found in a bankruptcy court file but unknown to prosecutor at the time of trial); *U.S. v. Quinn*, 445 F.2d 940, 943-44 (1971) (no suppression of exculpatory evidence where a Florida indictment of a government witness was returned under seal during the defendant's New York trial, but unknown to the prosecutor and not unsealed until after trial; no mention of a request for records from Florida prosecutor's office). Indeed, only *Hunter* and *Quinn* even consider law enforcement files as opposed to files in the hands of other agencies. And in *Hunter*, the appeals court ordered the material to be turned over;

in *Quinn,* it was clear that the trial prosecutor was unaware his witness was being indicted in the middle of the trial.

While most of the government's district court cases deny disclosure, none of them permits a prosecution team to willfully blind itself to potentially exculpatory material in the hands of another law enforcement office. This case does not raise the concerns articulated in *Hunter* and the other published appellate opinions: there is no risk that an "unworkable encumbrance on the system of justice" might be created because the defense has made a targeted request for searches of information related to six specific people and materials located in three specific offices all under the control of the DOJ and accessible to the prosecutors, *viz.* the U.S. attorneys' offices for the Eastern District of New York and the Southern District of Florida, and the DEA. The names involved reflect a narrowing of our request based on public statements revealing the names of people accused of the offenses charged in the S-1 Indictment. The defense is not, despite the government's arguments otherwise, taking a "whole-of-government approach." ECF No. 160 at 10. Rather, we take a whole-of-conspiracy approach: we ask that any government agent or attorney who investigated *the charged offenses—i.e.* agents and prosecutors who will undoubtedly make available evidence *against* Gen. Carvajal—also be required to check for and produce exculpatory materials. The government's proposal that only *Giglio* material from other offices needs to be produced, Opp. at 25-26, is not sufficient. If those offices hold evidence showing that Gen. Carvajal did not commit the crimes he is accused of, they must turn it over.

The government's proposal would leave beyond the reach of the defense even indisputably exculpatory material in the hands of three specific offices of the government who have investigated aspects of the charged conspiracy. That would undermine the truth-seeking function of the trial and violate Gen. Carvajal's right to due process in an American court.

II.  **The government has violated its discovery and *Brady* obligations through delay.**

Gen. Carvajal has waited in jail since last October for the government to respond to his *Brady* and Rule 16 request and continues to await the government's views on disclosure of classified information. But it now appears from the uncompromising tone and content of the government's brief that the government was never going to provide the information sought about the additional defendants accused of the same crime Gen. Carvajal is accused of. *See, e.g.,* Opp. at 18 (defendant advocates for "absurd results"), 24 (defense request for material relating to complex charges spanning twenty years is a "fishing expedition based on a nonsensical *Brady* theory"). In other words, the government used the instant dispute to engender an otherwise unnecessary three-month delay in the trial.

Moreover, the government grossly overstates the difficulty of complying with its obligations under a broader definition of "prosecution team" than it would like. Searching five additional names in the DEA's holdings and obtaining five electronic files from two U.S. attorneys' offices in a case as consequential as this one would hardly lead to a "state of paralysis" as the government claims. Opp. at 16.

The government calls on *the defense* to offer further evidence that the prosecutors here worked with other offices in the DEA and with the Eastern District of New York and Southern District of Florida in prosecuting Gen. Carvajal, Opp. at 16, yet fails to deny that it did so in a sworn declaration—or in *any* declaration by a person with institutional knowledge of this thirteen-year old prosecution.[4]

In addition, we did offer ample evidence of joint law enforcement conduct in our opening brief by pointing to press releases and public testimony and documents. The press release extolled the "collaborative nature" of the prosecution and quoted the then-U.S. attorneys of the Southern District of Florida and the Southern District of New York. *See* ECF No. 156-15. It went on to explain that "DEA's Special Operations Division Bilateral Investigations Unit, New York Strike Force, and Miami Field Division conducted the investigation." *Id*. And the government's unsworn memorandum of law admits, obliquely, that the prosecution team here shared resources with other offices, Opp. at 7, f.n. 4, and engaged with other offices and DOJ in a "deconfliction" process, Opp. at 7-8, f.n. 5. The shared resources were publicly known, of course, because the USAO-SDNY in November presented detailed (albeit incredible) evidence about the participation of Pedro Luis Martín Olivares at the trial of Carlos Orense. *See* Mot. at 8; ECF No. 156-8 (testimony

