# EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

- v. -

NICOLAS MADURO MOROS, and
CILIA FLORES DE MADURO,

Defendants.

S4 11 Cr. 205 (AKH)

**DECLARATION OF SARA THANNHAUSER**

I, Sara Thannhauser, declare as follows:

1.      I am currently employed as the Associate Director for Sanctions, Policy, and

Implementation at the U.S. Department of Treasury's (Treasury) Office of Foreign Assets

Control (OFAC), overseeing OFAC's Licensing, Policy, and Regulatory Affairs Divisions.  I

assumed the Associate Director role in July 2024.  I joined OFAC in 2015, serving in various

capacities, including as a Senior Sanctions Policy Advisor and the Assistant Director for OFAC's

Policy Division, where I played a role in leading the implementation of many sanctions programs

including Afghanistan, Burma, Counterterrorism, Global Magnitsky, Iran, Russia/Ukraine, and

Venezuela.

2.      I am familiar with the mission and operations of OFAC, and the facts attested to in this

declaration are based upon information within my personal knowledge or information made

available to me in the course of my official duties.

3.      I have been made aware of the motion filed in this action by Nicolás Maduro Moros

(Maduro) and joined by Cilia Adela Flores de Maduro (Flores).  This declaration is made in

connection with the Government's Memorandum of Law in Opposition to Defendants' Motion to Dismiss.

OFAC's Mission and Authority

4. OFAC is responsible for administering U.S. economic sanctions programs. These programs are primarily directed against foreign states and nationals to implement U.S. foreign policy and national security goals. Pursuant to authority delegated by the President to the Secretary of the Treasury, OFAC acts under Presidential wartime and peacetime national emergency powers. In performing its function, OFAC relies primarily on its broad delegated powers under the International Emergency Economic Powers Act (IEEPA), 50 U.S.C. §§ 1701–1706. As Associate Director for Sanctions, Policy, and Implementation, I am responsible for the implementation and administration of such economic sanctions programs, including those under the national emergency declared under Executive Order (E.O.) 13692, "Blocking Property and Suspending Entry of Certain Persons Contributing to the Situation in Venezuela." OFAC currently administers over 35 economic sanctions programs against foreign governments, entities, and individuals whose activities conflict with U.S. national security and foreign policy interests.

Blockings under IEEPA

5. IEEPA grants the President a broad spectrum of powers to deal "with any unusual and extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States, if the President declares a national emergency with respect to such threat." 50 U.S.C. § 1701(a). The President typically

2

exercises these IEEPA powers through Executive orders that declare a national emergency and impose economic sanctions to address the emergency.

6. In addition to identifying a particular threat in an Executive order, the President may also identify for sanctions specific individuals, entities, or governments that pose or contribute to the threat in the Executive order and set forth criteria pursuant to which additional sanctions designations may be imposed. Those who the Secretary of the Treasury or his designee determines meet one or more of these criteria are "designated" and thus made subject to the Executive order's restrictions. Typically, such a designation results in the blocking of any property and interests in property of the designated person that is in the United States or in the possession or control of a U.S. person.

7. A Presidential Executive order that blocks property constitutes the legal framework of an economic sanctions program. In practice, such orders require U.S. person holders of blocked property to freeze that property, including bank accounts, in their possession or control at the time of the order, as well as property that later comes into the U.S. person holders' possession. The property and property interests blocked by OFAC pursuant to an Executive order may not be transferred, withdrawn, exported, paid, or otherwise dealt in by U.S. persons without OFAC's prior authorization.

8. The prohibition against dealing in property of a sanctioned individual, entity, or government serves important objectives. Broadly, the blocking makes it difficult for the target of sanctions to conduct business involving the United States or make use of the U.S. financial system. A blocking prevents the designated person from receiving the economic benefits of transactions with U.S. persons or in the U.S. market, unless exempt or otherwise authorized, and

limits the flow of hard currency, goods, and other property to or for the benefit of that sanctions target, preventing the target from using its connections with the United States to further ends that conflict with U.S. interests. The prohibition also allows OFAC to guard against dissipation of assets in dealings involving U.S. persons, thereby preserving the President's ability to use assets as a negotiating tool encouraging a change of behavior by the designated person and in resolving the national emergency that gave rise to the blocking.

