Q3Q1MADA

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

UNITED STATES OF AMERICA,

            v.                          11 Cr. 205 (AKH)

NICOLÁS MADURO MOROS, CILIA
ADELA FLORES DE MADURO,

                Defendants.            Oral Argument
------------------------------x

                                       New York, N.Y.
                                       March 26, 2026
                                       11:41 a.m.


Before:

                HON. ALVIN K. HELLERSTEIN,

                                       District Judge


                        APPEARANCES

JAY CLAYTON
     United States Attorney for the
     Southern District of New York
BY:  KYLE A. WIRSHBA, ESQ.
     HENRY L. ROSS, ESQ.
     KEVIN T. SULLIVAN, ESQ.
     KAYLAN E. LASKY, ESQ.
     Assistant United States Attorneys

HARRIS ST. LAURENT & WECHSLER LLP
     Attorneys for Defendant Nicolás Maduro Moros
BY:  BARRY J. POLLACK, ESQ.
     JULIE WITHERS, ESQ.

PARKER SANCHEZ & DONNELLY, PLLC
     Attorneys for Defendant Cilia Adela Flores de Maduro
BY:  MARK DONNELLY, ESQ.
     M. ANDRES SANCHEZ-ROSS, ESQ.

ALSO PRESENT:   MIRTA HESS, Interpreter (Spanish)
                ERIKA DE LOS RIOS, Interpreter (Spanish)
                GABRIEL MITRE, Interpreter (Spanish)

Q3Q1MADA

(Case called)

THE DEPUTY CLERK:  Counsel, please state your appearances for the record.

MR. WIRSHBA:  Good morning.  Kyle Wirshba for the government.  And I'm joined at counsel table by Henry Ross, Kevin Sullivan, and Kaylan Lasky.

THE COURT:  Good morning, all.

MR. POLLACK:  Good morning, your Honor.  Barry Pollack on behalf of President Maduro.  With me at counsel's table are my colleague Julie Withers and an interpreter, Manolo De Los Santos.

THE COURT:  Good morning.

MR. DONNELLY:  Good morning, your Honor.  For First Lady Flores de Maduro, Mark Donnelly, joined also by Andres Sanchez-Ross.

THE COURT:  Good morning.  We'll start out by discussing the right to counsel.

It's the defendants' motion, so I guess, Mr. Pollack.

MR. POLLACK:  Thank you, your Honor.  I'll be brief, as I know the Court is familiar with the pleadings we've already filed.

THE COURT:  I've read them, but I don't want you to be brief.  Why don't you use the podium.

MR. POLLACK:  Thank you, your Honor.

As the Court is aware, the Supreme Court opinions

Q3Q1MADA

often refer to the right to counsel as fundamental, and commentators have described the right as a great engine by which an innocent man can make the truth of innocence visible. In *Luis v. United States*, the Supreme Court said that a defendant has a right to counsel of his choice, not just competent counsel, but counsel of his choice, and the right to use untainted funds for that purpose.  This court, in *Stein*, extended that right to use not only one's own funds but the funds of a third party to which one has a property interest.

In this case, the government has not meaningfully contested, and certainly has proffered no evidence to contest, that Mr. Maduro and Ms. Flores de Maduro have a property interest in having the government of Venezuela pay for their legal fees.  They've also attested under oath that they cannot afford counsel themselves.  Your Honor, under both *Luis* and *Stein*, that is the end of the matter.  They have an absolute right to use their funds to pay for their defense.

THE COURT:  Those cases are distinguishable, aren't they?

MR. POLLACK:  They are distinguishable only in the fact that here, it is OFAC that is precluding the use of the funds.  That makes the case here for the use of the funds stronger.  In this case it is not simply the prosecutor——

THE COURT:  The whole point in *Luis* was that untainted funds were involved.

MR. POLLACK:  Correct.  And these are——

THE COURT:  The similarity here is that the sanctions are equivalent, one could say, to the taint.

MR. POLLACK:  I would disagree——

THE COURT:  Sanctions on Venezuela from paying out and sanctions for other individuals in paying out.  So that's the difference, isn't it?

MR. POLLACK:  It is a difference.  In this case it is——that difference is not a difference that is outcome-determinative under *Luis*.  Under *Luis*, it talks about tainted funds.  There is no allegation here that these funds are tainted.  *Luis* defines tainted funds.  Tainted funds are ones that are traceable to the offense conduct.  There is no allegation here that these funds are traceable to the offense conduct.

THE COURT:  Truthfully, we have no case like this.  We have no case like this.  In *Monsanto*, the Supreme Court held that the right to counsel is vindicated not necessarily by counsel of choice but by appointed counsel as well.

MR. POLLACK:  That was in a case where the funds were tainted, and the finding was that the reason for that was that, unlike in *Stein*, the defendant had no property interest in the funds because the funds were illegal proceeds, and so the defendant never took title to those funds.  It was not the defendant's property.  There is no question, your Honor, there

Q3Q1MADA

is no right to spend someone else's money.  The Supreme Court said that——

THE COURT:  Where does property interest come in?  Where did this property interest come in?  Is it from *Luis*?

MR. POLLACK:  The property interest comes in from *Stein*.  In *Stein*, what Judge Kaplan held was, because KPMG, the accounting firm, had routinely advanced fees and indemnified its partners and employees, that the partners and employees had a reasonable expectation to be indemnified and that itself was a property interest.  And so in *Stein*, the court, this court, and then affirmed by the Second Circuit, treated that property as being the defendant's property; the defendant had a property interest in indemnification.

THE COURT:  And so you argue the government interfered with that.

MR. POLLACK:  Correct.  That's correct, and the interference here is much more direct and problematic than it was in *Stein* itself.  In *Stein* itself, KPMG made the decision not to indemnify because KPMG was concerned of the consequences to KPMG with the United States Attorney's Office if they did indemnify.  And Judge Kaplan found that that pressure from United States government and the Thompson Memorandum saying that whether or not a company indemnifies would be taken into account in determining whether the company cooperated, was sufficient to attribute KPMG's decision to the government.

