UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

- v. -

NICOLÁS MADURO MOROS, and,
CILIA FLORES DE MADURO,

Defendants.

S4 11 Cr. 205 (AKH)

**THE GOVERNMENT'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT CILIA FLORES DE MADURO'S MOTION FOR PRETRIAL RELEASE**

JAMES M. MCDONALD
United States Attorney for the
Southern District of New York
26 Federal Plaza, 37th Floor
New York, New York 10278

Kaylan E. Lasky
Henry L. Ross
Kevin T. Sullivan
Kyle A. Wirshba
Assistant United States Attorneys
*Of Counsel*

# TABLE OF CONTENTS


PRELIMINARY STATEMENT ........ 1

BACKGROUND ........ 2

APPLICABLE LAW ........ 4

ARGUMENT ........ 5

I. Counts Two and Three Establish a Presumption of Pretrial Detention ........ 5

II. The Defendant Should Be Detained Based on the Section 3142(g) Factors ........ 6

A. The Nature and Circumstances of the Offense ........ 7

B. The Strength of the Evidence ........ 8

C. The Characteristics of the Defendant ........ 9

1. Foreign Connections, Financial Resources, and History in Venezuela ........ 9

2. Medical Conditions and Treatment ........ 11

D. The Nature and Seriousness of Danger to Any Person and the Community ........ 15

III. There Are No Bail Conditions That Would Adequately Protect the Public and Ensure the Defendant's Appearance ........ 17

A. The Defendant's Proposed Private Security Condition Would Violate the Bail Reform Act in this Case ........ 17

B. The Defendant's Proposed Bail Package Does Not Otherwise Mitigate the Risks of Danger and Flight ........ 20

CONCLUSION ........ 23

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*United States v. Alexander*,
No. 25-222, 2025 WL 1693152 (2d Cir. June 17, 2025) .................................................. 17, 18

*United States v. Alexander*,
No. 24 Cr. 676 (VEC), Order (S.D.N.Y. Jan. 15, 2025) (Dkt. 35) .......................................... 17

*United States v. Alindato–Perez*,
627 F. Supp. 2d 58 (D.P.R. 2009) ........................................................................................... 8

*United States v. Ambrosio*,
No. 94 Cr. 674 (DC), 1995 WL 138605 (S.D.N.Y. Mar. 30, 1995) ........................................ 15

*United States v. Banki*,
10 Cr. 008 (JFK), Order (S.D.N.Y. Jan. 21, 2010) (Dkt. 7) ..................................................... 22

*United States v. Bellomo*,
944 F. Supp. 1160 (S.D.N.Y. Oct. 30, 1996) ............................................................................ 16

*United States v. Benatar*,
No. 02 Cr. 099, 2002 WL 31410262 (E.D.N.Y. Oct. 10, 2002) .............................................. 22

*United States v. Boustani*,
356 F. Supp. 3d 246 (E.D.N.Y. 2019) ............................................................................... 20, 21

*United States v. Boustani*,
932 F.3d 79 (2d Cir. 2019) ............................................................................................ 17, 18, 19

*United States v. Chimurenga*,
760 F.2d 400 (2d Cir. 1985) ........................................................................................................ 4

*United States v. Choudhry*,
941 F. Supp. 2d 347 (E.D.N.Y. 2013) ....................................................................................... 15

*United States v. Combs*,
No. 24 Cr. 542 (AS), 2024 WL 4903741 (S.D.N.Y. Nov. 27, 2024) ...................................... 17

*United States v. English*,
629 F.3d 311 (2d Cir. 2011) ...................................................................................... 5, 6, 11

*United States v. Epstein*,
425 F. Supp. 3d 306 (S.D.N.Y. 2019) ................................................................................ 17, 20

*United States v. Ferranti*,
66 F.3d 540 (2d Cir. 1995)................................................................................................ 4

*United States v. Hoey*,
No. 11 Cr. 337 (PKC), 2014 WL 572525 (S.D.N.Y. Feb. 13, 2014) ....................................... 6

*United States v. Jackson*,
823 F.2d 4 (2d Cir. 1987) .................................................................................................. 4

*United States v. LaFontaine*,
210 F.3d 125 (2d Cir. 2000)................................................................................................ 4

*United States v. Leon*,
766 F.2d 77 (2d Cir. 1985)................................................................................................ 15

*United States v. Liebowitz*,
669 F. App'x 603 (2d Cir. 2016) ........................................................................................ 8

*United States v. Martir*,
782 F.2d 1141 (2d Cir. 1986)............................................................................................. 5

*United States v. Maxwell*,
510 F. Supp. 3d 165 (S.D.N.Y. 2020)........................................................................ 17, 18, 19

*United States v. Mercedes*,
254 F.3d 433 (2d Cir. 2001)................................................................................................ 5

*United States v. Millan*,
4 F.3d 1038 (2d Cir. 1993).................................................................................................. 4

*United States v. Patriarca*,
948 F.2d 789 (1st Cir. 1991) ............................................................................................. 4

*United States v. Raniere*,
No. 18 Cr. 204 (NGG), 2018 WL 3057702 (E.D.N.Y. June 20, 2018) ............................. 18, 22

*United States v. Reza Zarrab*,
No. 15 Cr. 867 (RMB), Decision & Order (S.D.N.Y. June 16, 2016) (Dkt. No. 41) ................ 9

*United States v. Rodriguez*,
950 F.2d 85 (2d Cir. 1991).................................................................................................. 5

*United States v. Sabhnani*,
493 F.3d 63 (2d Cir. 2007)............................................................................................. 5, 9

*United States v. Tajideen*,
No. 17 Cr. 46, 2018 WL 1342475 (D.D.C. Mar. 15, 2018)................................................... 20

