UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

v.

CILIA ADELA FLORES de MADURO, et al.,

Defendants.

S4 11-CR-205 (AKH)

**REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF CILIA ADELA FLORES de MADURO'S APPLICATION FOR PRETRIAL RELEASE**

# TABLE OF CONTENTS


**Page(s)**

TABLE OF AUTHORITIES ........ iv

LIST OF EXHIBITS ........ v

PRELIMINARY STATEMENT ........ 1

ARGUMENT ........ 4

I. MS. FLORES DE MADURO'S CARDIAC CONDITION SUPPORTS RELEASE ........ 4

- A. The Government Answers an Argument She Did Not Make ........ 4
- B. The Government Does Not Dispute the Facts She Presented ........ 4
- C. Her Decision on the Timing of Catheterization Is Reasonable ........ 5
- D. A Single Blood-Pressure Reading Does Not Answer Her Cardiac Condition ........ 7
- E. The BOP's Commitment Does Not Change Where She Would Recover ........ 7

II. THE GOVERNMENT'S CENTRAL PREMISE THAT MS. FLORES DE MADURO IS WEALTHY IS CONTRADICTED BY THE RECORD ........ 8

- A. Her Unchallenged Affidavit Establishes That She Has No Funds ........ 8
- B. *Boustani* Does Not Bar the Proposed Conditions, and Courts in This Circuit Have Released Defendants on Comparable Packages Since ........ 10
  - 1. *Boustani* Permits Private Security Where the Government's Flight Theory Rests on Wealth ........ 11
  - 2. A Non-Extradition Country and Surrendered Travel Documents Do Not Establish an Unmanageable Flight Risk ........ 12
  - 3. Presumption-Triggering Narcotics and Firearms Charges Do Not Foreclose Release ........ 12
  - 4. *Boustani* Itself Is Inapposite ........ 14
- C. The Absence of a Secured Bond Reflects Her Lack of Assets, Not Concealment ........ 14

III. THE GOVERNMENT HAS NOT SHOWN BY CLEAR AND CONVINCING EVIDENCE THAT NO CONDITIONS CAN ASSURE THE SAFETY OF THE COMMUNITY ........ 14

- A. The Government Ignores the Conditions Directed at the Precise Risk It Identifies ........ 14
- B. The Allegations Specific to Ms. Flores de Maduro Are Limited, and the Government Does Not Dispute That ........ 15
- C. The Government's Theory of Danger Contradicts Its Own Characterization of Her ........ 16
- D. The Government Does Not Address the Court's Own Observation ........ 16

IV. THE PROPOSED CONDITIONS REASONABLY ASSURE HER APPEARANCE ....16
A. The Standard Is Reasonable Assurance, Not Certainty ....16
B. The Government Does Not Explain How Flight Would Occur....17
C. Her Lack of Ties Is the Product of the Government's Own Choice....17
D. Her Husband's Presence Here Is a Powerful Incentive to Remain....17
E. Residence and Custodian ....18
F. The Remaining Details Are Properly Set as Conditions of Release....18
CONCLUSION....20

## TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*United States v. Boustani*, 932 F.3d 79 (2d Cir. 2019) .......... 10, 11, 12, 13, 14

*United States v. Fox*, 602 F. Supp. 3d 434 (W.D.N.Y. 2022), *aff'd*, No. 22-1043, 2022 WL 2564600 (2d Cir. July 8, 2022) .......... 12, 13, 14

*United States v. Weigand*, 492 F. Supp. 3d 317 (S.D.N.Y. 2020) .......... 11, 12

**STATUTES**

18 U.S.C. § 3142(c)(1)(B) .......... 17, 18

18 U.S.C. § 3142(c)(1)(B)(i) .......... 19

18 U.S.C. § 3142(c)(1)(B)(xii) .......... 19

18 U.S.C. § 3142(c)(1)(B)(xiv) .......... 19

18 U.S.C. § 3142(c)(2) .......... 14

18 U.S.C. § 3142(c)(3) .......... 19

18 U.S.C. § 3142(e) .......... 11

18 U.S.C. § 3142(e)(1) .......... 17

18 U.S.C. § 3142(g) .......... 13

18 U.S.C. § 3142(g)(3)(A) .......... 4

18 U.S.C. § 924(c) .......... 12

**OTHER AUTHORITIES**

Constitution of the Bolivarian Republic of Venezuela, art. 69 .......... 12

## LIST OF EXHIBITS

Ex. 1 Declaration of Andres Sánchez regarding the events of May 21, 2026.

Ex. 2 Filed Under Seal – Proposed Residence of Cilia Adela Flores de Maduro.

Cilia Adela Flores de Maduro submits this reply in further support of her application for pretrial release (ECF 326, 327) and in response to the Government's opposition (ECF 333).