---

[4] The government's proposals would seem to invite defense trial subpoenas directly to the other government offices in play. But such subpoenas would, of course, be routed to the prosecutors here, *see* United States Attorney's Manual, Justice Manual, 1-6.310, and an inefficient way to adjudicate whether to compel compliance. If the Court is inclined to sign such subpoenas in lieu of ordering the prosecutors in this case to comply with their discovery obligations, the defense will of course prepare them.

regarding Martín). It is unimaginable that the USAO-SDNY would have presented this testimony publicly without coordinating with the office that had indicted Martín and is offering a $10 million reward for his capture. *See* https://www.justice.gov/usao-sdfl/pr/rewards-offered-capture-three-former-venezuelan-officials-charged-miami-federal-court.

If this is not sufficient evidence of joint investigations to justify the discovery requests here, we respectfully submit that an evidentiary hearing with testimony from the assistant U.S. attorneys who entered appearances in this case and any case agents they identify would clarify the scope of the joint investigations and the participation of other offices and DEA components in their witness interviews, grand jury presentations, document reviews, and strategy.

### III. The defense has made a sufficient showing of materiality to warrant reviews of files relating to the charged conspiracy.

Finally, the government argues that Gen. Carvajal's *Brady* requests are "speculative" because we do not know exactly what material other government offices relied on to accuse other people of the same crimes charged in the S-1 Indictment. Opp. at 23-25.

Notably, the government does not suggest that Kotosky, Martin, Blengio, Makled, Villasana or Tello were not members of the charged conspiracy.

Rather the government argues, without citation, that "the mere presence of co-conspirators in a narcotics-importation and narco-terrorism conspiracy is not, standing alone, exculpatory." Opp. at 24. But it *is* enough to raise the question and warrant a review of the existing law enforcement files of all known co-conspirators. Presumably, the

government interviewed dozens of witnesses before bringing these six cases and those witnesses described the workings of the alleged conspiracy. If any of them debunked in any way the rumor that Gen. Carvajal was being paid or otherwise participated in the conspiracy, that must be turned over "regardless of whether the government credits it." ECF No. 40: Rule 5(f) Order at 2. Accordingly, the government has already violated its *Brady* obligations by withholding Blengio's statements on the grounds that they are not credible or inadmissible. Opp. at 25; *see also* ECF Nos. 108 (letter motion describing exculpatory statements by Fernando Blengio), 109 at 4 (government response claiming Blengio's claims to the defense were inadmissible and incredible, but failing to reveal what Blengio said to the government).

Similarly, if the government's investigation into Martín, for example, revealed evidence—whether credited by the government or not—contradicting the claims that Gen. Carvajal was present at meetings with Martín and Orense, that would have to be turned over. The list goes on. The defense is not looking for information that further implicates Gen. Carvajal in drug importation. We ask for this review because we do not believe inculpatory information will be found in the files we are asking the government to review—the government, in its reluctance to collaborate with the other offices investigating the conspiracy, appears to agree. All we seek is assurance that the government turns over all exculpatory evidence, such as Blengio's statements we have already identified, present in its files. This should not be too much to ask and, in fact, is constitutionally required because it will ensure that the trial's result is accurate. "Because

we are dealing with an inevitably imprecise standard, and because the significance of an item of evidence can seldom be predicted accurately until the entire record is complete, the prudent prosecutor will resolve doubtful questions in favor of disclosure." *U.S. v. Agurs*, 427 U.S. 97, 108 (1976); *see also U.S. v. Nejad,* 487 F.Supp.3d at 212-213 (discussing "trial blinders preventing disclosure of disputably exculpatory material that the government admitted "should have been disclosed ahead of trial as a matter of good practice").

## CONCLUSION

Because it is discoverable under Rule 16 and *Brady*, information related to the participation of Martin, Blengio, Kotosky, Villasana, Makled, and Tello in the conspiracy alleged in the Indictment should be ordered disclosed forthwith.

Dated:    February 16, 2024
         New York, New York

Respectfully submitted,
ZMO Law PLLC

By: *Zachary Margulis-Ohnuma*

Zachary Margulis-Ohnuma
353 Lexington Avenue, Suite 900
New York, NY 10016
(212) 685-0999

14