Venezuela Sanctions Program

9. On March 8, 2015, President Barack Obama issued E.O. 13692, which declared a national emergency finding that the situation in Venezuela, including the Government of Venezuela's erosion of human rights guarantees, persecution of political opponents, curtailment of press freedoms, use of violence and human rights violations and abuses in response to antigovernment protests, and arbitrary arrest and detention of antigovernment protestors, as well as the exacerbating presence of significant public corruption, constituted an unusual and extraordinary threat to the national security and foreign policy of the United States. E.O. 13692 authorized sanctions against current or former officials of the Government of Venezuela, others undermining democracy in Venezuela, and others complicit in public corruption by senior officials within the Government of Venezuela. Since 2015, the United States has imposed an array of sanctions against Venezuela, including in response to Maduro's significant public corruption, plundering of Venezuelan assets, and exploitation of government institutions.

10. On July 31, 2017, OFAC sanctioned Maduro pursuant to E.O. 13692. The sanctions were imposed after the Maduro government held elections for a National Constituent Assembly that aspired illegitimately to usurp the constitutional role of the democratically elected National

Assembly and impose an authoritarian regime on the people of Venezuela, representing a rupture in Venezuela's constitutional and democratic order and following years of Maduro's efforts to undermine Venezuela's democracy and the rule of law.[1] The sanctions notice added that the Maduro regime committed widespread human rights abuses and engaged in systemic corruption, including rampant corruption around currency and the exchange rate regime. On September 25, 2018, OFAC designated Venezuela's First Lady and former Attorney General and President of the National Assembly Flores, also pursuant to E.O. 13692 as part of an effort targeting the inner circle on whom Maduro relied to maintain his grip on power and public corruption in Venezuela.[2]

11.     As a result of these actions, all property and interests in property of Maduro and Flores that are in the United States, that come within the United States, or that are or come within the possession or control of any United States person are blocked, and such property and interests in property may not be transferred, paid, exported, withdrawn, or otherwise dealt in.

12.     On August 5, 2019, President Donald J. Trump issued E.O. 13884, which took additional steps with respect to the national emergency declared in E.O. 13692, in light of the continued usurpation of power by Maduro and persons affiliated with him, as well as human rights abuses, including arbitrary or unlawful arrest and detention of Venezuelan citizens, interference with freedom of expression, including for members of the media, and attempts to undermine Interim President Juan Guaido and the Venezuelan National Assembly's exercise of legitimate authority in Venezuela.

---

[1] https://home.treasury.gov/news/press-releases/sm0137
[2] https://home.treasury.gov/news/press-releases/sm495

13.     Among other actions, E.O. 13884 blocked all property and interests in property of the Government of Venezuela,[3] including the Central Bank of Venezuela, that are in the United States, that come within the United States, or that are or come within the possession or control of any United States person. In other words, as of August 5, 2019, no Government of Venezuela property and interests in property may be transferred, paid, exported, withdrawn, or otherwise dealt in by any U.S. person.

14.     E.O. 13692, E.O. 13884, and other Venezuela-related sanctions Executive orders are implemented at 31 CFR part 591 (the "Venezuela Sanctions Regulations"), which provides the regulations related to the Venezuela Sanctions Program, including relevant prohibitions and authorizations.

OFAC Legal Services General Licenses

15.     As necessary and appropriate, OFAC issues general licenses in its sanctions programs to authorize certain transactions that would otherwise be prohibited, when doing so would further U.S. policy. General licenses are self-executing, meaning they allow persons to engage in certain transactions involving the United States or U.S. persons without needing to apply for a specific license, provided the transactions meet certain terms and conditions as described in the general license. General licenses are made publicly available by OFAC in the Federal Register, in the Code of Federal Regulations, and/or on OFAC's website. Across OFAC sanctions programs, including the Venezuela Sanctions Program, OFAC maintains general licenses for the

---

[3] Pursuant to Section 6(d) of E.O. 13884, the term 'Government of Venezuela' includes the state and Government of Venezuela, any political subdivision, agency, or instrumentality thereof, including the Central Bank of Venezuela and Petroleos de Venezuela, S.A. (PdVSA), any person owned or controlled, directly or indirectly, by the foregoing, and any person who has acted or purported to act directly or indirectly for or on behalf of, any of the foregoing, including as a member of the Maduro regime. The definition of Government of Venezuela in E.O. 13884 does not imply recognition of the Maduro regime.

provision of legal services as well as the receipt of payment for those services, subject to certain terms and conditions (the "legal services general licenses").