Q3Q1MADA

Here, it is the government directly that has made the decision. It is the government that is blocking the use of funds to which Mr. Maduro has a property interest.

THE COURT:  The government has a right to block the funds.

MR. POLLACK:  The government has the right to block the funds, absolutely; but doing so has consequences.

THE COURT:  Is it not the equivalent of a taint?

MR. POLLACK:  No.  It is not.  Because again, with the taint, the reason the taint has significance is because the defendant does not have a property interest in tainted funds. The defendant never had a property interest in tainted funds. If the funds are untainted, even if they would need to be available for use as substitute assets if subsequently there is a conviction, the fact that they are untainted means that the defendant, at least as of the time of trial, has a property interest in——all these cases make that distinction.  The distinction between tainted and untainted is based on the property interest.  *Stein* makes very clear that indemnification is a property right.  The government has conceded the property interest here.  What the government contends is they have a right to block that interest.  I'm not contesting that.  I'm not asking the Court to order OFAC to issue the licenses.  It is OFAC's decision.  But OFAC's decision does have a consequence in this case.

Q3Q1MADA

Your Honor, in our reply brief, we liken it to a case with classified information.  If there is material exculpatory classified information for which there is not an adequate substitute, the Court cannot order the classifying authority to declassify that information.  But what the Court can do, and in fact must do, is dismiss the case, because it is the judiciary's responsibility to make sure that the case does not go forward without the defendant's trial rights being fully vindicated.

THE COURT:  I was reviewing the indictment the other day, and it will take defense counsel lots of investigative work, would it not?

MR. POLLACK:  Yes, your Honor, and in fact——

THE COURT:  And you have to investigate witnesses who are located in Venezuela.

MR. POLLACK:  Absolutely.  All of the alleged——

THE COURT:  And Colombia.

MR. POLLACK:  Yes.  All of the alleged offense conduct here against these defendants occurred in Venezuela.

THE COURT:  And that would take an intensive investigation and a great deal of expense.

MR. POLLACK:  Correct.  And in addition, as in the *Stein* case itself, it is anticipated that there will be voluminous discovery and intense motions practice, and Judge Kaplan cited both of those in indicating that

court-appointed counsel is simply not a substitute for counsel with resources.

THE COURT:  And what will you say about the availability of resources to the Federal Defenders and to the CJA attorneys?

MR. POLLACK:  There certainly are resources available to those attorneys.  They are not the same resources that are available to counsel who has private resources, and what the case law says, including the *Stein* case, is that a defendant who has his own money or has funds to which he has a property interest is entitled to use those resources to defend himself, to investigate the case, and to represent himself.  And the Court notes, specifically notes the differential in resources available to the public defender, and the public defender is supposed to be available for people who don't have resources. And the funds that fund CJA are supposed to be for people who don't have resources, not for people who do.  And it is true, people who do——

THE COURT:  And a case like Maduro and its investigative requirements would sap the ability of CJA and Federal Defenders to do their work.

MR. POLLACK:  That's correct, your Honor.  And you're not just talking about one client here, you're talking about two clients, so you would have both the Federal Defenders Office, presumably, and a CJA court-appointed counsel draining

Q3Q1MADA

those resources in a case where you have someone other than the U.S. taxpayer standing ready, willing, and able to fund that defense.

THE COURT:  Let's hear from the government.  Are you finished, Mr. Pollack?

MR. POLLACK:  Your Honor, I was just going to note, from what we've referred to in our papers as *Stein II*——it's the *Stein* case at 495 F.Supp.2d——"while CJA relief would be better than nothing, it would not be the substantial equivalent of what these defendants lost as a result of the government's constitutional violations.  First, CJA funds may be expended only on behalf of financially eligible persons.  A defendant who is not financially eligible at the outset of a criminal proceeding must spend down his or her own assets to qualify for CJA.  Second, the CJA establishes a maximum fee per representation.  The large financial demands that this case——" and this is in reference to the *Stein* case but equally true here——"could place on the funds available would create a risk that the activities of CJA appointed counsel would be restricted."

So your Honor, it is for all of those reasons that the Court should not be appointing counsel for somebody who has property interest in resources that could be used to fund his own defense.  *Stein* also says it's not——

THE COURT:  Namely, the government of Venezuela.

Q3Q1MADA

MR. POLLACK:  Yes.  And *Stein* says, it's not about the quality of the representation, it is about the defendant's ability to choose his own counsel, which somebody with resources has the absolute right to do.  It talks about the trust that is required in an attorney-client relationship.

THE COURT:  You're overlooking *Monsanto*.

MR. POLLACK:  But *Monsanto* is dealing with the distinction between tainted funds and untainted funds.

THE COURT:  But in that case, there were very strong pronouncements that the government and the Constitution, in its right to counsel, does not necessarily mean counsel of choice; it also means appointed counsel.

MR. POLLACK:  And what both *Luis* and *Stein* say is that is true in the case of someone who does not have untainted funds available to them, but conversely, it is not true of somebody who does have untainted funds available to them.  And that is the very distinction——

THE COURT:  But they're under sanction.  We're going circular.

MR. POLLACK:  Except that the——it's not circular because while they are under sanction, there is no claim that the government has a property interest to those funds, much less has a superior property interest to those funds than the defendants.  And that was the issue in *Monsanto*, it was the issue in *Caplin & Drysdale*, and it was the very reason that

Q3Q1MADA

*Luis* and *Stein* distinguished those cases.

THE COURT:  I think I've got your point.

MR. POLLACK:  Thank you, your Honor.

THE COURT:  Does Mr. Donnelly have anything to say?

MR. DONNELLY:  Your Honor, thank you.  I think Mr. Pollack very eloquently summarized our position, and we join in all arguments that were proffered.

I think additionally, what's important to point out is that the government has not challenged, nor are they able to challenge, not only the affidavit of Mr. Facchinetti but also the fact, because of the lifting of certain sanctions related to oil production in Venezuela, that there are fresh funds that are available, and Mr. Facchinetti has indicated in his declaration that untainted funds are available for use in defense of both defendants.  That's the only thing I will add additionally, unless your Honor has any questions.