*United States v. Valerio*,
9 F. Supp. 3d 283 (E.D.N.Y. 2014) .......... 18, 21

*United States v. Zarger*,
No. 00 Cr. 773, 2000 WL 1134364 (E.D.N.Y. Aug. 4, 2000) .......... 22

**Statutes**

18 U.S.C. § 924(c)(1)(A) .......... 2

18 U.S.C. § 924(o) .......... 7

18 U.S.C. § 3141 .......... 4

18 U.S.C. § 3142(e) .......... 1, 4, 5, 6

18 U.S.C. § 3142(f)(2) .......... 4, 5

18 U.S.C. § 3142(g) .......... 4, 19

21 U.S.C. § 960(b)(1)(B) .......... 7

21 U.S.C. § 960a .......... 2

21 U.S.C. § 963 .......... 2

## PRELIMINARY STATEMENT

The Government respectfully submits this memorandum of law in opposition to the motion of defendant Cilia Flores de Maduro ("defendant" or "Flores de Maduro") for pretrial release. (*See* Dkts. 326, 327). The defendant poses an extreme risk of flight and danger to the public and has not—and cannot—rebut the statutory presumption that no conditions or combination of conditions will reasonably assure the appearance of the defendant and the safety of persons and the community, as required under 18 U.S.C. §§ 3142(e)(3)(A) and (B).

The defendant is the former *de facto* First Lady of Venezuela and a former Venezuelan attorney general and politician. She and her husband and co-defendant, Nicolás Maduro Moros, the former *de facto* President of Venezuela, partnered with their co-conspirators to abuse their positions of public trust to enrich themselves and entrench their power through drug-trafficking and rampant corruption, all enforced by acts of violence and repression against anyone who opposed them. Now, having been arrested and brought to the United States to face charges that carry a mandatory minimum sentence of 40 years' imprisonment, the defendant asks the Court to accept a promise that she will not flee or endanger anyone if released pending trial. Her request should be swiftly rejected.

As further discussed below, the defendant poses a clear risk of flight and danger to the public. Among other concerns: (1) she is a citizen of a country that does not extradite its own citizens; (2) she has no ties to or legal status in the United States; (3) she appears to have access to considerable wealth, although she pointedly declines to provide the Court with any information about the enormous financial resources necessary to fund her bail proposal; and (4) she has participated in a decades-long narcotics conspiracy that deployed violence and intimidation as a means of protection and enforcement, such that her release would pose a serious risk to the public.

These are glaring red flags, even before the Court considers the gravity of the charges in this case and the serious penalties the defendant faces if convicted at trial, which both dramatically increase the risk that she will seek to flee before trial and any potential sentencing. The bail package contemplated by the defendant, which includes employing a private security force (albeit impermissible under Second Circuit law, as discussed below), rental or purchase of a residence, hiring of a "third-party custodian," and installation of surveillance systems and other monitoring technology—cannot begin to address these significant concerns. Because there are no conditions that could address the significant flight risk and danger to the public posed by the defendant, the Court should deny her motion, and the defendant should remain detained pending trial.

## BACKGROUND

On December 23, 2025, a grand jury sitting in this District returned a fourth superseding indictment in the above-captioned case (the "Indictment"), charging Maduro Moros, Flores de Maduro, and four co-defendants with cocaine importation conspiracy, in violation of 21 U.S.C. § 963; possession of machineguns and destructive devices and conspiracy to commit the same, in violation of 18 U.S.C. §§ 924(c)(1)(A), 924(c)(1)(B)(ii), and 924(o); and also charging Maduro Moros and two of those co-defendants with narco-terrorism conspiracy, in violation of 21 U.S.C. § 960a.[1] (Dkt. 260 ("Indictment")). The Indictment alleges each count from in or about 1999 through in or about 2025. (*Id.*).

As set forth in the Indictment, the leaders of Venezuela, including the defendant, abused their positions of trust and corrupted once-legitimate institutions to engage in a decades-long conspiracy to traffic and import tons of cocaine into the United States. (Indictment ¶ 1). Drug-

[1] Maduro Moros had been previously charged in superseding indictment S2 11 Cr. 205 (AKH), returned in March 2020.

trafficking on such a massive-scale concentrated power and wealth in the hands of Maduro Moros and the defendant while also benefitting violent narco-terrorists and drug-traffickers who operated with impunity on Venezuelan soil and who help produce, protect, and transport tons of cocaine to the United States. (*Id.* ¶¶ 3, 21). Maduro Moros and the defendant, along with other members of their families and corrupt officials, provided government and law enforcement cover for such transport of cocaine through Venezuela. (*Id.* ¶ 21). Indeed, in approximately 2007, the defendant attended a meeting with a large-scale drug trafficker in which she accepted hundreds of thousands of dollars in bribes to broker a meeting between a large-scale drug trafficker and the director of Venezuela's National Anti-Drug Office, Néstor Reverol Torres. (*Id.* ¶ 21(b)). The drug trafficker later arranged to pay a monthly bribe to Reverol Torres, in addition to approximately $100,000 for each flight that was transporting cocaine to ensure the flight's safe passage through Venezuela, a portion of which was then paid to the defendant. (*Id.*)

The defendant, along with Maduro Moros, also deployed Venezuelan law enforcement and the military in furtherance of their drug trafficking, sourcing cocaine, in part, from law enforcement seizures and then using the assistance of armed military escorts to protect and transport those drug loads through Venezuela. (*Id.* ¶ 21(d)). In addition, both the defendant and Maduro Moros maintained state-sponsored gangs known as *colectivos* to facilitate and protect their drug trafficking operation. (*Id.*). They also resorted to extreme violence in furtherance of their drug trafficking and corruption, ordering kidnappings, beatings, and murders against those who owed them money or otherwise undermined them. (*Id.*).