## PRELIMINARY STATEMENT

Since Cilia Adela Flores de Maduro was taken into custody, her heart has produced a 33-beat run of ventricular tachycardia; a stress test was halted for chest pressure and shortness of breath and showed ST depressions in the lateral and inferior leads; and she suffered a 30-minute episode of intense chest pressure for which no labs were drawn. She has lost significant weight and two molars. She entered custody on a single monthly injection and now takes multiple daily cardiac medications and keeps nitroglycerin at hand. The Government disputes none of this.

It minimizes all of it. In the Government's telling, the run of ventricular tachycardia is described only as "certain types of arrhythmias." ECF 333 at 13. A procedure that threads a catheter into her heart is "routine." *Id*. at 11. A single blood-pressure reading shows her medications "appear to have had the intended effect," and her concern about needing so many of them "strains credibility." *Id*. at 14–15. The Government quotes the treating hospital's warning that deferring evaluation risks "sudden worsening of underlying cardiac disease," "life threatening pathology," and "severe adverse outcomes up to and including death," yet argues that she "effectively created a medical hardship." *Id*. at 11, 13.

Prior to January 3, 2026, Ms. Flores de Maduro's heart condition was stable and managed with a single monthly injection. In the early hours of that morning, she was taken from her home in a military operation that, by the Venezuelan government's count, left some 100 people dead. She arrived at the MDC with sutured wounds on her forehead and what the BOP's own intake records describe as "blast proximity injuries to face and bilateral abdomen." ECF 333, Ex. A at 202, 209. She was flown to a country where she knows no one and cannot speak the language, only to spend her first three months at the MDC in solitary confinement. Every finding the

Government now minimizes followed that military operation: the ST depressions, the ventricular tachycardia, the 30-minute episode of chest pressure, and the weight loss. The Government asks the Court to believe that Ms. Flores de Maduro brought these conditions on herself by asking to consult her lawyers before an invasive heart procedure. The far more likely explanation is what happened to her before she ever set foot in a hospital. If this hardship was manufactured, the Government is more the creator than she. A condition serious enough to warrant a warning of death is, the Government says, not serious enough to matter.

The Government mentions Ms. Flores de Maduro's age once. It does so to argue that "at age 69," she has more reason to flee. *Id*. at 8. It never asks what impact age may have for a woman with an unresolved cardiac condition who faces an invasive procedure, and very likely an intervention after it, followed by recovery in a general-population unit of more than 40 detainees, where staff used pepper spray to break up a fight as recently as August 14. In the Government's brief, her age is a reason to fear her. It is never a reason to care for her.

The Government does no better on flight and danger. Where the record is undisputed, as with her health, the Government minimizes it; where there is no record at all, the Government fills the gap with speculation.

“While the Government is not aware of instances where a defendant with a private security bail condition has fled the jurisdiction, that is beside the point.” ECF 333 at 21, n.12. The government has clearly missed the point. In its response to Ms. Cilia Flores de Maduro’s application for pretrial release, the Government asks the Court to indulge in speculation about nefarious activity in which Ms. Flores de Maduro may engage while also suggesting, without support, that she has unfettered access to vast sums of unaccounted for funds that would allow her to flee armed security, while monitored by video and GPS, in a country where she knows no one

and cannot speak the language. As detailed below, their creativity is anchored more in fiction than fact.

The opposition rests on three premises. The record refutes each.

First, the Government argues that she has received excellent medical care. ECF 333 at 11–15. She agrees and says so. ECF 327 at 7, n.2. Her argument is different, and the Government does not answer it: detention is far from an ideal place to recover from cardiac intervention. Moreover, Ms. Flores de Maduro made clear in her application that the catheterization and almost certain cardiac intervention that would follow are but one piece of her overall deteriorating health that requires adequate recuperation.

Second, the Government argues that Ms. Flores de Maduro has "access to enormous resources" and seeks to "buy her way out of jail." ECF 333 at 10, 17. She has no funds to support her defense and has said so under penalty of perjury in an unchallenged affidavit. ECF 293-2, Exhibit B, *Declaration of Cilia Adela Flores de Maduro*. As with her legal defense, the costs of the proposed conditions would be paid by the Republic of Venezuela, not by her. ECF 293-1, Ex. A, *Declaration of Henry Rodríguez Facchinetti* (declaring that the government will fund attorney's fees and all other costs related to defending against the charges brought against Flores de Maduro).

Third, the Government argues that she could direct co-conspirators to intimidate witnesses. ECF 333 at 16–17. The government's opposition never mentions the conditions she proposed to foreclose that very risk: a single recorded and monitored telephone line, a visitor list approved by the United States Attorney's Office, daily visitor logs, and random unannounced searches.