16.     The legal services general licenses provide the framework for OFAC's policy towards the authorization of payments for the provision of legal services to or on behalf of blocked persons. Specifically, the Venezuela Sanctions Regulations authorize the provision of certain legal services to or on behalf of persons whose property and interests in property are blocked pursuant to the Venezuela Sanctions Regulations, including the representation of persons named as defendants in or otherwise made parties to legal, arbitration, or administrative proceedings before any U.S. federal, state, or local court or agency.  31 CFR § 591.506.  The general license at 31 CFR § 591.507 authorizes payments for legal services that are authorized pursuant to 31 CFR § 591.506.  Specifically, 31 CFR § 591.507 authorizes the receipt of payment of professional fees and reimbursement of incurred expenses for the provision of such legal services from funds originating outside the United States, provided that the funds do not originate from (i) a source within the United States; (ii) any source, wherever located, within the possession or control of a U.S. person; or (iii) any individual or entity, other than the person on whose behalf the legal services are to be provided, whose property and interests in property are blocked pursuant to the Venezuela Sanctions Regulations or any other sanctions authority.

17.     As noted above, the legal services general licenses provide the contours of OFAC's legal services licensing policy.  This includes only authorizing the use of a blocked person's funds if those funds are not blocked, i.e., those funds are outside the United States and not in possession or control of a U.S. person (so-called "fresh funds"), as well as only allowing the blocked person who is seeking legal services to pay for such services.  This legal services licensing policy

7

reflects two central goals of OFAC's sanctions programs: first, preserving blocked funds, and, second, limiting the ability of blocked persons to take advantage of the U.S. financial system. OFAC may have concerns, for example, that a blocked person's funds (blocked or fresh) have been generated through the activity for which they were designated. Authorizing the flow of such funds through the U.S. financial system would therefore be counter to U.S. foreign policy and national security objectives. As such, OFAC only authorizes the use of fresh funds in certain limited circumstances, including for the purpose of a blocked person's own legal representation.

18. Another key facet of OFAC's sanctions program is limiting both U.S. persons and non-U.S. persons from conferring further benefit to a blocked person. In many IEEPA-based Executive orders, OFAC maintains a "material support" designation authority that authorizes the imposition of sanctions on a person for having materially assisted, sponsored, or provided financial, material, or technological support for, or goods or services to or in support of another blocked person. Given this national security priority, OFAC does not generally authorize the use of another blocked person's funds for the benefit of another blocked person.

OFAC Specific Licensing Authority

19. OFAC can mitigate the effects of a designation by providing authorization for certain transactions that would otherwise be prohibited by issuing a specific license. A specific license may be issued when a person requests authorization to conduct an otherwise prohibited transaction or service not already covered by a general license. *See* 31 C.F.R. § 501.801(b). Regulations administered by OFAC do not compel the issuance of specific licenses once certain criteria are met. Rather, OFAC's blocking authority under IEEPA and implementing Executive orders grant the agency the discretion to issue or withhold specific licenses based on national

security and foreign policy considerations. OFAC issues specific licenses in a manner consistent with the national security and foreign policy objectives of the United States.

<u>OFAC Specific Licensing of Attorney's Fees</u>

20. The legal services general licenses provide the contours of OFAC's legal services licensing policy. OFAC considers specific license requests relating to attorney's fees that fall outside the scope of these general licenses on a case-by-case basis, taking into account the facts of the application as well as the U.S. foreign policy and national security goals and objectives of the relevant sanctions program.

21. OFAC does on occasion issue specific licenses that authorize the payment of certain attorney's fees. The purpose of such specific licenses is often to address specific factual scenarios that mean the applicant is unable to take advantage of the full scope of the legal services general licenses. For example, as relevant here, the blocked person may be present in the United States and unable to rely on the legal services general license. *See* 31 CFR § 591.507(a)(1) (prohibiting payment from "[a]ny source, wherever located, within the possession or control of a U.S. person"); *see also* 31 CFR § 591.312 (defining U.S. person to include "any person in the United States"). In such scenarios, OFAC would generally issue a specific license that otherwise mirrors the terms and conditions of the legal services general licenses.