THE COURT:  No.  Mr. Wirshba?

MR. WIRSHBA:  Yes, your Honor.

Your Honor, the Court was precisely correct that this is a unique case that has not come before the judiciary before. This is not a matter of merely applying *Stein* and *Luis*, as the defense suggests, but instead, it's a matter of interpreting those cases and doing so in a way that protects the ability of the government to sanction parties abroad, which has been duly passed by Congress and implemented by the Executive.  Because

Q3Q1MADA

those sanctions are justified——

THE COURT:  Are those purposes still live?

MR. WIRSHBA:  Yes, your Honor, those purposes are still live.

THE COURT:  What is the interest of the government now in blocking those funds?

MR. WIRSHBA:  I'm sorry, your Honor.  I couldn't hear you.

THE COURT:  What is the government interest applied here?

MR. WIRSHBA:  Your Honor, the government interest is one of national security and foreign policy, as articulated by——

THE COURT:  We are doing business with Venezuela.

MR. WIRSHBA:  Well, your Honor, simply because there are limited relations with another country does not change the ability of the government to use sanctions to influence foreign policy and national security.  That is the purpose of the sanctions, and a justifiable reason for limiting access to funds.  And as your Honor knows, that purpose predated the criminal case here.  And so it is apparent that the limitation on those funds of the government of Venezuela preexisted the criminal case and was independently justified by foreign policy and by national security, and in that way completely distinguishes this case from *Stein* and others.

Q3Q1MADA

Your Honor focused on another very important distinction between this case and the other cases, *Stein* and its progeny, and that is that this is a case in which the purported funds are outside the United States.  As your Honor knows, all of the cases——

THE COURT:  There is a property interest.

MR. WIRSHBA:  No, your Honor.  So the government does not believe that there is a property interest here, despite what the defense says.  The government in no way concedes there's a property interest.  When *Stein* and other cases, its progeny, discuss property interest, what they're talking about is the expectation of access to those funds in the United States.  For all of those cases, which are domestic-based cases, the expectation is that those funds would be available from Bank of America, or JPMorgan, or wherever they are held.  But here, there are longstanding, preexisting sanctions that prevented these defendants from having access to any of those funds inside the United States.  The government has——

THE COURT:  Wouldn't you say that things have changed in Venezuela?

MR. WIRSHBA:  Your Honor, of course things have changed in Venezuela.

THE COURT:  And is there any further purpose in not applying a specific license here?

MR. WIRSHBA:  Yes, your Honor.  OFAC has determined

Q3Q1MADA

that there is, and it's OFAC's role, in consultation with other members of the Executive Branch, to determine whether there are existing national security and foreign policy reasons to keep those sanctions in place.  And they are still in place.

THE COURT:  Maduro and Flores are here.

MR. WIRSHBA:  Yes, your Honor.

THE COURT:  Their interest is the right to defend themselves.  And I see no abiding interest of national security in a right to defend one's self.

MR. WIRSHBA:  Well, your Honor, OFAC is not considering whether or not, how——OFAC is not considering whether it interferes with the payment in this case.  What OFAC is considering, as is its goal and its ambit, are national security and foreign policy, and I'll tell your Honor——

THE COURT:  What are those interests here?

MR. WIRSHBA:  Well, your Honor, they're the same ones that were——

THE COURT:  We're doing business with Venezuela.  The oil industry in Venezuela has become vital, particularly because of these charges arising from the Strait of Hormuz.  The defendant Maduro is here, Flores is here.  They present no further national security threat.  I don't see it.  I'm looking at the Executive Order that sets up the sanctions.  That's by President Obama.  It finds that the situation in Venezuela, including the government of Venezuela's erosion of human rights

Q3Q1MADA

guarantees, persecution of political opponents, curtailment of press freedoms, use of violence and human rights violations, and abuses in response to antigovernment protests, and so on, those interests are no longer implicated. Here, Maduro, Flores are here. They cannot be involved in Venezuela. And we have changed the situation in Venezuela. Now I did concede that the government has a right to sanction to serve extraordinary national purposes. And I don't concede that in this case it would serve any purpose——

MR. WIRSHBA: Well, perhaps——

THE COURT: ——any purpose in the Executive Order. And therefore, the right that's implicated, paramount over other rights, is the right to constitutional counsel.

MR. WIRSHBA: Your Honor, I think I have a response to the two parts of what your Honor just raised.

First, with respect to the ongoing national security implications of a possible license, I think your Honor focuses precisely correctly on the original bases for the sanctions. Those bases were, they accused the Maduro regime and these two individuals of maintaining an authoritarian state while plundering Venezuela's wealth——in effect, using the coffers of the state——

THE COURT: But the accusations are now overwhelmed by the trial, and the need to prepare for trial.

MR. WIRSHBA: But your Honor, if the purpose of the

Q3Q1MADA

sanctions is because the defendants are plundering the wealth of Venezuela, it would undermine sanctions to allow them to access those same funds now in order to pay their defense for the crimes they've committed while in that position.

THE COURT:  Isn't that a matter for Venezuela?

MR. WIRSHBA:  Well, no, your Honor.  It's a matter of the Executive's determination of what is appropriate for national security and foreign policy reasons, and OFAC has determined that continuing the sanctions, even to now, and not providing a license, is in the foreign policy interest of the United States.  That is something that's separate than what happened in *Stein*, where, in *Stein*, it was the prosecutors themselves who were accused of interfering.

THE COURT:  Does the Court have any role?

MR. WIRSHBA:  With respect to what, your Honor?

THE COURT:  The decision whether to give a specific license or not.

MR. WIRSHBA:  Your Honor, licensing——

THE COURT:  Like involved here.

MR. WIRSHBA:  Understood.