On January 3, 2026, Maduro Moros and the defendant were apprehended and brought to the Southern District of New York to face the charges contained in the Indictment. The Court has scheduled trial to begin on June 1, 2027.

**APPLICABLE LAW**

Under the Bail Reform Act, 18 U.S.C. §§ 3141 *et seq.*, the Court may order a defendant's detention pending trial upon a determination that the defendant is either a danger to the community or a risk of flight. 18 U.S.C. § 3142(e). A finding of risk of flight must be supported by a preponderance of the evidence. *See*, *e.g.*, *United States v. Patriarca*, 948 F.2d 789, 793 (1st Cir. 1991); *United States v. Jackson*, 823 F.2d 4, 5 (2d Cir. 1987); *United States v. Chimurenga*, 760 F.2d 400, 405 (2d Cir. 1985). A finding of dangerousness must be supported by clear and convincing evidence. *See*, *e.g.*, *United States v. Ferranti*, 66 F.3d 540, 542 (2d Cir. 1995); *Patriarca*, 948 F.2d at 792; *Chimurenga*, 760 F.2d at 405.

The Bail Reform Act lists four factors to be considered in the detention analysis: (1) the nature and circumstances of the crimes charged, including whether the offense involves a controlled substance or firearm; (2) the weight of the evidence against the defendant; (3) the history and characteristics of the defendant, including the person's "character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, [and] past conduct," among other factors; and (4) the "nature and seriousness of the danger to any person or the community that would be posed by the person's release." *See* 18 U.S.C. § 3142(g). The concept of "dangerousness" encompasses not only the effect of a defendant's release on the safety of identifiable individuals, such as victims and witnesses, but also "'the danger that the defendant might engage in criminal activity to the detriment of the community.'" *United States v. Millan*, 4 F.3d 1038, 1048 (2d Cir. 1993) (quoting legislative history).

Evidentiary rules do not apply at detention hearings, and the Government is entitled to present evidence by way of proffer, among other means. *See* 18 U.S.C. § 3142(f)(2); *see also* *United States v. LaFontaine*, 210 F.3d 125, 130-31 (2d Cir. 2000) (noting that the government is

entitled to proceed by proffer in detention hearings). And where a judicial officer concludes after a hearing that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community, such judicial officer shall order the detention of the person before trial." 18 U.S.C. § 3142(e)(1).

The Government bears the burden of establishing that the defendant poses a flight risk by a preponderance of the evidence, and that she poses a danger to the community by clear and convincing evidence. *See* 18 U.S.C. § 3142(f)(2); *see also United States v. Sabhnani*, 493 F.3d 63, 75 (2d Cir. 2007). However, "[s]ubsection (e) of § 3142 provides that there is a rebuttable presumption that 'no condition or combination of conditions will reasonably assure' against flight or danger where probable cause supports a finding that the person seeking bail committed certain types of offenses." *United States v. English*, 629 F.3d 311, 319 (2d Cir. 2011) (quoting 18 U.S.C. § 3142(e)(3)). When the presumption established by Section 3142(e)(3) applies, the defendant "bears a limited burden of production" to "rebut that presumption by coming forward with evidence that he does not pose a danger to the community or a risk of flight." *United States v. Mercedes*, 254 F.3d 433, 436 (2d Cir. 2001). "Although the government retains the burden of persuasion, a defendant must introduce some evidence contrary to the presumed fact in order to rebut the presumption." *United States v. Rodriguez*, 950 F.2d 85, 88 (2d Cir. 1991) (citing *United States v. Martir*, 782 F.2d 1141, 1144 (2d Cir. 1986)). "Once a defendant introduces rebuttal evidence, the presumption, rather than disappearing altogether, continues to be weighed along with other factors to be considered when deciding whether to release a defendant." *Id.*

## ARGUMENT

### I. Counts Two and Three Establish a Presumption of Pretrial Detention

As the defendant concedes (*see* Dkt. 327 at 1), Counts Two and Three of the Indictment give rise to a presumption under Section 3142(e) that the defendant should be detained pending

trial. "'[A]n indictment returned by a duly constituted grand jury conclusively establishes the existence of probable cause for the purpose of triggering the rebuttable presumptions set forth in § 3142(e).'" *United States v. Hoey*, No. 11 Cr. 337 (PKC), 2014 WL 572525, at *1 (S.D.N.Y. Feb. 13, 2014) (quoting *English*, 629 F.3d at 319). Count Two charges a violation of the Controlled Substances Act with a maximum penalty of life imprisonment, which triggers the presumption. *See* 18 U.S.C. § 3142(e)(3)(A). So too does Count Three, which alleges a particularly serious violation of Section 924(c) that involves machineguns and destructive devices. *See* 18 U.S.C. § 3142(e)(3)(B). Therefore, there is a presumption in favor of pretrial detention.

## II. The Defendant Should Be Detained Based on the Section 3142(g) Factors

For the reasons set forth below, the defendant presents an extreme risk of flight and danger to the community, and therefore she cannot overcome the statutory presumption in favor of detention in this case. Even in the absence of the statutory presumption, the relevant factors identified in Section 3142(g)—the nature and circumstances of the offense, the strength of the evidence, the history and characteristics of the defendant, and the nature and seriousness of the danger to any person or the community that would be posed by the person's release—all strongly support continued pretrial detention. The defendant is charged with serious, violent crimes involving the distribution of massive quantities of cocaine, and is alleged to have engaged in a long-term and egregious course of conduct. The penalties at issue are appropriately severe, including a mandatory minimum 40-year sentence and a maximum of life in prison. The evidence against the defendant is overwhelming. She lacks ties to the United States and maintains strong connections abroad, including to her home country, which does not extradite its own nationals.[2]

[2] The Government consulted with the Department of Justice's Office of International Affairs, which advised that under the Venezuelan constitution, Venezuela is prohibited from extraditing its

(*continued on next page*)

The weight of each of these factors against the defendant is so strong that, standing alone, they would justify continued detention. Accordingly, based on all of these considerations, the defendant should be detained pending trial.