The Government bears the burden of persuasion. On each of these points, it offers either silence or speculation. The application should be granted.

## ARGUMENT

### I. MS. FLORES DE MADURO'S CARDIAC CONDITION SUPPORTS RELEASE

A defendant's "physical and mental condition" is a factor the Court must weigh. 18 U.S.C. § 3142(g)(3)(A). The Government treats it as an afterthought.

#### A. The Government Answers an Argument She Did Not Make

Ms. Flores de Maduro acknowledged that she has received excellent care from medical professionals at the MDC and at the hospital. ECF 327 at 7, n.2. Her argument is that the environment at the MDC, both before and after any procedure, is inadequate for recovery. *Id.* at 8–11. The Government devotes five pages to the quality of her care and does not address the environment at all, the point most relevant to her request for release. ECF 333 at 11–15.

#### B. The Government Does Not Dispute the Facts She Presented

The Government does not dispute that Ms. Flores de Maduro spent three months in solitary confinement among staff with few Spanish speakers. ECF 327 at 8. It does not dispute that on August 14, staff deployed pepper spray to break up a fight in her unit, after which she reported chest tightness and was forced to use her inhaler. *Id.* at 9. It does not dispute that her April 23 stress test was terminated for shortness of breath and chest pressure, also showing frequent premature ventricular contractions and 1–2 millimeter ST depressions in the lateral and inferior leads. *Id.* It does not dispute that her Holter monitor recorded a 33-beat run of non-sustained ventricular tachycardia, which the Government describes only as "certain types of arrhythmias." ECF 333 at 13. It does not dispute that on July 29 she suffered a 30-minute episode of intense chest pressure, and that no labs were drawn. ECF 327 at 10. And it does not dispute that she has not received her monthly mitral valve injection since her detention, has lost more than 25 pounds and two molars,

sleeps three to four hours a night, and cannot find rest in a unit of more than 40 detainees. *Id*. at 7, 10.

### C. Her Decision on the Timing of Catheterization Is Reasonable

The Government contends that Ms. Flores de Maduro "effectively created a medical hardship" by declining catheterization. ECF 333 at 11. She did not. The ST depressions, the premature ventricular contractions, the ventricular tachycardia, and the July 29 episode are findings about her condition. None was caused by her decision to stay the cardiac catheterization.

Nor does that decision reflect indifference to her health. As the Government's own description makes plain, cardiac catheterization is invasive: a catheter is passed into the heart, most often through the groin or arm. ECF 333 at 12, n.7. Its purpose here is to "define coronary anatomy" (*Id.* at 12)—that is, to determine whether further intervention is needed. If it is, she would recover from both the catheterization and the intervention in the same general-population unit. Her concern is not the test itself; it is undergoing an invasive cardiac procedure, and whatever follows from it, only to return to that unit to recover. That is a reasonable decision for a 69-year-old patient, and it is hers to make. She has committed to undergo the procedure promptly upon release, as a condition of that release, since she would be assured of an appropriate setting for recovery. ECF 327 at 4.

Equally as important, the government fails to give full context to the May 21, 2026 event when Ms. Flores de Maduro "was transported to TBHC for a scheduled cardiac catheterization." ECF 333 at 12-13. Attached as Exhibit 1 is a declaration from Andres Sánchez, counsel for Ms. Flores de Maduro, describing the events surrounding the May 21, 2026 event. Ms. Flores de Maduro never consented to the proposed catheterization. Ms. Flores de Maduro had been clear that she wished to consult her counsel before any procedure. Furthermore, her counsel had been in

contact with government representatives expressing Ms. Flores de Maduro's concerns regarding the intervention, the pre- and post-operative procedures, and the environment for recovery. Never did she or her counsel express that she was willing to move forward with the procedure. On the evening of May 20, 2026, Ms. Flores de Maduro was unexpectedly moved into the Special Housing Unit and was awakened the next day with instructions to prepare to be transported. Without prior notice or the ability to confer with her counsel, she was transported to TBHC and was informed that she would undergo the catheterization.[1] She then "refused to undergo the procedure, telling medical professionals that she had not yet made a final decision about the procedure and wanted to consult with her attorneys." ECF 333 at 13. The government emphasizes that Ms. Flores de Maduro "refused that day to undergo a pre-cath doppler," but that decision can hardly be questioned in light of the buildup and movement for a procedure to which she had never agreed to submit. ECF 333 at 13.