22. It is exceedingly rare for OFAC to issue specific licenses authorizing a different blocked person to pay the attorney's fees for the blocked person on whose behalf the legal services are provided. Further, the use of funds of a blocked foreign government to pay for another blocked person's legal services presents unique considerations that are distinct from a private blocked

9

person's request to use a private blocked employer's assets to pay for their legal services. When a foreign government, its officials, and its central bank are blocked, the United States is effectively severing economic relations with an entire regime, if not an entire country. Those types of sanctions represent some of the most aggressive and far-reaching economic measures the United States can deploy. Any relief from sanction prohibitions that target an entire government is carefully scrutinized and granted only when there is a compelling foreign policy or national security reason to do so.

23. Although we cannot categorically exclude that at some point in OFAC's long history a license was issued under these circumstances, we have identified no such case in a search of our records, and no employee currently in the Licensing Division, including some who have served for more than 30 years, recalled a case where a blocked foreign government was authorized to pay for the legal services and representation of a separately blocked person.

24. OFAC's specific licensing practices are consistent with the legal services general licenses, which do not authorize payment from a blocked person other than the one on whose behalf the relevant legal services are provided. *See* 31 CFR § 591.507(a)(1)(iii).

Nicolas Maduro Moros and Cilia Adela Flores de Maduro's License Applications

25. As described above, both Maduro and Flores have been blocked pursuant to E.O. 13692 since 2017 and 2018, respectively.

26. On January 7, 2026, OFAC received separate license applications on behalf of Maduro's and Flores's defense counsel, seeking authorization to receive payment for legal services in their representation of Maduro and Flores in the matters of *United States v. Maduro Moros, et al.*, and *United States v. Cilia Adela Flores de Maduro, et al.*, respectively, including payment from

Maduro and Flores's own funds, their joint accounts, and/or those of the Government of Venezuela.

27. A specific license was necessary for payment in connection with these legal services given that both Maduro and Flores are located in the United States, *see* Par. 21, and because each sought payment of legal services by blocked persons other than themselves.

28. Given the expedient nature of the requests, OFAC prioritized the applications to ensure that appropriate legal services were available to Maduro and Flores. An OFAC licensing officer issued licenses to each of Maduro's and Flores's defense teams on January 9, 2026 (the "Maduro License" and "Flores License", respectively). Both the Maduro License and Flores License initially authorized payment for legal services from Maduro's and Flores's respective individual accounts, their joint accounts, and funds from the Government of Venezuela. (MUL-2026-1449494-1; VENEZUELA-2026-1450067-1)

29. As described above, the Government of Venezuela has been blocked since 2019 pursuant to E.O. 13884. As such, it was inconsistent with OFAC's licensing practice, reflected in its legal services general licenses, and inconsistent with U.S. foreign policy objectives, to authorize payment from the Government of Venezuela for legal services provided to either Maduro or Flores, each a separate blocked person. *See* 31 CFR § 591.507(a)(1)(iii).[4]

30. The inclusion in these licenses of an authorization to use funds paid by the Government of Venezuela was an administrative error. Once OFAC's Licensing Division became aware of the error in the Maduro License, OFAC amended this license to align with OFAC's licensing policy and with U.S. foreign policy objectives. (MUL-2026-1449494-2) OFAC's Licensing

---

[4] Given Maduro and Flores's spousal relationship and associated commingling of spousal assets, OFAC was comfortable authorizing payment from their joint accounts.

Division only became aware of the error in the Flores License upon further correspondence with Maduro's defense team.  After becoming aware of this error, OFAC amended this license to align with OFAC's licensing policy and with U.S. foreign policy objectives.  (VENEZUELA-2026-1450067-2).

In accordance with 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated: March 13, 2026

Sara E. Thannhauser
Digitally signed by Sara E. Thannhauser
Date: 2026.03.13 13:25:32 -04'00'

Sara Thannhauser
Associate Director
Office of Foreign Assets Control
Department of the Treasury