THE COURT:  The argument is that a specific license is necessary in order to allow Maduro and Flores to defend themselves.  That's a constitutional right.  No matter the circumstance that brought them here, they are entitled to a presumption of innocence and the right to defend themselves.

Q3Q1MADA

Now the Venezuelan government is no longer implicated in the kinds of atrocities we're talking about now.  We corrected that.  And so the purposes of the Executive Order are past, and the current paramount goal and need and constitutional right is the right to defend.

MR. WIRSHBA:  The defendants certainly have a right to defend themselves with money that is lawfully available to them.  They have the ability to use their own funds, or joint funds, for the purpose of that defense.  They do not have the ability to access funds of a third party here.  And the Supreme Court has said that——

THE COURT:  Well, they have an expectation, they have a right——Supreme Court has said there's a right to property——the Venezuelan authorities say it's proper to indemnify Maduro and Flores, and indemnification is extremely important here because of the enormous expense that will be implicated in defending this case.  Aren't these distinguishing qualities?

MR. WIRSHBA:  Your Honor, so first of all, the government does not concede that the defense does not have resources available to them, and I can circle back to that if that would be helpful.  But——

THE COURT:  You can.

MR. WIRSHBA:  Okay.  Thank you, your Honor.

But to your point, they do not have an expectation,

Q3Q1MADA

even if indemnified within Venezuela, that those funds would be available to them for this purpose, because since 2019, no Venezuelan government funds have been available to anyone, absent a license, here in the United States.  It could not have been their expectation that the Venezuelan government would have been able to pay because they have been sanctioned, and the Venezuelan government has been sanctioned since before this case began.  So unlike in *Stein*, there is no property right.

THE COURT:  They had no expectation that they would be in this court?

MR. WIRSHBA:  Well, your Honor, Nicolás Maduro has been under United States charges since 2020, so to the extent that the defendant thought about whether or not he would end up in the United States at all or considered whether or not he would be able to have his attorneys' fees paid, he would have known that there was no way to have those attorneys' fees paid inside the United States because of the sanctions.  That distinguishes this case from the others that your Honor was discussing earlier, from *Stein*, for example, where there was no law that was preventing the corporation from paying the defendant.

THE COURT:  This is a different case.

MR. WIRSHBA:  Absolutely it is, your Honor, and here, there are important national security and foreign policy reasons why OFAC has kept those sanctions in place, and as your

Honor knows well——

THE COURT:  Yes.  No question about that.  The question is whether a specific license ought to be available here because the right to defend is paramount over all those other interests, which are in the past.

MR. WIRSHBA:  But, your Honor, the case law analyzes that through whether or not the government is acting justly, whether or not it is purposefully interfering in the right to choice of counsel, and it analyzes that through the expectation.  And we've already discussed the expectation.  Your Honor knows, there could not have been an expectation, and therefore no property right, for these defendants because they knew that they were sanctioned.  They knew that there was nothing available to them in the United States from this third party, from this third party.

In addition to that, your Honor, as your Honor appears to recognize, there is a just reason for OFAC's decision.  It is not a corrupt reason.  And the Sixth Amendment right to counsel is flexible, your Honor.  It is not absolute.  As much as it is an important and fundamental right, the Supreme Court and other courts have recognized it is flexible.

THE COURT:  It's an unusual case in terms of its investigative requirements and interviews of witnesses in a distant country.

MR. WIRSHBA:  It is an unusual case.  However, I will

say that there are other cases in this district in which CJA

has effectively defended individuals who are accused of similar

crimes.

THE COURT:  I've had them.

MR. WIRSHBA:  Precisely, your Honor, as have other

colleagues on the bench.  It is not——it would not be out of the

ordinary in this district to have the capable counsel who work

with CJA funds or who work for Fed Defenders to be handling

these kinds of complicated issues, including foreign travel,

etc., and your Honor obviously has the ability to supervise the

expenditures and to ensure that the defendants receive a

complete defense through whatever expenditures are necessary.

THE COURT:  Well, I have great respect for the Federal

Defenders and for the attorneys on the CJA list, but this is a

case that is beyond the normal.

MR. WIRSHBA:  Your Honor, I don't think that——

THE COURT:  It would tax their office in a way that

could hamper their ability to do their primary work of

representing people in this court.

MR. WIRSHBA:  Well, my recollection, your Honor, is

that Federal Defenders had been conflicted out, so it would

likely be CJA counsel who would take over, and as the Court

knows, those are, you know, practitioners who obviously have

other cases, but it is the case that of course the, you know,

the panel can add more people as necessary to ensure that these

individuals get their complete defense.

THE COURT:  I don't think that supplants the ability of a single firm with investigative resources to do the important job of defending their clients.

MR. WIRSHBA:  Your Honor, understood.  However, the Supreme Court has said that a defendant has no Sixth Amendment right to spend another person's money for services rendered by an attorney, even if those funds are the only way a defendant will be able to retain counsel of choice.

THE COURT:  That's *Monsanto*.

MR. WIRSHBA:  That's from *Caplin & Drysdale*, which is among the progeny of *Monsanto*, yes, your Honor.

THE COURT:  Go ahead.

MR. WIRSHBA:  So, your Honor, understood that it would be better for the defense if they had access to these funds, but that does not mean that the government has unjustifiably interfered with their access to these third-party funds, because the national security and foreign policy reasons that OFAC has articulated are paramount, are deferred to by the Court in many similar situations, and are sound.  And in addition, that they do not have an expectation and therefore do not have a property right.

THE COURT:  Tell me about the availability of other funds.

MR. WIRSHBA:  Well, your Honor, the government is

Q3Q1MADA

continuing to investigate, obviously, and it's the government's position that the Court could deny the motion without any sort of hearing, and so the government did not bring to bear the facts that it would seek to elicit if there were to be some sort of factual inquiry with respect to the defendants' ability to pay additional funds. Of course, the defense can continue to try to raise additional money, and it's my understanding that the defense is—that the trip to Venezuela that was referenced in the defendants' reply has been approved by OFAC, so they are able to travel to the extent that that will allow them to explore alternative funds.