**A. The Nature and Circumstances of the Offense**

The nature and circumstances of the charged offenses demonstrate that the defendant poses a danger to the community and a significant risk of flight. Counts Two, Three, and Four charge the defendant and her co-conspirators with engaging in large-scale, long-term, and heavily armed drug trafficking. The Indictment contains findings by the grand jury that the defendant's drug-trafficking and related corruption and violence were as varied as they were prolific. The defendant received bribes to facilitate large-scale narcotrafficking sanctioned by government officials, such as the director of Venezuela's anti-drug agency; sourced cocaine for trafficking, in part, from purported law enforcement seizures; and ordered kidnappings, beatings and murders of those who sought to undermine her illicit activity.(*See* Indictment ¶ 21(b), (d)).

In light of the gravity of the defendant's conduct, the serious charges in the Indictment carry appropriately heavy penalties. Count Two carries a mandatory minimum term of 10 years' imprisonment and a maximum term of life. *See* 21 U.S.C. § 960(b)(1)(B). Count Three carries a mandatory consecutive term of 30 years' imprisonment and a maximum term of life. *See* 18 U.S.C. § 924(c)(1)(B)(ii). Count Four carries a maximum term of life imprisonment. *See* 18 U.S.C.

own citizens. The prohibition is contained in Article 69 of the Venezuelan constitution. *See* Constitution of the Bolivarian Republic of Venezuela, UNIVERSITY OF MINNESOTA HUMAN RIGHTS LIBRARY, https://hrlibrary.umn.edu/research/venezuela-constitution.html (last visited Sept. 23, 2026) ("Article 69 [ . . . ] Extradition of Venezuelans is prohibited.") (in English translation from the original text).

§ 924(o). As a result of these charges, the defendant faces a mandatory minimum term of 40 years' imprisonment and a maximum term of life.[3]

As the Second Circuit has noted, "[t]he lengthy jail sentence that could be imposed for the charged crimes provides an incentive to flee." *United States v. Liebowitz*, 669 F. App'x 603, 605 (2d Cir. 2016); *see also United States v. Alindato–Perez*, 627 F. Supp. 2d 58, 66 (D.P.R. 2009) ("[T]he steeper the potential sentence, the more probable the flight risk is, especially considering the strong case of the government . . . ."). Here, the defendant is facing a mandatory minimum of 40 years in prison. This fact alone would provide a compelling incentive for anyone to flee from prosecution, but the incentive to flee is especially strong for this defendant, who, at age 69, faces the very real prospect of spending the rest of her life in prison. Thus, for both of these reasons—the horrific nature of the charged conduct, and the penalties which the defendant now faces—the nature and circumstances of the charged offenses weigh in favor of pretrial detention.

**B. The Strength of the Evidence**

The strength of the evidence against the defendant also counsels in favor of pretrial detention. As the facts set forth in the Indictment make plain, the evidence in this case is strong. The Government expects to call at trial multiple cooperating witnesses who participated in drug-trafficking, violence, and other illicit activities with, or at the direction of, the defendant and Maduro Moros, or who have knowledge of the defendants' co-conspirators undertaking such activities with, or at the direction of, the defendant and Maduro Moros. These include witnesses who interacted directly with the defendant and can give a first-hand account of what they saw and heard regarding the defendant's conduct. Their testimony will provide detailed, credible, and

---

[3] Additionally, the applicable Guidelines sentence would almost assuredly be life imprisonment, in light of, among other things, the quantity of drugs involved, her leadership role, and the use of firearms.

corroborated information against the defendant, and such compelling evidence of guilt at trial in this case weighs heavily in favor of detention.

### C. The Characteristics of the Defendant

#### 1. Foreign Connections, Financial Resources, and History in Venezuela

The characteristics of the defendant, such as her extensive foreign connections and apparent access to substantial financial resources, strongly support detention.

*First*, the defendant is a citizen of Venezuela, which does not extradite its own citizens, and further has extensive personal and political connections in Venezuela—including multiple siblings, children, and other family—with no ties to the United States. *See Sabhnani*, 493 F.3d at 76-77 (finding Government's "argument for detention" to be "particularly compelling" because "flight would impose no insurmountable personal or professional hardship" on the defendant and he had, "not surprisingly, maintained strong family ties" abroad); *United States v. Reza Zarrab*, No. 15 Cr. 867 (RMB), Decision & Order (S.D.N.Y. June 16, 2016) (Dkt. No. 41) (denying bail to defendant charged with export violations based on, among other things, defendant's lack of ties to the United States, significant wealth and resources, and extensive international travel). While the defendant contends that her "one very significant, current connection to the United States" is her husband and co-defendant Maduro Moros, and that she is committed to supporting her husband "with her constant presence," such a commitment is not realistic under the bail conditions that the defendant herself proposes—namely, home detention, with permitted leave only for necessary medical and legal appointments. (Dkt. 327 at 3). Indeed, as the Court is aware, in light of the massive security apparatus required to ensure the safety and protection of the defendant and Maduro Moros when either is moved from any secure location, such as, for example, between the Metropolitan Detention Center ("MDC") and the Court, to the extent the defendant believes that,

while on home detention, she would have unfettered access to Maduro Moros amounting to a "constant presence," that belief is mistaken.