The Government also relies on a June 23 email from the defense-retained cardiologist, quoting his acknowledgment that medical personnel have not been able to "document that [she] has coronary artery disease via a cardiac cath." ECF 333 at 14, Ex. B. The Government stops the sentence at the comma. Dr. David Liu, Vice-Chief of Cardiac Surgery at Beth Israel Deaconess Medical Center, wrote: "Although we haven't document[ed] that she has coronary artery disease via a cardiac cath, she had a positive stress test, so it's very likely she has coronary artery disease." ECF 333 Ex. B. His next sentence: "She has angina." *Id*. The email was part of the defense's request that the BOP add a beta blocker to her regimen; the BOP did so five weeks later, the day after her July 29 episode. ECF 333 Ex. A, at 13, 281. No one disputes that catheterization is the next

[1] For a 69-year-old patient, who doesn't speak English, with documented ischemia and arrhythmia, being moved into segregation without explanation on the eve of the procedure, woken, and transported without notice to counsel is hardly sound pre-procedure practice. The experience reinforced her decision to undergo catheterization only where she could prepare for it, and recover from it, outside custody.

diagnostic step. To be precise about the record, no surgery has been scheduled, because that first step has not yet occurred. The question is where she will undergo the procedure, and any intervention it almost certainly indicates, and where she will recover.

### D. A Single Blood-Pressure Reading Does Not Answer Her Cardiac Condition

The Government points to a single blood-pressure reading of 100/59, which it describes as "the last reading in early September," as evidence that her medications are working. ECF 333 at 14–15. The reading is from August 20. ECF 333 Ex. A at 243. The only September entries in the Government's exhibit are two notations that the scheduled reading was "Unavailable"—one because of a legal visit, the other because it was "[n]ot completed on scheduled date" and removed from the scheduler. *Id*. Those medications were not prescribed "[t]o address elevated blood pressure." ECF 333 at 14. The BOP's Clinical Director wrote on April 24 that he wanted to hold the one blood-pressure medication because of her "frequently running low normal BP's," and that "[t]he ASA and Lipitor are the 2 most important meds at this time." ECF 333 Ex. A at 65. Aspirin, atorvastatin, nitroglycerin, and later metoprolol were prescribed for a positive stress test, angina, and "[p]aroxysmal tachycardia," not for blood pressure. *Id*. at 13, 65, 280–82. The concern is ischemia and arrhythmia, which the Government does not address. The significance of her medication history is not the effect, but rather the change: she entered custody taking a single monthly injection, and she now requires multiple daily cardiac medications and keeps nitroglycerin at hand. ECF 327 at 1, 7.

### E. The BOP's Commitment Does Not Change Where She Would Recover

The Government represents that the BOP will abide by whatever post-procedure regimen is prescribed (ECF 333 at 14), and Ms. Flores de Maduro does not doubt it. ECF 327 at 7–8. But a commitment to follow a prescribed regimen does not change where she would follow it: a unit

of more than 40 detainees, with constant noise and periodic disruption, where she cannot rest and recuperate fully from all of her current health issues. The Government does not suggest otherwise.

## II. THE GOVERNMENT'S CENTRAL PREMISE THAT MS. FLORES DE MADURO IS WEALTHY IS CONTRADICTED BY THE RECORD

### A. Her Unchallenged Affidavit Establishes That She Has No Funds

The government's flight argument turns on the belief that Ms. Flores de Maduro has substantial funds available at her fingertips. It asserts that she "appears to have access to significant financial resources," that her finances are "opaque," and that the Court "should be troubled" by "strong indicia" of "enormous resources." ECF 333 at 10. The government doubles down and suggests that "the defendant has provided the Court with zero information about any funds or assets in the United States or abroad, and that, "[s]o far as the Government is aware," she has not completed a financial affidavit. *Id.*

That is incorrect. On March 3, 2026, Ms. Flores de Maduro executed a sworn declaration attesting that she "cannot afford to pay for [her] own legal defense" and that "[i]f the Court requests me to do so, I will submit a financial affidavit to the Court to demonstrate my inability to fund my own legal defense." ECF 293-2, Exhibit B, *Declaration of Cilia Adela Flores de Maduro*. The Government has not challenged her declaration. Rather, it confirmed that "the defendants have said in sworn statements that they do not have those funds available" (ECF 297 at 25 (21:22) while also suggesting that "the defense can continue to try to raise additional money." ECF 297 at 22 (6:7). The government has continued to insinuate, without support, that Ms. Flores de Maduro has "access to significant financial resources." ECF 333 at 9-10. This is a refrain that the government has echoed more than once. The Court pressed the government on this issue during the March 26, 2026 oral argument:

1. MR. WIRSHBA: Your Honor, so first of all, the government does not concede that the defense does not have resources available to them, and I can circle back to that if that would be helpful. ECF 297 at 17 (19:22).
2. THE COURT: Tell me about the availability of other funds.