THE COURT: After a wait of how long?

MR. WIRSHBA: Your Honor, I do not know how long they waited, but I know that they have received an answer to that question.

THE COURT: It allows them to go.

MR. WIRSHBA: Yes, your Honor. My understanding is—and defense counsel will correct me if I'm wrong, but my understanding is that OFAC has responded and has allowed them to go. And your Honor—

THE COURT: That's interference, or potential interference, with the right of a defendant to defend himself.

MR. WIRSHBA: But, your Honor, the Sixth Amendment has to be flexible, and the Supreme Court has said that it is.

And your Honor, defense counsel has raised the CIPA

Q3Q1MADA

context, for example.  They raised today the CIPA context.  And they raised classified information and said that the Sixth Amendment requires and is not flexible with respect to disclosure of *Brady* information that may be classified.  And fair enough, but there are other cases specifically about choice of counsel in the CIPA context in which courts have recognized that actually, the Sixth Amendment choice of counsel is flexible.  So in *bin Laden*, Judge Sand found that the Executive Branch could require chosen counsel to seek a security clearance, and in *Hashmi*, which is 621 F.Supp.2d 83, Judge Preska said that while requiring security clearances may to some extent impose on defendant's right to counsel of choice, that interest is outweighed by the countervailing government interest here.

Your Honor, the Sixth Amendment right to choice of counsel is flexible.  That flexibility is reflected in *Stein* in the two-part test that it articulated, where there has to be a unjustified interference, which there wasn't here, and there has to be an expectation that is akin to the property right, which, again, there was not here with respect to these proceedings.

THE COURT:  Circle back and tell me about the availability of other funds.

MR. WIRSHBA:  Your Honor, the government is continuing to investigate the availability of other funds.  We do not have

Q3Q1MADA

anything to bring to bear at this time.  However, if the Court were considering any sort of grant of the application, the government would believe that a hearing would be appropriate. That said, the government——the Court should not hold any hearing.  The Court should deny the motion because it is legally insufficient on its face because there is a justified reason why the sanctions continue to be in place and there is a justified reason, through national security and foreign policy, that OFAC denied the licenses, and there cannot be an expectation that the defendants wanted to use those funds here. And so——

THE COURT:  Likely the government would take the position that any other funds will be forfeitable.

MR. WIRSHBA:  Well, your Honor, that brings us back to an important distinction here.  All of the cases that are cited in this context are domestic cases.  They are cases in which the ability of the court and the prosecutor and the defense to look very closely at what is in an account at JPMorgan is tainted or not tainted.  We are talking about the availability of funds belonging to a third party outside the United States, and that is the place where the courts traditionally defer to the Executive.

THE COURT:  Namely, the government of Venezuela.

MR. WIRSHBA:  Yes, your Honor, the government of Venezuela.  Your Honor articulated——

Q3Q1MADA

THE COURT: The government of Venezuela has taken the position that it will honor the indemnification rights of the defendants.

MR. WIRSHBA: But, your Honor, those indemnification rights, since 2019, could not have included proceedings in the United States.

THE COURT: I think we've gone back.

MR. WIRSHBA: Understood.

THE COURT: So that's the issue of the circle-back, whether other funds are available.

And the likelihood is that if there were any such funds available, they would be forfeitable.

MR. WIRSHBA: Well, your Honor, they might be forfeitable, but that does not mean that it would be unavailable.

THE COURT: Or subject to sanctions. Or subject to sanctions.

MR. WIRSHBA: And because they're outside the United States, it's not clear that the government would be able to learn enough about the funds in order to make that determination. But in any event, the defendants have said in sworn statements that they do not have those funds available. It's a question of whether or not they do or they could raise them from other sources.

The bottom line is that the prevention of access to

these particular third-party funds from the government of Venezuela does not violate the defendant's Fifth and Sixth Amendment rights, and therefore, the motion should be denied.

THE COURT:  If I were to rule that this case is significantly different from *Monsanto* and *Caplin & Drysdale*, as I indicated, how would I implement that rule?

MR. WIRSHBA:  Well, your Honor, you would merely say that this case is different than *Stein*, which your Honor recognized at the very start of the proceedings today is distinguishable.

THE COURT:  This is unique.

MR. WIRSHBA:  What's that, your Honor?

THE COURT:  This case is unique.

MR. WIRSHBA:  Absolutely.  And you would say, your Honor, there is a justified reason why the government took action here that has nothing to do with the prosecutors in this case purposefully interfering with the defendants' Sixth Amendment rights, and you would say that in any event, there is no expectation of these funds in the United States because they have been sanctioned since 2019.  And while the defendants may have expected——I think the language in the affidavit is——all costs, all of their costs to be paid by the Venezuelan government, since 2019, that has not included costs borne here in the United States, where OFAC has maintained the sanctions.

THE COURT:  What remedy would be available?  Can I

Q3Q1MADA

order OFAC to give a specific license——

MR. WIRSHBA:  I see, your Honor.

THE COURT:  ——for release of funds?

MR. WIRSHBA:  No, your Honor.  I don't believe that you can.  And your Honor did ask earlier——and I meant to come back to the question of——how these sanctions can be challenged.  And the answer, your Honor, is that the sanctions can be challenged.  There is a suit that can be brought to challenge the sanctions under the APA.  That is a separate proceeding.

THE COURT:  This is not a challenge to the sanctions; this is an issue whether a specific license was arbitrarily denied——

MR. WIRSHBA:  Yes, your Honor.  I believe that is——

THE COURT:  ——because of lack of recognition in this case that the only current interest, expressed by President Obama——the only current interest is the interest of defense.

MR. WIRSHBA:  That's not what OFAC has said, your Honor.  OFAC believes there is a continuing interest.  And your Honor——

THE COURT:  Do I have to take what they said?

MR. WIRSHBA:  Your Honor should defer to what they said.  And your Honor, there is the possibility of challenging OFAC action, and that is a suit under the APA.  The defense has not availed themself of that possibility.  It would not be before this Court.  And they could sue OFAC, if they so chose,

Q3Q1MADA

to challenge that decision.