*Second*, the defendant appears to have access to significant financial resources that would enable her flight from prosecution. This is evident by the very bail package proposed by the defendant, which includes retention of a private security force, rental or purchase of a residence, hiring of a "third-party custodian" to monitor compliance with pretrial release conditions, and installation of 24-hour surveillance systems and other monitoring technology. Yet, the defendant's finances are seemingly opaque. Indeed, the defendant has provided the Court with zero information about any funds or assets in the United States or abroad. So far as the Government is aware, the defendant has not completed a financial affidavit, under penalty of perjury, in connection with her application for bail, thereby denying the Court any insight into the magnitude or scope of the defendant's resources. Moreover, despite such apparent financial resources, glaringly absent from the defendant's proposed bail package is any commitment to post a bond, secured or unsecured, and, identify any potential co-signers to such a bond—as is customary in bail proceedings in this District. The Court should be troubled by all of the foregoing in light of the strong indicia of the defendant's access to enormous resources.

*Third*, to the extent that the defendant points to the fact that she was never previously charged in Venezuela and that, as an attorney, she held public positions in service of her country, including as attorney general, (Dkt. 327 at 14), such claims are unavailing. Indeed, those are points for concern in that defendant, despite her legal training and positions of public trust, she betrayed both to engage in a decades-long conspiracy involving serious and violent criminal conduct. And she avoided any accountability by her abuse and manipulation of the power afforded to her in those positions of public trust.

### 2. Medical Conditions and Treatment

The defendant asserts that a "serious and documented cardiac condition" of hers "independently warrants release," (Dkt. 327 at 7), and that she "deserves the opportunity to await her trial while on home confinement, recovering from invasive heart surgery" (*Id.* at 1). The defendant, however, "does not dispute"—and cannot dispute—"that she has received excellent care from medical professionals, both inside the MDC and at the [Brooklyn] hospital" where the Bureau of Prisons ("BOP") has arranged for additional medical care and examination as needed. (*Id.* at 7 n.2). Further, the defendant cannot dispute that no medical professional, including the one her defense team has retained to consult, has determined that she must undergo "heart surgery." Indeed, as detailed below, the defendant has repeatedly refused for months—against medical advice—to undergo a routine diagnostic procedure that would allow medical professionals to better determine any additional course of treatment needed in connection with her cardiac condition. The defendant now has agreed to undergo such diagnostic procedure but only as proposed condition of her release. (*Id.* at 327 at 8). In essence, the defendant has effectively created a medical hardship that she now relies on to seek release. The Court should reject these bases for release. The defendant has received, and will continue to receive, appropriate medical care and any claim to the contrary is belied by her own medical records and documented refusal of necessary procedures.

More specifically, counsel for the defendant first raised with the Government and the BOP in March and April 2026 concerns regarding the defendant's pre-existing condition of a mitral valve prolapse—i.e., when the valves of the mitral valve of the heart do not close tightly[4]—and

[4] *Mitral Valve Prolapse*, MedlinePlus, National Library of Medicine, National Institutes of Health, https://medlineplus.gov/mitralvalveprolapse.html (last visited Sept. 22, 2026).

additional concerns regarding elevated blood pressure readings and complaints of angina—i.e., chest discomfort or pain due to poor blood flow.[5] The BOP responded quickly to provide necessary treatment and care that was clinically indicated by medical professionals, as detailed below.[6] Her care has continued to date, and she does not need to be released on this basis.

On April 23, 2026, the defendant underwent a stress test at The Brooklyn Hospital Center ("TBHC") with three different cardiologists present, one of whom was Spanish-speaking, and immediately thereafter a cardiac catheterization was recommended to "define coronary anatomy."[7] Ex. A at 65-66, 71, 72, 74. [redacted]

[5] *Angina*, MedlinePlus, National Library of Medicine, National Institutes of Health, https://medlineplus.gov/ency/article/001107.htm (last visited Sept. 22, 2026).

[6] The defendant submitted as Exhibit C to her motion a set of her BOP medical records current as of August 17, 2026. For completeness and to provide the Court with an updated set of the defendant's BOP medical records, attached hereto as Exhibit A are the defendant's latest set of BOP medical records, current as of September 21, 2026. In light of the detailed, personal medical information pertaining to the defendant that is contained therein, the Government submits Exhibit A under seal. The pagination cites to Exhibit A in this memorandum correspond to the overall pagination of Exhibit A, and such page numbers appear in Exhibit A in large, bolded three-digit page numbers in the lower right corner of each page of Exhibit A. Finally, the Government has filed this memorandum on the public docket with redactions to protect any detailed, personal medical information of the defendant not otherwise openly addressed without redaction in the defendant's opening memorandum (which contained no redactions in discussing the defendant's medical conditions and treatment). The Government will submit to the Court for filing under seal an unredacted copy of this memorandum.

[7] Cardiac catheterization is a diagnostic procedure lasting 30 to 60 minutes that "involves passing a thin flexible tube (catheter) into the right or left side of the heart . . . most often inserted from the groin or the arm"—i.e. "an intravenous (IV) line"—which allows the doctor to: "[c]ollect blood samples from the heart"; "[m]easure pressure and blood flow in the heart's chambers and in the large arteries around the heart"; "[m]easure oxygen levels in different parts of [the] heart"; "examine the arteries of the heart"; and "[p]erform a biopsy of the heart muscle." *Cardiac catheterization*, MedlinePlus, National Library of Medicine, National Institutes of Health, https://medlineplus.gov/ency/article/003419.htm (last visited Sept. 22, 2026).

[redacted]

In the course of such treatment, the Government and the BOP were engaged with counsel for the defendant regarding her care. While the Government and BOP understood counsel was consulting with a private physician retained by the defense who was making certain recommendations as to medication, the BOP advised counsel that it must follow the course of treatment prescribed by BOP and contracted TBHC medical personnel and physicians actually

[8] *Doppler Ultrasound*, MedlinePlus, National Library of Medicine, National Institutes of Health, https://medlineplus.gov/lab-tests/doppler-ultrasound/ (last visited Sept. 22, 2026).