   MR. WIRSHBA: Well, your Honor, the government is continuing to investigate, obviously… ECF 297 at 21 (23:25) - 22 (1).
3. THE COURT: Circle back and tell me about the availability of other funds.

   MR. WIRSHBA: Your Honor, the government is continuing to investigate the availability of other funds. We do not have anything to bring to bear at this time. ECF 297 at 23 (22:25) - 24 (1).

The Government has made no showing that Ms. Flores de Maduro has access to any resources beyond those thoroughly discussed in sworn submissions and in court. Their investigation has been ongoing for years and they proffered no evidence to the Court to suggest the Government has made any progress on this front since the March 26 suggestion that "the government is continuing to investigate, obviously." It has offered no evidence that the investigation has found anything. An investigation without results is not evidence, and the Government's burden on flight cannot be carried by the possibility that evidence may someday appear.

This directly undercuts several of the government's arguments advanced as reasons for denying release. There is no evidence that she has "access to enormous resources", that she is an "uber-wealthy" person seeking to "buy her way out of jail", that she has some wealth that "exacerbates an already clear risk of flight", or that "the prisoner is the one paying her own jailers." ECF 333 at 10, 17, 19, 20. What was clearly stated in Ms. Flores de Maduro's application was that

"the cost would be borne by Ms. Flores de Maduro's defense, who are responsible for standard monitoring costs and payments associated with pretrial release, and unlike her detention, would not be borne, even in part, by United States taxpayers." ECF 327 at 15. The Court will recall that the Chief of Litigation for the Attorney General's Office of Venezuela submitted a declaration on March 3, 2026, stating in relevant part that "The Venezuelan government thus has a clear, legal obligation to cover all expenses for the First Lady…[including] attorneys fees and all other costs related to defending against the charges brought against her." ECF 293-1, Ex A, *Declaration of Henry Rodríguez Facchinetti*. (emphasis added).

That distinction matters under *Boustani*. The Second Circuit's concern was "a two-tiered bail system in which defendants of lesser means are detained pending trial while wealthy defendants are released to self-funded private jails," and its rule is that "a wealthy defendant cannot avoid detention by relying on his personal funds to pay for private detention." 932 F.3d at 82. Ms. Flores de Maduro is not relying on personal funds; she has attested to her lack of funds. The costs would be borne by a sovereign with a legal obligation to defend its officials, exactly as it bears the cost of her counsel. Nothing in *Boustani* suggests that a defendant without means must be detained because a third party with a legal duty to her would pay for the conditions that assure her appearance.

### B. *Boustani* Does Not Bar the Proposed Conditions, and Courts in This Circuit Have Released Defendants on Comparable Packages Since

The Government contends that "[e]ach case relied upon by the defendant preceded" *Boustani*, and that none "involved the same types of offenses or the high mandatory minimums" at issue here. ECF 333 at 19–20. Neither contention holds. Since *Boustani*, courts in this Circuit have released, on comparable conditions, a foreign national whose home country would not

extradite him and a defendant charged with presumption-triggering narcotics and firearms offenses carrying substantial mandatory minimums.

#### 1. *Boustani* Permits Private Security Where the Government's Flight Theory Rests on Wealth

In *United States v. Weigand*, 492 F. Supp. 3d 317 (S.D.N.Y. 2020), Judge Rakoff released a German national pending trial even though "Germany would likely not extradite him without his consent." *Id.* at 318. The Government invoked *Boustani* against a package that included 24-hour armed guards retained at the defendant's expense and authorized by the court to use reasonable force. *Id.* at 318–19. The court rejected the argument. It noted that *Boustani* itself recognized that a private security arrangement "may be appropriate where the defendant is deemed to be a flight risk primarily because of his wealth." *Id.* at 319 (quoting *Boustani*, 932 F.3d at 82). It then explained that the fairness principle underlying *Boustani* "sounds in equal protection," and that "equal protection works both ways": just as a wealthy defendant may not buy a release unavailable to others, a defendant "cannot be detained when an otherwise similarly situated indigent defendant would be released." *Id.* Because "[t]he Government, and th[e] Court, ha[d] repeatedly emphasized [the defendant's] wealth in explaining the risk of flight," the court held that "the fundamental fairness principle identified in *Boustani*, as well as the Eighth Amendment and 18 U.S.C. § 3142(e), require his release" on conditions that reasonably assured his appearance. *Id.*

The Government's argument here tracks the one rejected in *Weigand*. It warns of "enormous resources," an "uber-wealthy" defendant, and "significant financial resources that would enable her flight," and argues that her wealth "exacerbates an already clear risk of flight." ECF 333 at 10, 17, 19. As shown in Section II.A, the record establishes no such wealth. Either way, *Boustani* does not foreclose the proposed conditions. If Ms. Flores de Maduro lacks personal

wealth, as the record shows, *Boustani*'s concern—a wealthy defendant "relying on his personal funds to pay for private detention"—is absent. ECF 333 at 18 (quoting *Boustani*, 932 F.3d at 82). If instead the Government's flight theory rests on the wealth it attributes to her, the proposed conditions are exactly what *Boustani* permits.