THE COURT:  Well, the issue has come up in this court.

MR. WIRSHBA:  Oh, absolutely, your Honor.

THE COURT:  The issue is basic to the whole defense. So if I were to rule that way, what would be the remedy, by ordering OFAC to give a specific license?

MR. WIRSHBA:  No, your Honor.

THE COURT:  For them to reconsider?

MR. WIRSHBA:  I do not believe that the Court has the ability, as part of this case, to order OFAC to grant a license so I don't believe that that is a remedy that is available to the Court.

THE COURT:  What remedy would be available?

MR. WIRSHBA:  Well, your Honor, the government does not believe that the——if your Honor is talking about the possibility of your entertaining granting the motion in that circumstance, your Honor——

THE COURT:  Supposing I rule that the interest that's paramount here is the right of the defendants to defend themselves, given the circumstances arising from the indictment and a heavy burden of investigating witnesses and events that took place some time ago in Venezuela and Colombia is such as to require private counsel, or to hold that if I prevent private counsel from functioning on this case, there will be a deprivation of serious rights——that's the argument——if I rule

Q3Q1MADA

that way, what is the remedy?

MR. WIRSHBA:  Well, your Honor, I think that if you—

THE COURT:  Is there a remedy?

MR. WIRSHBA:  I do not believe that there is a remedy in particular that the Court could identify.  However, if the Court decided that that was how it was going to rule, the government would take that back to the relevant stakeholders and allow them to make a decision, knowing what the Court was inclined to do.  I will say that it's the government's position that that's contrary to *Stein*, it's contrary to the existing case law on the Sixth and Fifth Amendment—

THE COURT:  It's not contrary.  It's an application of *Monsanto* and its broad principles over other cases.

MR. WIRSHBA:  Your Honor, before the Court could make that determination, the government also believes that additional fact finding would be required.

THE COURT:  Such as?

MR. WIRSHBA:  Such as with respect to the defendants' inability to have other funds available to them.  The defendants have, for example, offered to fill out financial affidavits.  The Court should require more.  And the government should have the opportunity to challenge those financial affidavits.  That said, your Honor, the Sixth Amendment principles are not implicated here.

THE COURT:  The government has taken the position in

Q3Q1MADA

many cases that it will not interfere with the rights of defendants to defend themselves.

MR. WIRSHBA:  But these are not the defendants' funds, your Honor.  That's what it comes down to.

THE COURT:  We are circling again.

MR. WIRSHBA:  Yes, your Honor, we are.

THE COURT:  Let me ask Mr. Pollack, what remedy would you suggest?

MR. POLLACK:  Thank you, your Honor.

The only remedy——and that's the reason it's the remedy that we've asked for——is dismissal.  If the government is——

THE COURT:  I'm not going to dismiss the case.

MR. POLLACK:  But, your Honor, I think the government itself, very candidly, just told the Court that if that is the only remedy available to the Court and the Court understands that is the only remedy and indicates that that is a remedy that will be forthcoming if the specific license is not granted, that the government would reconsider with its stakeholders whether that license can in fact be granted.  The government says that the Sixth Amendment gives——

THE COURT:  Tell me that again?

MR. POLLACK:  Yes.  The prosecutor just said to the Court that if the Court finds, as the Court indicated earlier, that the right to counsel is a fundamental right under *Stein*, there has to be a compelling and narrowly tailored interest to

interfere with that right, that under the current circumstances, where we have formal relations with the government of Venezuela, the current government, have recognized that——

THE COURT:  Don't argue.  What is the relief?  How do I implement my ruling?

MR. POLLACK:  What the prosecutor just said is if the Court finds that their rights are being interfered with and that in the absence of the issuance of a specific license the Court would be required to dismiss the case, the prosecution will consult with OFAC and other, quote, stakeholders within the government to reconsider whether in fact the specific license should issue under those circumstances.

THE COURT:  So it's to require reconsideration.

MR. POLLACK:  I think the prosecution has been quite candid that if the Court were to indicate that it understands that the only remedy——that there is interference here and the only remedy is dismissal, that the government would consult with OFAC and would reconsider its refusal to date to issue the license in that new light.

THE COURT:  Any different argument, Mr. ——

MR. POLLACK:  I will just make a——

THE COURT:  ——Donnelly?

MR. POLLACK:  I'm sorry?

MR. DONNELLY:  No, your Honor.  I agree completely.

Q3Q1MADA

THE COURT:  Go ahead, Mr. Pollack.

MR. POLLACK:  Just a couple of other points, your Honor.

The government talks about the reasonable expectation, and I think it is conflating the reasonable expectation that gives rise to a property interest with whether or not there's an expectation that the government might seek to interfere with that property interest.  And in this respect, this case is very similar to *Stein*.  In *Stein*, the Thompson Memo issued before the case was indicted, the defendants certainly might have expected that even though they had a right to indemnification from KPMG, that the government might hold that against KPMG under the Thompson Memo.

THE COURT:  That was the issue that Judge Kaplan took up.

MR. POLLACK:  Exactly.  And what the Court said is, they had a reasonable expectation——

THE COURT:  The point is——and I think it's a good point——is that any review by the government interferes with the right of defense is itself irrevocable.

I think I have your point.

MR. POLLACK:  Yes.  So as long as that property interest is there, it doesn't matter that the government might seek to interfere with it.  Once the government does interfere with it, the question is whether they have a compelling reason

Q3Q1MADA

to do so.  And here, the government has articulated none.  What the government has talked about is generally the value of sanctions programs.  The Court asked the prosecutor multiple times, specifically, what is the government's national security interest in depriving the government of Venezuela from the ability of funding the defense in this case, and the prosecutor offered no answer to that question.

Your Honor, it's been reported that the government of Venezuela has made approximately $18 billion in oil sales since this case began.  There are clearly untainted funds available to the government of Venezuela to make good on their lawful obligation to advance fees for——

THE COURT:  I don't think we need to get into that, whether the government of Venezuela's budgetary issues allow for this or not.  The government of Venezuela has said, has it not, that it will honor the indemnification?