[9] *Arrhythmia*, MedlinePlus, National Library of Medicine, National Institutes of Health, https://medlineplus.gov/arrhythmia.html (last visited Sept. 22, 2026).

treating the defendant. Nevertheless, the Government learned that even the private physician retained by the defense acknowledged in a June 23, 2026 email forwarded by counsel the limitation posed by the fact that medical personnel have not been able to "document that [the defendant] has coronary artery disease via a cardiac cath[eterization]."[10] In other words, despite what appears to be vehement agreement by all, including the defendant-retained physician, as to the necessity of this next diagnostic step, the defendant continues to refuse to undergo the procedure while in custody. Accordingly, the defendant's claims of needing to be released so that she can properly "recover[] from invasive heart surgery" are unfounded because no such diagnosis or course of treatment has been determined—possibly owing to the defendant's own refusal to undergo a threshold test before any next step is scheduled. Even still, as the above record demonstrates, the BOP is prepared to address the defendant's cardiac condition and has committed to abide by whatever post-procedure recovery regimen is prescribed as appropriate by medical professionals. (*See* Dkt. 327 at 7-8).

Finally, to the extent the defendant complains about the number of medications she has been prescribed and suggests they are indicative of her deteriorating health while in custody, these claims are also unfounded. To address elevated blood pressure, BOP medical personnel have prescribed various medications over the course of the defendant's time in custody, and indeed, as the medical records make plain, they appear to have had the intended effect, lowering the defendant's blood pressure to consistently within or about a normal range. *See* Ex. A at 243-45 (listing all blood pressure readings while in custody showing [redacted]

[10] This email is attached hereto as Exhibit B and, like Exhibit A, due to other detailed, personal medical information pertaining to the defendant contained therein, is also submitted to the Court for filing under seal.

[redacted][11]). To be sure, if the defendant did *not* receive medication that she felt necessary, she would be relying on the lack of medication to be a basis for relief; she now argues the opposite, claiming that medication she is receiving, which appears to be working, supports the same. This argument strains credibility and also should be swiftly rejected.

In sum, the foregoing demonstrates, as the defendant concedes, that the BOP has "gone to great lengths to support" the defendant (Dkt. 327 at 11), and nothing in the record before the Court indicates that it will stop doing so in the future. Accordingly, the defendant's medical condition and related care and treatment do not warrant her release.

### D. The Nature and Seriousness of Danger to Any Person and the Community

The danger posed by the defendant also weighs in favor of pretrial detention. "[I]t is clear that the harm to society caused by narcotics trafficking is encompassed within Congress' definition of 'danger'" under the Bail Reform Act. *United States v. Leon*, 766 F.2d 77, 81 (2d Cir. 1985); *see also United States v. Ambrosio*, No. 94 Cr. 674 (DC), 1995 WL 138605, at *2 (S.D.N.Y. Mar. 30, 1995) ("[The defendant] is charged with masterminding an international drug ring involving the importation and distribution of large amounts of narcotics, which raises a strong presumption of dangerousness."). The defendant's drug-trafficking activities here were particularly dangerous not only because they involved ton-quantities of cocaine destined for the United States but also because of the means of violence and intimidation she and her co-conspirators used against those who threatened such activities. As described in the Indictment, Maduro Moros and the defendant engaged in acts of violence including by "order[ing] kidnappings, beatings, and murders against

[11] *See High blood pressure in adults – hypertension*, MedlinePlus, National Library of Medicine, National Institutes of Health, https://medlineplus.gov/ency/article/000468.htm (last visited Sept. 22, 2026) ("Normal blood pressure is when your blood pressure is lower than 120/80 mm Hg most of the time"

those who owed them drug money or otherwise undermined their drug trafficking operation, including ordering the murder of a local drug boss in Caracas, Venezuela." (Indictment ¶ 21(d)). If bailed, the defendant would pose a greater danger not only to the United States but also to Venezuela in that she could seek to direct intimidation of witnesses and victims still in Venezuela or elsewhere around the world. *See United States v. Choudhry*, 941 F. Supp. 2d 347, 358 (E.D.N.Y. 2013) ("Although 18 U.S.C. § 3142 does not define the term community, courts considering the scope of this term have concluded that it may encompass communities outside the United States at risk of danger from a particular defendant." (citations omitted)). Indeed, the defendant's dangerousness is also exacerbated by the fact that her co-conspirators include several other powerful individuals, including unapprehended co-defendants in Venezuela, who are capable of violence and witness intimidation. *See United States v. Bellomo*, 944 F. Supp. 1160, 1167 (S.D.N.Y. Oct. 30, 1996) (reasoning that defendant "is a danger at least as much for what he might direct or assist others in doing as for what he might do himself"). Such co-defendants corruptly wield and influence levers of state power. By way of example, as alleged in the Indictment, Maduro Moros worked with others to cover up their crimes by authorizing the arrest and detention of innocent Venezuelans. In particular, after a load of drugs dispatched by co-defendants Diosdado Cabello Rondón and Hugo Armando Carvajal Barrios was seized in Mexico in 2006, Maduro Moros "and others authorized the arrests of certain Venezuelan military officials in an effort to divert public and law enforcement scrutiny away from Maduro Moros's, Cabello Rondón's, and Carvajal Barrios's participation in the [cocaine] shipment and its coverup." (Indictment ¶ 21(i)). This ability to arrest and detain potential witnesses using force usually reserved for the state creates additional risk not typically present in even the most violent cases. Here, while no longer in Venezuela, there would remain a real risk that the defendant, if released, could still communicate

and otherwise direct co-conspirators in Venezuela to target witnesses and victims of the conspiracy. For all of these reasons, the danger posed by the defendant is yet another consideration that supports the denial of her application for bail.