#### 2. A Non-Extradition Country and Surrendered Travel Documents Do Not Establish an Unmanageable Flight Risk

*Weigand* also answers the Government's reliance on Article 69 of the Venezuelan Constitution. ECF 333 at 6 n.2, 9. The court found that Germany's likely refusal to extradite "would not be enough standing alone to show a risk of flight because [the defendant's] only passport [was] in the custody of the United States authorities." 492 F. Supp. 3d at 318. What had led the court to order detention initially was the defendant's "substantial wealth." *Id.* Here, Ms. Flores de Maduro has no travel documents and can apply for none, and she has no personal funds. The package Judge Rakoff approved included 24-hour confinement in an apartment, armed guards authorized to use reasonable force, visitors pre-approved by Pretrial Services, and GPS monitoring. *Id.* at 318, 320–21. Ms. Flores de Maduro proposes each of those conditions and more: a single hardline subject to a consensual Title III wiretap, visitors approved by the United States Attorney's Office, daily visitor logs transmitted to the Government, random unannounced searches, and video provided to the Government. ECF 327 at 3–4.

#### 3. Presumption-Triggering Narcotics and Firearms Charges Do Not Foreclose Release

In *United States v. Fox*, 602 F. Supp. 3d 434 (W.D.N.Y. 2022), *aff'd*, 2022 WL 2564600 (2d Cir. July 8, 2022), the defendant was charged with heroin distribution causing serious bodily injury, possession of a firearm in furtherance of drug trafficking under § 924(c), and sex trafficking by coercion—charges carrying mandatory minimums of 5, 20, 15, and 15 years and triggering the

same presumptions at issue here. *Id.* at 438–39, 441. The government proffered evidence of violence against two victims. *Id.* at 440–41. The court nonetheless vacated the detention order and released the defendant to home incarceration with a custodian, monitored devices, and security cameras whose live feed was available to the government. *Id.* at 444–46. It specifically rejected the government's contention that defendant-funded cameras amounted to a "self-funded private jail" under *Boustani*. *Id.* at 443 n.5. The Second Circuit affirmed.

*Fox*'s reasoning applies directly here. The court found it significant that "[n]oticeably absent from the government's brief is any explanation of how the numerous proposed conditions would not mitigate any potential risk of danger or flight." *Id.* at 443. The same is true here. *See* Section III.A. The court saw "no reason to believe that [the defendant] would continue any such exchanges while his electronic devices were being monitored by the government." *Id.* Ms. Flores de Maduro's only telephone would be recorded and monitored by the Government. The court also declined the government's invitation to ask "what if?," explaining that "[i]f 'what if' were the proper inquiry, virtually no one indicted for a serious crime would ever go free," *Id.*, and that a danger finding requires a "high degree of certainty," *Id*. Finally, the court treated the weight of the evidence as "the least important" of the § 3142(g) factors, particularly where "much of the case will likely hinge on the credibility of the government's witnesses—an assessment the Court is unable to make at this juncture." *Id.* at 441. The Government suggests that the "evidence against the defendant is overwhelming" (ECF 333 at 6) because they will call "multiple cooperating witnesses" (ECF 333 at 8). Like *Fox*, the Court should be weary of making such determinations based only on these representations.

#### 4. *Boustani* Itself Is Inapposite

As the Government describes it, the detention in *Boustani* rested on factors beyond wealth, including the defendant's "frequent international travel" and "extensive ties to foreign countries without extradition." ECF 333 at 19 (quoting *Boustani*, 932 F.3d at 83). Ms. Flores de Maduro did not travel here, and under the proposed conditions she could not travel anywhere. She was brought to this District by the Government, and she has no travel documents, no funds, and does not speak English. Her only tie to a non-extraditing country is to a nation she could not reach from a monitored residence under 24-hour watch. What remains is the seriousness of the charges and the sentence she faces. *Fox* confirms that neither forecloses release where, as here, conditions reasonably assure appearance and safety.

### C. The Absence of a Secured Bond Reflects Her Lack of Assets, Not Concealment

The Government faults Ms. Flores de Maduro for failing to offer a bond or identify co-signers. ECF 333 at 10, 20. A defendant cannot secure a bond with assets she does not have. Nor may she be detained for that reason. "The judicial officer may not impose a financial condition that results in the pretrial detention of the person." 18 U.S.C. § 3142(c)(2). Ms. Flores de Maduro will gladly execute a personal recognizance bond in an amount set by the Court.