MR. POLLACK:  Absolutely.  My point is only that it will do so with untainted funds and certainly has the ability to do that.

THE COURT:  And therefore it distinguishes *Stein*.

I'm not holding any hearings of fact finding on that issue.  I think I have this.  You can sit down, Mr. Pollack.

If I find that in this case a specific license was arbitrarily withheld and the government does not comply, that would be the time when you could address the issue of

dismissing the indictment.  At this point it would be such a serious step, based on hypotheticals, that I don't think we should get into it now.  So that's so much for that part of your argument.

And what else do you have, did you raise in your motion?

MR. POLLACK:  Your Honor, I think that is the issue. The only other point——

THE COURT:  The other point is you want to quit the case because you can't fund it.

MR. POLLACK:  Yes, your Honor.

THE COURT:  And I would certainly allow that to be.

MR. POLLACK:  I appreciate that, your Honor.

THE COURT:  Because by implication, the findings of *Monsanto* and *Caplin & Drysdale* that defense by a public defender or CJA attorney is adequate, for reasons I've laid out, it's doubtful.  Okay.

MR. POLLACK:  Your Honor, there is no question that court-appointed counsel sometimes do complex cases.  And that is routine.  But they do that for defendants who don't have access to other funds.

THE COURT:  Yes.  The issue of public funds against foreign funds.

MR. POLLACK:  Yes.  So in this case, I think there is an interference with the rights, the defendants' Sixth

Amendment, Fifth Amendment rights.  There's not a compelling basis for that interference.

If the Court is not presently prepared to rule on the avenue for a remedy that we have identified and the government offers none other than dismissal, then I think the Court should allow the government the opportunity to consider whether it wants to risk dismissal over not issuing a specific license.

THE COURT:  Okay.  I take your point.

MR. POLLACK:  And in that scenario, your Honor, I think just like the Court would not be prepared to rule on the motion to dismiss, the Court would not need to rule on the motion to withdraw, because there would still be the prospect that the license might issue and that there might be funds available for retained counsel.

THE COURT:  All right.  Is there anything else, Mr. Wirshba?

MR. WIRSHBA:  Yes, your Honor.

I think the government has articulated that it doesn't believe that that would be an available remedy, but more importantly, I think that the government has articulated that if the Court were contemplating granting the motion, additional fact finding would be required, and I just want to be clear with the Court about——

THE COURT:  What fact finding?

MR. WIRSHBA:  Fact finding with respect to the

Q3Q1MADA

availability of the defendants' other funds that would

currently fall within a license.

THE COURT:  I don't want to get into that.  The

government of Venezuela said it will honor the

indemnifications.  That's sufficient, I think.

MR. WIRSHBA:  Well, your Honor, those funds are not

available to the defendants lawfully, and even if there were a

question as to third-party funds——

THE COURT:  I take your point.  We've gone over this.

Anything new?

MR. WIRSHBA:  No, your Honor.

THE COURT:  The decision will be reserved.

I want to get into another point now, which is the

protective order.  And there's one clause that's at issue, and

that clause has to do with the ability of the defendants to

share information with other defendants.  I think the answer is

they should not.  The defendants have the right to use

information for their defense and not to ward off prosecutions

for others.  So you can redraw the protective order in that

vein.

MR. POLLACK:  Your Honor, if I may address that issue.

The issue is not——the issue is the defendants' ability to

defend themselves.  It's not the right of the defendant who has

not yet been before this Court.  It is the right of the

defendants who are before this Court.

Q3Q1MADA

THE COURT:  The way it's worded suggests just that.

MR. POLLACK:  Well, your Honor, the government has charged a conspiracy.  The government is going to charge that those missing co-defendants——

THE COURT:  I understand.  You want to use the information for your defense, and that means that there will be a certain amount of interchange of information with the other defendant existing.

MR. POLLACK:  Yes, your Honor.

THE COURT:  But not potentially other defendants.  And not other defendants in the past.

MR. POLLACK:  I'm sorry, your Honor.  I didn't quite follow that.

THE COURT:  The protective order is to allow the use of information for the defense, and if there's a common defense, for the common defense.  But it should not have to do with other people's rights and interests.  Now the protective order will have to be redrawn to conform to that.

MR. POLLACK:  I understand, your Honor.

THE COURT:  Okay.  And it should be done speedily by someone to move this case ahead.

Next there is to be a report by the government of where production stands of the Rule 16.

MR. WIRSHBA:  I apologize, your Honor.  What was the question?  I didn't hear you.

THE COURT:  Where production under Rule 16 stands.

MR. WIRSHBA:  Your Honor, the government has begun producing Rule 16.  In fact, despite the lack of a protective order in this case, the government has fashioned a way to get Rule 16 in the hands of the defense on an attorneys' eyes only basis.  The government has made a substantial production of Rule 16 that we evaluate as actually the majority of Rule 16 in this case.  Obviously the government's work continues.  This is a large case, a longstanding one from the indictment, and therefore, there is substantial discovery to do, but the government has endeavored, as it promised at the initial conference, to begin discovery as soon as possible and, despite the lack of a protective order, has gotten a substantial amount of discovery in the hands of the defense.

I just want to understand the Court's instruction with respect to that protective order, if I may, your Honor.  Your Honor said that you would like the protective order redrawn. The government offered a protective order that had the restriction with respect to those individuals that you were just discussing with defense counsel.  Is there another part of the protective order that the Court would like to see changed?

THE COURT:  There was only one clause at issue.

MR. WIRSHBA:  That's right, your Honor.  So if the Court does not have an issue with that particular clause, it's the government's position that the Court could enter that

Q3Q1MADA

protective order as written, unless the Court wishes to see other changes.

THE COURT:  Which protective order?

MR. WIRSHBA:  The protective order that the government——with the government's letter, articulating why these other defendants should not have access to the discovery.

THE COURT:  I've already ruled in your favor.