## III. There Are No Bail Conditions That Would Adequately Protect the Public and Ensure the Defendant's Appearance

In light of the foregoing, there are no bail conditions that could sufficiently mitigate the danger and flight risk posed by the defendant, and the defendant's proposal falls far short of demonstrating that her pretrial release is appropriate under these circumstances.

### A. The Defendant's Proposed Private Security Condition Would Violate the Bail Reform Act in this Case

It is black letter law in this Circuit that "the Bail Reform Act does not permit a two-tiered bail system in which defendants of lesser means are detained pending trial while wealthy defendants are released to self-funded private jails." *United States v. Boustani*, 932 F.3d 79, 82 (2d Cir. 2019); *see also United States v. Maxwell*, 510 F. Supp. 3d 165, 177 (S.D.N.Y. 2020) ("[T]he Defendant's argument that private security guards could ensure her appearance at future proceedings runs afoul of the Bail Reform Act, which the Second Circuit has held 'does not permit a two-tiered bail system in which defendants of lesser means are detained pending trial while wealthy defendants are released to self-funded private jails.'" (quoting *Boustani*, 932 F.3d at 82)). This principle protects the Constitution's guarantee of equal protection and ensures all defendants—poor, wealthy, and even the uber-wealthy—are treated the same under the law. *See Boustani*, 932 F.3d at 82. The defendant here seeks to circumvent this basic tenet of justice and buy her way out of jail by hiring guards to watch her inside of a private residence (that has yet to be proposed by the defendant). This is nothing more than an attempt to leverage her wealth to receive special treatment that is forbidden under the law. Courts in this Circuit presented with these proposals have repeatedly rejected them. *See, e.g.*, *United States v. Alexander*, No. 24 Cr.

676 (VEC), Order (S.D.N.Y. Jan. 15, 2025) (Dkt. 35) *aff'd* No. 25-222, 2025 WL 1693152, at *1 (2d Cir. June 17, 2025); *United States v. Combs*, No. 24 Cr. 542 (AS), 2024 WL 4903741, at *3 (S.D.N.Y. Nov. 27, 2024); *Maxwell*, 510 F. Supp. 3d at 177; *United States v. Epstein*, 425 F. Supp. 3d 306, 326 (S.D.N.Y. 2019); *United States v. Raniere*, No. 18 Cr. 204 (NGG), 2018 WL 3057702, at *7 (E.D.N.Y. June 20, 2018); *United States v. Valerio*, 9 F. Supp. 3d 283, 296 (E.D.N.Y. 2014). This Court should do the same here.

In *Boustani*, the Second Circuit directly confronted the question of whether private guards are a permissible bail condition and held that the Bail Reform Act permits the use of private guards to avoid pretrial detention *only* where the defendant is detained on risk of flight premised on his wealth. "[A] defendant may be released on such a condition only where, *but for* his wealth, he would not have been detained." *Boustani*, 932 F.3d at 82 (emphasis in original). This, however, is the exception to the rule. Where, as here, there are additional factors that require detention—including other factors going to risk of flight—the use of private security guards is not permitted under the Bail Reform Act. *See id.* ("[I]f a similarly situated defendant of lesser means would be detained, a wealthy defendant cannot avoid detention by relying on his personal funds to pay for private detention."); *see also Alexander*, 2025 WL 1693152, at *1 ("[T]he record supports the district court's finding that Defendants-Appellants' proposed conditions, which included a private security force, could not reasonably assure the safety of the community and Defendants-Appellants' appearance. Given its finding that Defendants-Appellants posed a danger to others, the district court did not err in finding that private detention would be inappropriate, as it 'did not rely primarily on [Defendant-Appellants'] personal wealth in finding that [they] posed a flight risk.'" (quoting *Boustani*, 932 F.3d at 83)); *Maxwell*, 510 F. Supp. 3d at 177 ("[T]he Defendant's argument that private security guards could ensure her appearance at future proceedings runs afoul

of the Bail Reform Act" because the defendant "would be detained regardless of her wealth . . . ."). Circumstances beyond a defendant's wealth that justify pretrial detention include, "the seriousness of the charged offenses and the lengthy possible sentence [a defendant] would face if convicted"; the strength and nature of the evidence against the defendant; and a defendant's "personal characteristics, including . . . 'frequent international travel . . . and extensive ties to foreign countries without extradition.'" *Boustani*, 932 F.3d at 83; *see also* 18 U.S.C. § 3142(g).

This case is far afield from one where the need for detention is based solely on risk of flight related to the defendant's wealth. The defendant is an extreme flight risk regardless of her wealth and presents a clear danger to others and the community. Here, the defendant's wealth only exacerbates an already clear risk of flight. *See Boustani*, 932 F.3d at 83 ("It is clear that the District Court did not rely primarily on Boustani's personal wealth in finding that he posed a flight risk. Rather, his wealth was one of many factors the Court considered."). And just as a defendant of lesser means in the same situation would be detained pending trial (including a defendant with foreign contacts and sufficient wealth to pay for travel but insufficient wealth to hire around-the-clock private guards until a trial concluded), so too must the defendant be detained here. *See Maxwell*, 510 F. Supp. 3d at 177 ("As in *Boustani*, the Defendant in the present case would be detained regardless of her wealth, and 'if a similarly situated defendant of lesser means would be detained, a wealthy defendant cannot avoid detention by relying on his personal funds to pay for private detention.'" (quoting *Boustani* 932 F.3d at 82)).