## III. THE GOVERNMENT HAS NOT SHOWN BY CLEAR AND CONVINCING EVIDENCE THAT NO CONDITIONS CAN ASSURE THE SAFETY OF THE COMMUNITY

### A. The Government Ignores the Conditions Directed at the Precise Risk It Identifies

The Government's danger theory is that Ms. Flores de Maduro, if released, "could still communicate and otherwise direct co-conspirators in Venezuela to target witnesses and victims." ECF 333 at 16–17. She proposed conditions aimed squarely at that risk. Her only telephone would

be a single hardline without call forwarding, subject to a consensual Title III wiretap, with every non-attorney call recorded and monitored. ECF 327 at 4. Only visitors approved in advance by Pretrial Services and the United States Attorney's Office could enter the residence, and a visitor log would be transmitted to the Government daily. *Id.* at 3. The residence would be subject to random, unannounced searches on dates set by Pretrial Services. *Id.* at 4. The Government would receive video of the residence. *Id*. at 3.

The government fails to mention any of these conditions or explain how a defendant whose only telephone is monitored by the government, and whose every visitor is approved by the Government, could direct anyone to do anything. The government has not proffered any evidence that such activity has even been alluded to during Ms. Flores de Maduro's nine months of detention. Once again, the government asks the Court to indulge them in theories without any support.

### B. The Allegations Specific to Ms. Flores de Maduro Are Limited, and the Government Does Not Dispute That

Ms. Flores de Maduro showed that only one paragraph of the Indictment, ¶ 21(d), alleges violent conduct by her, and that it does so in general terms, without reference to when or where any act occurred. ECF 327 at 7. The Government does not dispute this. It repeats ¶ 21(d) (ECF 333 at 15–16) and then turns to conduct attributed to others: arrests that Maduro Moros and others allegedly authorized after a 2006 seizure involving co-defendants Cabello Rondón and Carvajal Barrios. *Id.* at 16 (citing Indictment ¶ 21(i)).) Ms. Flores de Maduro denies all allegations of unlawful conduct in the indictment, yet Paragraph 21(i) does not allege conduct in which Ms. Flores de Maduro participated. Whatever capabilities the Government attributes to unapprehended

co-defendants are theirs, not hers—and the conditions described above address her ability to communicate with anyone.

### C. The Government's Theory of Danger Contradicts Its Own Characterization of Her

The Government describes Ms. Flores de Maduro as "the former de facto First Lady of Venezuela and a former Venezuelan attorney general and politician." *Id*. at 1. It then argues that her dangerousness is "exacerbated" by unapprehended co-conspirators who "corruptly wield and influence levers of state power," including "force usually reserved for the state." *Id*. at 16. If, as the government contends, she holds no position, it does not explain how she could command state power from a monitored residence in this District. If the government maintains that Ms. Flores de Maduro still holds power as a result of her position as First Lady and member of the National Assembly, it has not addressed the consequences of that status, which their opposition ignores entirely.

### D. The Government Does Not Address the Court's Own Observation

On March 26, 2026, the Court observed: "The defendant Maduro is here, Flores is here. They present no further national security threat. I don't see it." ECF 297 at 14. Ms. Flores de Maduro cited that observation (ECF 327 at 17–18), yet the Government does not mention it, and identifies nothing that has changed since.

## IV. THE PROPOSED CONDITIONS REASONABLY ASSURE HER APPEARANCE

### A. The Standard Is Reasonable Assurance, Not Certainty

The Government dismisses GPS monitoring because it "does nothing to prevent the defendant's flight after it has been removed." ECF 333 at 22. The same can be said of every condition of release. The statute does not require conditions that make flight impossible; it asks

whether conditions will "reasonably assure" appearance. 18 U.S.C. § 3142(c)(1)(B), (e)(1). Relegated to a footnote near the end of their opposition, the Government concedes that it is aware of no defendant who has fled while subject to a private-security condition. ECF at 21, n.12.

### B. The Government Does Not Explain How Flight Would Occur

Ms. Flores de Maduro would have no passport or travel documents and could not apply for any. She does not speak English. She has attested to her lack of funds. Since January 3, she has been among the most widely recognized women in the Western Hemisphere. She would be confined to a residence, tracked by GPS, monitored around the clock, and supervised by a team committed to report any violation. The Government argues that Venezuela does not extradite its nationals (ECF 333 at 6, n.2, 9), but that argument presupposes she could reach Venezuela. The government offers no account of how she would leave the residence undetected, let alone leave the country. Instead, it asks the Court to assume that such an escapade would occur.