MR. WIRSHBA:  Yes, your Honor.  And so you mentioned redrawing the protective order.  The only point I'm making is that the government has already submitted a protective order that conforms to your ruling, so it may be entered.

THE COURT:  Is there any problem with that, Mr. Pollack?

MR. POLLACK:  Yes, your Honor.  The protective order that the government presented to the Court, and which we have not yet had the chance to respond to in writing, includes a provision that does not make the distinction that the Court just referenced.  It has an absolute bar on the defense sharing any discovery.

THE COURT:  I agree.  It should be reworded.  So you'll do that and submit it.

MR. POLLACK:  Yes.  My understanding of what the Court is saying is it has to allow for the sharing, to the extent necessary, to defend the allegations, but without giving any rights to a third party.

THE COURT:  It has a right——I'll repeat——to serve the common interest of the two outstanding defendants, if the lawyers want to go into a common interest defense, but not for others past or present, or future.

MR. WIRSHBA:  So the government objects to any discovery being shown to those other defendants, to the nonapprehended defendants.  I just want to understand the Court's ruling.  Is the Court ruling that——

THE COURT:  Let me think about that.

MR. WIRSHBA:  Yes, your Honor.  We can hand up a copy of the proposed protective order if that would be helpful.

THE COURT:  I don't want to impose any restrictions on the defense.

MR. WIRSHBA:  Well, there is no restriction with respect to this provision on what can be shown to the defendants, what they can see.  There is also no restriction on the provision——on the displaying of information, on showing information to prospective witnesses, with the exception of the other defendants who are charged in this very case, who are not apprehended——the four unapprehended individuals who are charged in this very case.  And it's the government's position that those individuals should not be able to receive the discovery.

THE COURT:  Those who are charged?

MR. WIRSHBA:  Those who are charged, where the grand jury has found they are co-conspirators of the defendants.

Q3Q1MADA

THE COURT:  But have not appeared.

MR. WIRSHBA:  Correct, your Honor.

THE COURT:  I agree with that.

MR. WIRSHBA:  So that's paragraph 13, your Honor.  So my understanding is that the defense is——I mean, is seeking to file a written submission on that, but if your Honor has what it needs from oral argument, that is as it is reflected in the protective order that's been handed up to the Court, that those four individuals, just those four individuals, cannot be shown discovery.

THE COURT:  Mr. Pollack?

MR. POLLACK:  And the government is correct.  We have an objection to that.  We were going to submit in writing by Monday that objection, but I'm happy to address it now.

As the Court says, part of representing our clients may be representing them by exchanging information with those who have a common interest.  At trial, the government is going to be putting on evidence of conduct by these other individuals and that, because of the conspiracy, arguing to the jury that our clients should be found guilty based on the conduct of these other individuals.

THE COURT:  I take your point.

MR. POLLACK:  Yet they're not allowing us to discuss the evidence in the case with those individuals.  We can't investigate the facts if we can't talk to and share information

Q3Q1MADA

with the alleged co-conspirators.

THE COURT:  "Talk to" is different from "sharing with."

MR. POLLACK:  We're not seeking to be able to give a copy of any discovery to these individuals.  What we are seeking to be able to do is to discuss the discovery, to show the discovery, get their reactions to it, or——

THE COURT:  Draft appropriate language, like subject to the right of the defendant to prepare his own case.

MR. POLLACK:  We'll be happy to submit some language, your Honor.

THE COURT:  What else is available?  What else is at issue?  Any other issue?

MR. DONNELLY:  Your Honor, there's only——on behalf of Ms. Flores de Maduro, there's only one other issue.  I brought it to the attention of the prosecutors, additionally brought it to the attention of the BOP facility.  Essentially it concerns the current health condition of the First Lady.  She has been receiving treatment for some time.

THE COURT:  There are no titles to be used in this court.

MR. DONNELLY:  Understood, your Honor.

Ms. Flores de Maduro has been dealing for some time with a mitral valve prolapse issue, one that has been identified additionally during health visits in the facility.

Q3Q1MADA

THE COURT:  What's the problem?

MR. DONNELLY:  Receiving adequate treatment, and most specifically, your Honor, urgently needing an echocardiogram. They have at the facility indicated that after many EKGs, that she should be given an echocardiogram.  We've been waiting on that for some time.  The prosecution has indicated that they would assist in whatever way possible to ensure that she receives that echo as soon as possible so that we can provide it to a specialist for additional——

THE COURT:  Let me know when the problem arises.

MR. DONNELLY:  Thank you, your Honor.

THE COURT:  Is there anything else?

All right.  Yes, Mr. Wirshba.

MR. WIRSHBA:  I was just going to ask for a moment, your Honor.  If I may have a moment, I would appreciate it.

THE COURT:  Yes.

MR. WIRSHBA:  Thank you, your Honor.

Thank you, your Honor, for the opportunity.  Your Honor, I think that what would be helpful is to set a date at which the parties would come back before the Court and the government would then——

THE COURT:  I will set the date in the opinion if it's appropriate.

MR. WIRSHBA:  Thank you, your Honor.

And the government could exclude time or your Honor

Q3Q1MADA

could rely on the pending motion, and I defer to your Honor on that.

THE COURT:  The time is excluded while there is a motion pending.

MR. WIRSHBA:  Yes, your Honor, of course.

THE COURT:  So I will invoke that.

MR. WIRSHBA:  Thank you, your Honor.

THE COURT:  I don't think I have to say anything or make any ruling.  It's in the statute.

MR. WIRSHBA:  I'm sorry, your Honor.  Can you say that again?

THE COURT:  I don't need a special ruling.  It's in the statute.

MR. WIRSHBA:  Absolutely, your Honor.  Only if your Honor wanted to do so in an abundance of caution.

THE COURT:  No.

Okay, folks.  Thank you very much for excellent arguments.

ALL COUNSEL:  Thank you, your Honor.

THE COURT:  I hope to get this out as quickly as I can, but the case is unique, and it may take some time.

o0o