None of the cases the defendant cites where private security was used suggest a different outcome. (*See* Dkt. 327 at 14-16). Each case relied upon by the defendant preceded the Second Circuit's decision in *Boustani*, which cabined the permissible use of private security. And none of the cases involved the same types of offenses or the high mandatory minimums and sentencing

exposure present in this case. For example, in *United States v. Seng*, the defendant was charged with bribery and money laundering offenses and was ultimately sentenced to 48 months' imprisonment. *See* No. 15 Cr. 706 (S.D.N.Y.). And, in any event, even if the use of private security guards were appropriate in this case, such a condition would fall far short of justifying release for all of the reasons otherwise detailed in this opposition.

### B. The Defendant's Proposed Bail Package Does Not Otherwise Mitigate the Risks of Danger and Flight

As an initial matter, as noted above, the defendant's proposed bail package fails to commit to post a bond of any kind and identify any potential co-signers to such a bond. In light of the impermissibility of the private security proposal, the absence of any proposed bond should be of concern to the Court. Even still, any amount posted, even if secured, would not substantially mitigate the significant incentive to flee and avoid what for her would amount to a sentence of life in prison.

Moreover, putting aside its impermissibility, the defendant's private security proposal is flawed in that there is an inherent conflict of interest present when the prisoner is the one paying her own jailers. *See Epstein*, 425 F. Supp 3d at 326 (noting that there is a "conflict that is created by the salary the 'trustees' are earning from the Defendant and their purported role as independent monitors. (The same problem arises in relation to private 24/7 security guards.)"); *United States v. Boustani*, 356 F. Supp. 3d 246, 257 (E.D.N.Y. 2019) ("Guidepost employees would face a clear conflict of interest—private prison guards paid by an inmate."); *United States v. Tajideen*, No. 17 Cr. 46, 2018 WL 1342475, at *6 (D.D.C. Mar. 15, 2018) ("While the Court has no reason to believe that the individuals selected for the defendant's security detail would intentionally violate federal law and assist the defendant in fleeing the Court's jurisdiction, it nonetheless is mindful of the power of money and its potential to corrupt or undermine laudable objectives. And although these

realities cannot control the Court's ruling, they also cannot be absolutely discounted or ignored."). The conflict of interest is not only one of divided loyalty but also a financial one where a security guard's act of reporting violations of bail conditions would risk ending a lucrative contract for his employer and potentially his own salary. This creates a risk that a company and its employees would observe, if not outright assist, bail condition violations, without bringing them to the Court's attention. *See Boustani*, 356 F. Supp. 3d at 257 ("[T]he defendant in [*Seng*], who was released to private armed guards from Guidepost in an arrangement similar to what defendant proposes here, was outside of his apartment virtually all day, every weekday; was visited by a masseuse for a total of 160 hours in a 30-day period; and went on an unauthorized visit to a restaurant in Chinatown with his private guards in tow.").[12]

Further, irrespective of the conflict of interest, the capabilities of a private security team are also limited. Private security guards are substantially limited in their ability to stop or restrain a defendant determined to flee or otherwise violate her conditions. *See Valerio*, 9 F. Supp. 3d at 295 ("The questions about the legal authorization for the private security firm to use force against defendant should he violate the terms of his release, and the questions over whether the guards can or should be armed, underscore the legal and practical uncertainties—indeed, the imperfections—of the private jail-like concept envisioned by defendant, as compared to the more secure option of an actual jail."); *see also Boustani*, 356 F. Supp. 3d at 258 ("Although Defendant has consented to the use of 'any' force by Guidepost and has waived his right to sue any party in connection with the risks and dangers associated with escape attempts, it is not clear such an agreement is

[12] While the Government is not aware of instances where a defendant with a private security bail condition has fled the jurisdiction, that is beside the point. Courts do not allow defendants that present the enormous risk of flight that is presented here to be released, with or without private security guards. Nevertheless, in *Seng*, a case the defendant cites, private security did not ensure compliance with pretrial release conditions.

enforceable—and the defense fails to point to precedent suggesting it would be. Defendant cannot consent to the use of deadly force."). Beyond questions of the defendant's ability to consent to use of force by private security, such an arrangement also implicates the safety of the community. *Raniere*, 2018 WL 3057702, at *7 ("[A]ny escape attempt would also present the risk of a confrontation between armed guards and Defendant (or his followers) in the streets of New York City, which would mean that any reduction in the Defendant's flight risk from this proposal would be at least partially offset by a greater risk to the community.").

Finally, the defendant's proposed use of location monitoring should also be of no comfort to the Court. In particular, a GPS monitoring bracelet is of no persuasion because it does nothing to prevent the defendant's flight *after it has been removed.* At best, home confinement and electronic monitoring would reduce her head start should she decide to cut the bracelet and flee. *See United States v. Banki*, 10 Cr. 008 (JFK), Order (S.D.N.Y. Jan. 21, 2010) (Dkt. 7) (denying bail to a naturalized citizen who was native to Iran, who was single and childless and who faced a statutory maximum of 20 years' imprisonment, and noting that electronic monitoring is "hardly foolproof."), *aff'd*, 369 F. App'x 152 (2d Cir. 2010); *United States v. Zarger*, No. 00 Cr. 773, 2000 WL 1134364, at *1 (E.D.N.Y. Aug. 4, 2000) (rejecting defendant's application for bail in part because home detention with electronic monitoring "at best . . . limits a fleeing defendant's head start"); *United States v. Benatar*, No. 02 Cr. 099, 2002 WL 31410262, at *3 (E.D.N.Y. Oct. 10, 2002) (same).

**CONCLUSION**

For the foregoing reasons, the Court should deny the defendant's motion for pretrial release.

Dated: New York, New York
September 23, 2026

Respectfully submitted,

JAMES M. MCDONALD
United States Attorney for the
Southern District of New York

By: /s/
Kaylan E. Lasky
Henry L. Ross
Kevin T. Sullivan
Kyle A. Wirshba
Assistant United States Attorneys