### C. Her Lack of Ties Is the Product of the Government's Own Choice

The Government repeats that she has "no ties to or legal status in the United States." ECF 333 at 1, 9. She is here because the Government brought her here. ECF 327 at 14. The Government does not respond to that point. In any event, the proposed conditions do not depend on community ties; they rest on confinement, monitoring, and supervision.

### D. Her Husband's Presence Here Is a Powerful Incentive to Remain

The Government contends that Ms. Flores de Maduro's commitment to support her husband with her "constant presence" is unrealistic under home detention. ECF 333 at 9–10. The government once again misses the point. Her husband is detained in this District and faces the same charges. She is committed to seeing both cases through and flight would mean abandoning him. ECF 327 at 2, 15–16. The government does not dispute the sincerity of that commitment; it

disputes only the logistics of potential visits. Her presence at every court appearance, and at any joint legal meetings the Court and the MDC may permit, is what she seeks. Ms. Flores de Maduro's "constant presence" is in the same district as her husband, not as a fixture at the MDC. And the government need not be concerned with the "massive security apparatus required to ensure the safety and protection" of Ms. Flores de Maduro when she moves from the proposed residence to any other location as that burden falls on the security detail proposed in the conditions.[2]

**E. Residence and Custodian**

The Government notes that no residence has yet been proposed. ECF 333 at 17. Attached as Exhibit 2 to this document, and filed under seal, is the location of the proposed residence. As mentioned in her application, the defense will suggest "an appropriate third-party custodian, acceptable to the Court, with an obligation to report any violation of conditions to Pretrial Services." At the Court's request, any potential custodian will be submitted for review.

**F. The Remaining Details Are Properly Set as Conditions of Release**

The Government faults Ms. Flores de Maduro for not yet identifying who will pay for the proposed conditions, a third-party custodian, or co-signers for a bond. ECF 333 at 10, 20. None of these is a reason to deny release. Each is exactly the kind of detail the Bail Reform Act expects the Court to set as a condition of release, and that courts in this District routinely require to be satisfied before a defendant leaves custody.

The statute authorizes release subject to the "least restrictive further condition, or combination of conditions," that will reasonably assure appearance and safety. 18 U.S.C. § 3142(c)(1)(B). Those conditions include custody with a designated person who agrees to supervise

---

[2] Guidepost personnel can and will coordinate, as requested, with the United States Marshal Service regarding any movements. Guidepost officials include former deputy US Marshals, and they are therefore familiar with the "security apparatus" required for Ms. Flores de Maduro.

the defendant and report any violation, *Id.* § 3142(c)(1)(B)(i); a bail bond with solvent sureties, *Id.* § 3142(c)(1)(B)(xii); and "any other condition that is reasonably necessary," *Id.* § 3142(c)(1)(B)(xiv). In ordinary practice, the Court sets the terms, and the defendant is released only once they are met. The Court also retains authority "at any time" to "amend the order to impose additional or different conditions of release." Id. § 3142(c)(3). There is no reason to depart from that practice here.

Ms. Flores de Maduro therefore suggests that the Court can make each of the Government's concerns a condition of her release, to be satisfied before she leaves custody, for example:

1. The Bolivarian Republic of Venezuela shall submit, through an authorized official, a written commitment to bear all costs of the residence, security, monitoring, and custodian for as long as she is on release. That commitment would formalize what the Republic has already stated under oath. ECF 293-1.
2. The defense shall propose a third-party custodian who agrees to report any violation, subject to vetting by Pretrial Services and the Government and approval by the Court.
3. She shall execute a bond in an amount set by the Court, co-signed by financially responsible persons approved by the Court.

Proceeding this way does not avoid scrutiny. It is a matter of sequence, and of fairness to people who are not parties to this case. Anyone who agrees to serve as custodian or co-signer takes on a public role in one of the most closely watched prosecutions in the country. Naming those individuals in a public filing, before the Court has decided whether any set of conditions is acceptable, would expose them to intense attention prematurely. Once the Court identifies the conditions it would require, the defense will promptly submit the proposed custodians and sureties

under seal, and to Pretrial Services and the Government for vetting, as it has done with the proposed residence.

## CONCLUSION

For the foregoing reasons and those stated in her opening memorandum, Ms. Flores de Maduro respectfully requests that the Court grant her application for pretrial release on the conditions proposed, as supplemented above. In the alternative, she requests an evidentiary hearing.

Dated: September 30, 2026

Respectfully submitted,

/s/ Mark E. Donnelly
Mark E. Donnelly
Andres Sánchez
Parker Sánchez & Donnelly, PLLC
700 Louisiana, Suite 4520
Houston, Texas 77002
(713) 659-7200
Mark@PSD.law

Counsel for Cilia Adela Flores de Maduro