UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

v.

NICOLÁS MADURO MOROS, and
CILIA ADELA FLORES DE MADURO,

Defendants.

**SUPERSEDING INDICTMENT**

S5 11 Cr. 205 (AKH)

The Grand Jury charges:

## INTRODUCTION

1. For over 25 years, NICOLÁS MADURO MOROS and CILIA ADELA FLORES DE MADURO, the defendants, abused their positions of public trust, enriching themselves through corruption and remaining in power through grave violations of human rights.

2. Through drug trafficking, the corrupt use of law enforcement and the military, the abuse of the judicial system, and the pilfering of public funds, NICOLÁS MADURO MOROS and CILIA ADELA FLORES DE MADURO, the defendants, and other Venezuelan leaders personally benefited at the expense of the Venezuelan people. While this systemic corruption was immensely profitable for MADURO MOROS and FLORES DE MADURO, it was deeply unpopular with the Venezuelan people. To undermine Venezuelan democracy and entrench themselves in power, these same leaders presided over a system of repression that relied on violence against political opposition, arbitrary detention, and the torture of detainees, including United States citizens. That torture included electric shock, asphyxiation, rape, forced nudity, prolonged isolation, starvation, punishment cells, and psychological torture, such as threats to harm and kill victims' families, including children.

3. NICOLÁS MADURO MOROS and CILIA ADELA FLORES DE MADURO, the defendants, sat atop that violent power structure. MADURO MOROS and FLORES DE MADURO developed and facilitated the systems which they and their co-conspirators used corruptly to amass immense wealth and power, rewarding allies with ill-gotten funds and terrorizing perceived opponents through persecution and violence. These systems relied on MADURO MOROS's and FLORES DE MADURO's control over Venezuela's military, judiciary, and law enforcement agencies, and their partnerships with organized criminal groups, including terrorist organizations and groups of state-sponsored gangs known as *colectivos*.

4. In amassing such wealth and power, NICOLÁS MADURO MOROS and CILIA ADELA FLORES DE MADURO, the defendants, as well as other members of their inner circle referred to as the *Cártel de Los Soles* or Cartel of the Suns, trafficked drugs under the protection of the Venezuelan military, judiciary, and law enforcement agencies. As described in more detail below and in the Fourth Superseding Indictment in this case, S4 11 Cr. 205 (AKH),[1] MADURO MOROS, FLORES DE MADURO, and their co-conspirators partnered with narcotics traffickers and narco-terrorists from designated foreign terrorist organizations, including the *Fuerzas Armadas Revolucionarias de Colombia* ("FARC"), *Ejército de Liberación Nacional* ("ELN"), the Sinaloa Cartel, the Zetas, later known as the *Cártel del Noreste* ("CDN"), and *Tren de Aragua* ("TdA"), who dispatched cocaine from Venezuela to the United States via transshipment points in the Caribbean and Central America.

5. NICOLÁS MADURO MOROS and CILIA ADELA FLORES DE MADURO, the defendants, as well as other high-ranking members of their inner circle, created and maintained a

[1] The allegations contained in the Fourth Superseding Indictment are realleged and incorporated by reference as though fully set forth herein.

violent system of repression. Between in or about 1999 and in or about 2025, thousands of Venezuelans were harassed, threatened, arrested, prosecuted, assaulted, tortured, or killed by individuals wielding the purported authority of the Venezuelan state to ensure that MADURO MOROS and FLORES DE MADURO remained in power. MADURO MOROS and FLORES DE MADURO used military units, *colectivos*, and narco-terrorist groups involved in their drug trafficking to unlawfully detain and torture their victims. Such violence and repression increased around periods of political instability in which MADURO MOROS's and FLORES DE MADURO's power was threatened. During these periods, MADURO MOROS, FLORES DE MADURO, and other high-level officials jointly undertook efforts to stifle those who opposed, or were merely suspected of opposing, MADURO MOROS or his regime. Those efforts included physical and psychological torture systematically used to terrify the populace and silence dissent.

6. As described in more detail below, NICOLÁS MADURO MOROS, the defendant, presided over this system of repression and torture, commanded the law enforcement and military units and officers responsible for committing torture, ordered that particular individuals be illegally detained and tortured, and received updates on the torture of specific prisoners. CILIA ADELA FLORES DE MADURO, the defendant, helped develop this system of repression and ordered that individuals be tortured to protect her family members' illegal activities. In addition to MADURO MOROS and FLORES DE MADURO, other high-level officials were integral to this system. One high-level Venezuelan official ("CC-1") ordered the murders of certain individuals who opposed MADURO MOROS or his regime, oversaw torture undertaken by officials under his command, and personally threatened the murder of a prisoner's child as a form of psychological torture. Another senior Venezuelan officer who reported directly to MADURO MOROS ("CC-2") developed torture methods that he presented for approval to MADURO MOROS, led an agency

responsible for torturing scores of victims, and personally signed off on the unlawful arrest and torture of specific individuals. A third Venezuelan official ("CC-3"), who reported to CC-2 directly, personally ordered and participated in the torture of civilians and military members, including United States citizens, who were believed to pose a threat to MADURO MOROS's rule. For example, as described in more detail below, one particular United States citizen was detained in Venezuela and subjected to, among other things, deprivation of food and water, simulated drowning, repeated beatings, electric shock to his testicles, and forced injections.

**THE DEFENDANTS**

7. NICOLÁS MADURO MOROS, the defendant, a Venezuelan citizen, was previously the President of Venezuela, and later became the *de facto* but illegitimate ruler of the country. MADURO MOROS also previously held a seat in Venezuela's National Assembly between in or about 2000 and in or about 2006, acted as the Venezuelan Minister of Foreign Affairs between in or about 2006 and in or about 2013, and acted as the Vice President of Venezuela in or about 2013. MADURO MOROS succeeded to the Venezuelan presidency after former President Hugo Chávez ("Chávez") died in or about 2013. During MADURO MOROS's own presidency, MADURO MOROS continued to participate in cocaine trafficking with drug dealers and narco-terrorist groups. In or about 2018, MADURO MOROS declared victory in a disputed and internationally condemned presidential election in Venezuela. In or about 2019, Venezuela's National Assembly invoked the Venezuelan constitution and declared that MADURO MOROS had usurped power and was not the legitimate President of Venezuela. Nonetheless, MADURO MOROS continued to exercise the powers of the Venezuelan presidency, causing more than 50 countries, including the United States, to refuse to recognize MADURO MOROS as Venezuela's head of state. In or about March 2020, MADURO MOROS was first charged with narco-terrorism, narcotics trafficking, and weapons offenses, *see* S2 11 Cr. 205 (AKH), but remained a fugitive

from justice. In or about 2024, Venezuela held another presidential election that was again widely criticized by the international community, in which MADURO MOROS declared himself the winner despite widespread condemnation. On or about January 3, 2026, MADURO MOROS was apprehended on narco-terrorism, drug trafficking, and weapons charges set forth in the Fourth Superseding Indictment in this case, S4 11 Cr. 205 (AKH).

8. CILIA ADELA FLORES DE MADURO, the defendant, a Venezuelan citizen, was previously the First Lady of Venezuela, having married NICOLÁS MADURO MOROS, the defendant, in or about 2013, and later became the *de facto* but illegitimate First Lady alongside MADURO MOROS. FLORES DE MADURO had a lengthy political career. FLORES DE MADURO acted as the President of the National Assembly (starting when MADURO MOROS left that role to become Minister of Foreign Affairs) between in or about 2006 and in or about 2011, and as the Attorney General of Venezuela between in or about 2012 and in or about 2013. Between in or about 2017 and in or about 2020, FLORES DE MADURO acted as a member of Venezuela's National Constituent Assembly, an illegitimate entity that tried to claim the constitutional powers of Venezuela's National Assembly and further entrenched the ruling regime. In or about December 2025, FLORES DE MADURO was first charged with drug trafficking and weapons offenses as set forth in the Fourth Superseding Indictment in this case, *see* S4 11 Cr. 205 (AKH), and on or about January 3, 2026, FLORES DE MADURO was apprehended on those charges.

**<u>THE DEFENDANTS' SCHEME TO ENRICH THEMSELVES THROUGH DRUG TRAFFICKING AND CORRUPTION</u>**

9. NICOLÁS MADURO MOROS and CILIA ADELA FLORES DE MADURO, the defendants, perpetuated and protected a culture of corruption in which members of law enforcement, the military, and the judiciary allowed powerful members of MADURO MOROS's

and FLORES DE MAUDRO's inner circle to benefit from drug trafficking and the theft of public funds.

10. When Chávez rose to power in Venezuela in or about 1999, those in his inner circle began to have access to positions of political significance that permitted both the accumulation of power and amassing of personal wealth through corruption. As early as approximately 2006, NICOLÁS MADURO MOROS and CILIA ADELA FLORES DE MADURO, the defendants, used law enforcement officers assigned for their protection to generate personal wealth, including through narcotics trafficking. In or about 2006, for example, MADURO MOROS and FLORES DE MADURO ordered close associates and members of their security details to oversee and facilitate the regular transport of loads of cocaine totaling approximately 1,000 to 2,000 kilograms using the Bolivarian National Guard. Similarly, in or about 2016, CC-1 ordered officers in the Venezuelan Directorate of Military Intelligence ("DGCIM") assigned to CC-1's security detail to coordinate the movement of drug loads. CC-1 sourced those drug loads from the FARC, a designated terrorist organization dedicated to the overthrow of the democratically elected government of Colombia and its United States government backers, through violence financed with drug trafficking.

11. NICOLÁS MADURO MOROS and CILIA ADELA FLORES DE MADURO, the defendants, also relied on the law enforcement or military resources available to them by virtue of their official positions to protect their drug trafficking through violence. Starting in or about 2006, MADURO MOROS and FLORES DE MADURO ordered members of their security details to kidnap, beat, and murder those who owed them drug money or otherwise undermined their drug trafficking operations. For example, MADURO MOROS ordered the murder of a local drug boss in Caracas, Venezuela, who fell behind on making payments for drugs that MADURO MOROS

had helped supply. Similarly, CC-1 ordered military officers under his control to interrogate suspected rival drug traffickers at his properties to further CC-1's narcotics trafficking. And when those security officials were suspected of being disloyal, they in turn were subjected to violence. A particular Venezuelan law enforcement officer, for example, worked for MADURO MOROS and FLORES DE MADURO for years, including by trafficking drugs and perpetrating violence on FLORES DE MADURO's behalf ("Official-1"). In or about 2010, when MADURO MOROS and FLORES DE MADURO suspected Official-1 of being disloyal—including that he had purportedly stolen narcotics from one of their loads—MADURO MOROS ordered uniformed members of the Bolivarian National Guard and others who worked on MADURO MOROS's and FLORES DE MADURO's security detail to torture Official-1. Those security officers did so inside a military trailer, tying up Official-1's hands and feet, striking him with a shovel and with the butts of National Guard long guns, kicking him in the groin, shooting him in his left leg near his knee, and raping him with a broomstick, resulting in extensive injuries to Official-1, including to his genitalia.

12. During the presidencies of Chávez and NICOLÁS MADURO MOROS, the defendant, drug trafficking also served as a method of financing terrorist groups that aligned with Chávez's and MADURO MOROS's goals of inflicting harm on Colombia and the United States. Shortly after Chávez's death in or about 2013, MADURO MOROS and CILIA ADELA FLORES DE MADURO, the defendant, attended a meeting with the FARC's leadership, including Rodrigo Londoño Echeverri, a/k/a "Timochenko,"[2] Luciano Marín Arango, a/k/a "Iván Márquez," and

[2] In or about 2004, Londoño Echeverri was charged with narcotics trafficking crimes alongside 49 other FARC leaders. He was later convicted of kidnapping by a court in Colombia.

Seuxis Pausias Hernández Solarte, a/k/a "Jesús Santrich"[3] about money that MADURO MOROS owed the FARC in connection with their drug trafficking partnership. To pay at least some of the debt, MADURO MOROS agreed to sell explosive mines and other weapons to the FARC, which MADURO MOROS recognized would also increase the FARC's capacity to wage war against Colombia. Indeed, sales of mines continued into in or about 2015, with MADURO MOROS facilitating the sale of mines manufactured in Cuba to, among others, terrorist groups. Similarly, in or about 2017, CC-3 ordered members of the DGCIM to transport weapons in exchange for loads of cocaine from the Bolivarian National Guard to members of the FARC and ELN, another terrorist organization dedicated to the violent overthrow of the democratically elected government of Colombia. Military officials then took that cocaine, which typically filled three to four military cargo trucks, to a Venezuelan military base and on to a port to be shipped outside Venezuela. MADURO MOROS, FLORES DE MADURO, and their co-conspirators intended a significant proportion of their cocaine to be imported into the United States, whose communities Chávez and MADURO MOROS hoped it would harm.

13. As drug trafficking ran rampant, NICOLÁS MADURO MOROS and CILIA ADELA FLORES DE MADURO, the defendants, along with other high-level members of the Venezuelan government, also used their positions to steal from taxpayer-funded government institutions through corrupt contracting. This corruption was particularly prevalent in the state-owned oil company Petróleos de Venezuela, S.A. ("PDVSA"), and involved corrupt contracts that were referred to by PDVSA leadership as "state policy" established by MADURO MOROS. Theft, waste, incompetence, and corruption were widespread at PDVSA, and Venezuelan leadership also

[3] In or about 2020, Marín Arango and Hernández Solarte were indicted on narco-terrorism, drug trafficking, and weapons charges in the Second Superseding Indictment in this case, S2 11 Cr. 205 (AKH).

used PDVSA to facilitate their drug trafficking. For example, in or about 2007, FLORES DE MADURO offered ELN-aligned groups PDVSA contracts to assist in negotiations with the group, and, in or about 2014 and 2015, MADURO MOROS's son, Nicolás Ernesto Maduro Guerra, a/k/a "Nicolasito,"[4] used a PDVSA plane to transport drugs protected by the Bolivarian National Guard on Margarita Island, Venezuela.

14. The opportunity to traffic drugs under official protection or secure large and fraudulent contracts was available to only the most powerful officials in Venezuela. Nonetheless, to ensure the loyalty of lower-level officials or criminal groups working to enrich their superiors, NICOLÁS MADURO MOROS and CILIA ADELA FLORES DE MADURO, the defendants, allowed smaller-scale corruption to flourish. In particular, military and law enforcement officers who regularly engaged in illegal conduct also abused their positions of power to enrich themselves through drug trafficking, extortion, and theft. For example, security officials working for CC-1 regularly arrested individuals and stole their personal property, and members of DGCIM working for CC-3 required individuals in their custody to transfer property into the names of DGCIM officers by threat of force. Similarly, criminal groups trusted to assist with drug trafficking, such as the FARC and ELN, collected "taxes" through extortion in the areas they controlled in Venezuela.

15. NICOLÁS MADURO MOROS and CILIA ADELA FLORES DE MADURO, the defendants, also corrupted the Venezuelan legal system to further their illegal gains and remain in power. During the Chávez administration, at the direction of CC-1 and others, judges regularly engineered the dismissal of cases against FARC members, including those related to narcotics, to

[4] In or about 2025, Maduro Guerra was indicted on drug trafficking and weapons charges in the Fourth Superseding Indictment, S4 11 Cr. 205 (AKH).

ensure that the FARC could continue operating in Venezuela unabated. Similarly, in or about 2010, FLORES DE MADURO ordered the General Counsel of the Venezuelan National Assembly, which she ran at the time, to demand that a drug case be dismissed against a narcotics trafficker in Anzoátegui State. And, in or about 2017, after DGCIM officials seized cocaine from a warehouse in Carabobo, Venezuela, CC-3 informed others that CC-1 had ordered that the cocaine be returned to its owners and that the warehouse operator be allowed to go free.

16. NICOLÁS MADURO MOROS, the defendant, also used the judiciary to suppress political opposition. In or about June 2021, MADURO MOROS announced on television the creation of a "Special Commission for the Conduct of the Judicial Revolution throughout Venezuela's Justice System," appointing CILIA ADELA FLORES DE MADURO, the defendant, as vice president of the commission. While the commission ostensibly was intended to overhaul the judiciary, it was instead used to ensure that the judiciary would imprison individuals and government officials whom MADURO MOROS, FLORES DE MADURO, or others in their inner circle viewed as political dissidents and who were disloyal to the ruling regime. In or about 2022, MADURO MOROS summoned a particular judge ("Official-2") and other jurists to the presidential palace to a meeting with, among others, FLORES DE MADURO and CC-1. There, MADURO MOROS told the assembled members of the judiciary that MADURO MOROS would give instructions through particular senior judges and that those instructions must be followed. At the same meeting, MADURO MOROS said each judge would receive an additional "bonus" of $1,000 per month. When Official-2 was ordered by the head of her judicial chambers to rule that certain individuals who were political opponents of MADURO MOROS should not be allowed as candidates on the ballots, Official-2 at first attempted to resist. Shortly after Official-2's refusal, however, family members of Official-2 were arrested and tortured by members of the DGCIM.

For example, one family member ("Victim-1") was forced to drink latrine water; assaulted with tear gas in Victim-1's cell; threatened that Victim-1 would be killed at gunpoint; and placed in a cold room known as the "Freezer" in which a bright light was left on at all times of day and night and music was blared on repeat. Ultimately, Official-2 relented and blocked the opposition figures from running for political office.

17. This corrupt activity persisted for as long as NICOLÁS MADURO MOROS, the defendant, remained in Venezuela. Between in or about 2022 and in or about June 2024, approximately every three weeks, CC-3 ordered members of DGCIM to hide narcotics in shipments of scrap metal that CC-3 had forced a local businessman to sell to him at a steep discount. During that same period, CC-1 regularly traveled to clandestine airstrips controlled by the ELN near the Colombia-Venezuela border to ensure the cocaine's continued safe passage in Venezuelan territory. From these airstrips, cocaine was dispatched out of Venezuela both on flights approved by Venezuelan military officials and on clandestine flights designed to avoid detection by law enforcement or militaries in South and Central America. Representatives of CC-1 continued to discuss with Colombian drug dealers plans for ongoing cocaine trafficking through Venezuela into at least in or about 2025.

## THE DEFENDANTS' CORRUPT SCHEME TO MAINTAIN POWER THROUGH REPRESSION AND TORTURE

18. NICOLÁS MADURO MOROS and CILIA ADELA FLORES DE MADURO, the defendants, distributed drug proceeds and other corruptly obtained funds to secure the loyalty of those Venezuelan elites sharing in their ill-gotten spoils. That patronage system, however, did little to secure the subservience of the greater Venezuelan population. For that purpose, MADURO MOROS and FLORES DE MADURO, as well as other high-level members of the Venezuelan government, resorted to torture, among other abuses and atrocities. MADURO MOROS and

FLORES DE MADURO employed their system of violent repression with particular force and regularity during periods of political unrest.

19. After coming to power in or about 2013, NICOLÁS MADURO MOROS, the defendant, continued and expanded a policy of repression, illegal detention, and torture that had begun under Chávez, including through the use of the DGCIM. As described above, as early as 2006, while Chávez was President, MADURO MOROS and CILIA ADELA FLORES DE MADURO, the defendant, used military officials assigned to their protective details to torture and intimidate individuals viewed as disloyal or a threat to their illegal narcotics activity. When MADURO MOROS became President of Venezuela in or about 2013, he authorized the use of torture against specific individuals and oversaw a system designed to use torture, arbitrary detention, and violence as a means of repression against the political opposition.

20. For example, in or about November 2013, NICOLÁS MADURO MOROS, the defendant, ordered the arrest of a Venezuelan military officer ("Victim-2") believed to be meeting with a former high-level Venezuelan official who was, at the time, opposed to Chávez and MADURO MOROS ("Official-3"). MADURO MOROS ordered that Victim-2 be kidnapped to put pressure on and make an example of Official-3. At MADURO MOROS's direction, members of the DGCIM detained Victim-2 and transported Victim-2 to a camp in Colombia near the Colombia-Venezuela border controlled by the FARC, where Victim-2 was held in inhumane conditions by a combination of FARC members and DGCIM officers. Before making the trip to Colombia, members of the DGCIM tortured Victim-2 during interrogations lasting approximately two days. While asking questions about whether Victim-2 was planning a coup against MADURO MOROS, DGCIM officials shocked Victim-2 using a live electric wire approximately 20 times, including after wetting his back to increase the pain; struck Victim-2 on his legs, back, and head

with their fists, a belt, and what appeared to be a pipe; forced Victim-2 to lie on a mattress containing only metal springs; hung Victim-2 from his hands and feet for several minutes at a time causing him to lose consciousness; and placed Victim-2's head into water, submerging his nose and mouth to simulate drowning, approximately 30 times. While engaging in this torture, the DGCIM officers threatened to kill Victim-2 and alleged that he was conspiring against MADURO MOROS.

21. After arriving in the FARC-controlled camp, Victim-2 was again repeatedly interrogated and this time subjected to myriad threats, including that his daughter would be kidnapped and raped if he did not confess and name his supposed confederates. On one occasion, interrogators produced women's underwear, claiming it belonged to his daughter. After approximately two weeks, Victim-2 was forced to record a false confession and was released near the Colombia-Venezuela border. During these two weeks, NICOLÁS MADURO MOROS, the defendant, inquired about and was kept apprised of Victim-2's treatment and, at MADURO MOROS's specific request, MADURO MOROS viewed video of Victim-2's forced confession, which MADURO MOROS ordered be shared with another senior Venezuelan government official.

22. In or about early 2014, a series of mass protests erupted about the integrity of the 2013 Venezuelan presidential elections, seeking the resignation of NICOLÁS MADURO MOROS, the defendant. At the start of this unrest, MADURO MOROS, CILIA ADELA FLORES DE MADURO, the defendant, and newly appointed CC-2 met to discuss an intelligence report that there was dissension in the military ranks. In response, MADURO MOROS suggested kidnapping five to seven military members and "drawing the information out of them" through torture. FLORES DE MADURO agreed, dismissing an alternative suggestion for clandestine infiltration of the officers. Shortly thereafter, CC-2 began carrying out the kidnappings.

23. In or about early 2014, on the day of the planned kidnappings, NICOLÁS MADURO MOROS, the defendant, regularly received briefings in meetings attended by high-level officials, including CC-2 and CILIA ADELA FLORES DE MADURO, the defendant. In such meetings, CC-2 briefed MADURO MOROS and others, and MADURO MOROS inquired about whether any of the officers had a change of heart once in detention, with particular focus on any high-level military leaders who had been arrested. At times, CC-2 indicated that individuals had broken down, but at other times, reported that they remained defiant. On at least one occasion, faced with the news that, despite arrest, an individual refused to relent, MADURO MOROS made a signal with his hands—screwing one into the other—and said, "squeeze them harder," ordering that the intensity of abuse be increased.

24. Early in his presidency, NICOLÁS MADURO MOROS, the defendant, also sought to quell civilian political protests through arrest, repression, and torture. MADURO MOROS and CC-1 sought to intimidate the opposition through shows of force and the arrests of protest leaders. To facilitate outright violence in a way that would not be directly attributable to the government, CC-1 ordered certain soldiers under his command to go undercover with *colectivos*, which were seeking to cause chaos among the protestors. Alongside the *colectivo* members carrying out violence, undercover officers were ordered to gather information from protestors using arrests and threats of violence. MADURO MOROS also ordered the arrest of a particular opposition figure leading the protests ("Victim-3"). On or about February 12, 2014, Venezuelan government officials appeared on Venezuelan television and blamed Victim-3 for two recent deaths during protests. That same day, a warrant was issued for Victim-3's arrest. On or about February 18, 2014, when Victim-3 surrendered, he was taken to prison by, among others, CC-2, who informed Victim-3 that he was "a prisoner of Maduro." While in custody, Victim-3 was subjected to beatings, sleep

deprivation, threats to his life, isolation, and sound and bright lights for days at a time, some of which was done at MADURO MOROS's specific instructions. At times, MADURO MOROS inquired—in meetings attended by CILIA ADELA FLORES DE MADURO, the defendant, and CC-2—whether Victim-3 was still "feeling arrogant" and ordered further abuse if he was.

25. As opposition to the ruling regime intensified, NICOLÁS MADURO MOROS, the defendant, continued to oversee the development of a more systematic approach to unlawfully arresting and torturing dissidents. MADURO MOROS ordered who would be arrested and tortured, and high-level officials, including CC-2, relayed the orders to lower-level officials, often specifying the particular torturous interrogation methods to be employed. MADURO MOROS, at times, inquired what was being done to an arrestee and was provided a description of the torture, such as shock treatment, beatings, or simulated drowning. MADURO MOROS would then decide, on a case-by-case basis, whether an individual who had been abused would be released or subjected to criminal prosecution. If an arrestee was refusing to talk, MADURO MOROS would ask questions including, "what can we do to make them talk," and would encourage bringing additional "pressure." On occasion, MADURO MOROS made suggestions for particular torture techniques, saying "do not let them sleep," or "pour water on them," at times laughing after hearing about the abuse of prisoners. In addition to ensuring these particular orders were carried out, CC-2 also directed the systematic abuse of members of the Venezuelan military who were imprisoned for their opposition to MADURO MOROS.

26. Starting in or about 2014, several international bodies—including the Office of the United Nations High Commissioner for Human Rights, Inter-American Commission on Human Rights, Organization of American States Panel of Independent Experts, and a Fact-Finding Mission of the United Nations Human Rights Council—issued widely publicized reports

documenting patterns of torture by Venezuelan authorities, including citing specific instances of torture at the Boleíta Norte and Ramo Verde prisons, among other facilities. Between in or about 2014 and in or about 2025, NICOLÁS MADURO MOROS, the defendant, and others repeatedly and falsely denied public accusations of torture in Venezuelan government-controlled detention facilities and allowed the inhumane treatment of prisoners to continue at those facilities unabated.

27. Despite these public reports exposing torture by the ruling regime, repression intensified. In or about 2016, NICOLÁS MADURO MOROS, the defendant, canceled a presidential recall referendum in Venezuela intended to remove him from office and led by opposition political figures who had gained control of the National Assembly. After nationwide protests in or about late 2016, on or about January 11, 2017, MADURO MOROS announced at a televised cabinet meeting the creation of an "Anti-Coup Command" to be commanded by, among others, CC-2. The next day, Official-3 was rearrested and, on or about January 24, 2017, Victim-2 was rearrested.[5]

28. After being arrested, Victim-2 was taken to the basement of DGCIM's headquarters, this time under the command of CC-3. At times with CC-3 present and participating in the torture, DGCIM officials placed a bag over Victim-2's head and tightened it around his neck so that he could not breathe; pulled his arms and legs in opposite directions to simulate dismemberment; poured ice water on him; and locked him in handcuffs so tightly that they needed to break the handcuffs to remove them, injuring Victim-2's hands and requiring stitches. During these torture sessions, Victim-2 was repeatedly told by his captors that NICOLÁS MADURO

---

[5] In or about October 2021, Official-3 died in custody, according to the UNHRC Mission, as a direct consequence of the denial of adequate medical care by Venezuelan authorities.

MOROS, the defendant, was going to "leave you in jail the rest of your life until you motherfuckers die."

29. The arrests by the Anti-Coup Command did little to quell the protests. On or about April 18, 2017, one day before a large, planned protest, NICOLÁS MADURO MOROS, the defendant, announced on television a widening of the repression efforts dubbed "Plan Zamora" with the objective of maintaining "internal order" in the country. During that announcement, MADURO MOROS said the plan was to be coordinated by the Anti-Coup Command and threatened that for "civilians and military personnel, retired or active, whether already captured or on the run . . . military justice will be severe, and I, as Commander-in-Chief, will also be making severe decisions." Consistent with these public comments, CC-2 informed DGCIM personnel that MADURO MOROS had ordered CC-2 to treat military personnel particularly cruelly because of MADURO MOROS's fear of a military uprising.

30. On or about January 4, 2018, Venezuelan law enforcement arrested an individual ("Victim-4") known to be friendly with a particular law enforcement officer who, in the months before Victim-4's arrest, had become a famous opponent of the regime. Official-4 had, in or about June and December 2017, respectively, flown a stolen helicopter around Caracas and stolen weapons from a military command station. Desperate to locate Official-4, members of the Venezuelan National Police and military tortured Victim-4 while interrogating him for information about Official-4's whereabouts. In a house and, on one occasion, on the side of a road, the officers, among other things, punched Victim-4 in the face and abdomen, forcefully squeezed his testicles, gouged his eyes, and struck him in the face with a weapon, causing him to bleed. While Victim-4 was almost always hooded to prevent him from seeing, at one point, officers took off Victim-4's clothes and hood, and made him lie down handcuffed on his stomach; the officers showed him a

machete, and then began kicking him and striking him on his back and legs with the flat side of the machete; and they sprayed him with an insecticide or other chemical irritant before putting plastic over his face to prevent him from breathing. During this particular torture session, Victim-4 lost consciousness.

31. The most severe torture occurred on Victim-4's third day of victimization. That day, his hood was removed and he immediately recognized CC-1 in the room with him. CC-1 told Victim-4 that if he did not provide Official-4's location, CC-1 would make him "go insane" by killing Victim-4's young child, whose hair color CC-1 specifically referenced. The officers then stripped Victim-4 naked and applied electrical currents to Victim-4's sides, feet, and genitals. CC-1 remained in the vicinity of the room for at least a portion of the time during which Victim-4 was being shocked, casually looking at his phone. On or about January 12, 2018, Victim-4 was released, never having divulged the location of Official-4 because he did not know where Official-4 was located. Thereafter, on or about January 15, 2018, Official-4 was killed during a Venezuelan security forces operation led by CC-3, after CC-1 relayed orders from NICOLÁS MADURO MOROS, the defendant, that Official-4 be killed.

32. On or about January 17, 2018, Victim-4 tried to flee the country, but was rearrested and beaten by DGCIM officers. On or about January 22, 2018, CC-2 visited Victim-4 and told him that he would be charged and tried for treason, theft of property belonging to the armed forces, and enticement to military rebellion, after which, Victim-4 was transferred to a military prison where he was held in solitary confinement for over a month. On or about March 13, 2018, Victim-4 was released on bail and, when it later looked as though he could be again rearrested, Victim-4 fled Venezuela.

33. In or about May 2018, NICOLÁS MADURO MOROS, the defendant, declared victory following the sham 2018 presidential election. Several months later, in or about August 2018, two drones detonated explosives in Caracas near where MADURO MOROS was giving a speech to members of the Bolivarian National Guard. The Venezuelan government claimed the event was an attempt to assassinate MADURO MOROS and arrested numerous individuals, including a victim ("Victim-5") who was a friend of someone suspected of involvement in the attack. Victim-5 experienced lengthy interrogations by DGCIM officials in Boleíta Norte prison that included physical and psychological torture such as electric shocks, beatings, asphyxiations, and being forced to stand in painful positions for long periods of time. On one occasion, Victim-5 overheard the DGCIM officers conducting the torture comment that "the boss," who Victim-5 understood to be MADURO MOROS, did not believe what Victim-5 was saying. In the ensuing interrogation, the officers tortured Victim-5 by asphyxiating him with a bag, applying electric shocks to his testicles and knees, and kicking and beating him with a blunt object. The same officers recorded the abuse and interrogation of Victim-5. When Victim-5 was subsequently transferred to Ramo Verde prison, CC-3 participated with other DGCIM officers under his command in a night-time search of detainees' cells at that military prison, during which DGCIM officers deployed tear gas, beat the detainees, stripped them naked, stole their food, and smashed their belongings.

34. The regime of NICOLÁS MADURO MOROS, the defendant, also seized upon the August 2018 drone incident to arrest scores of other people, including members of the press and leading opposition figures. Those arrested included a Venezuelan opposition figure who had just returned from attending the United Nations General Assembly in New York City and was arrested on or about October 8, 2018, approximately two months after the drone attack ("Victim-6").

Approximately three days after his arrest, Venezuelan authorities reported that Victim-6 jumped to his death from the tenth floor of the headquarters of the *Servicio Bolivariano de Inteligencia Nacional*. Prior to his death, CC-2 had ordered that Victim-6 be tortured using, among other methods, electric shock.

35. NICOLÁS MADURO MOROS, the defendant, and other high-level officials also assigned blame to the United States for the instability in Venezuela. Shortly after the June 2017 incident involving Official-4, MADURO MOROS stated, "They've given the order to assassinate the president of the Bolivarian Republic of Venezuela, and the order comes from the Oval Office [of the White House]." On or about November 21, 2017, six senior oil executives—five of whom were United States citizens—were detained in Venezuela and were ultimately charged and sentenced on corruption-related charges.[6] MADURO MOROS accused the executives on television of "bankrupting [a large oil company affiliated with PDVSA] in order to give it away—through dirty dealings, very dirty dealings—to give it away to a group of people connected to the United States government," and CC-1 stated privately that these arrests were necessary to put pressure on the United States during negotiations. MADURO MOROS further falsely stated on national television that, with respect to the August 2018 drone attack, "several of those intellectually responsible and the financiers of this attack live in the United States, in the state of Florida."

36. As Venezuelan government officials' rhetoric against the United States increased, so did the abuse of American citizens by Venezuelan authorities. For example, in or about January 2022, a United States citizen ("Victim-7") was detained by DGCIM and other Venezuelan officers while entering Venezuela. The officers took Victim-7 to a concrete house, where they repeatedly

[6] These victims were released in or about 2022.

tortured him over the course of two or three days. Among other things, the officers punched him in the face and abdomen, covered his face, and poured a noxious liquid over his face that caused him to vomit, which the officer then forced him to eat.

37. Victim-7 was falsely accused of, among other things, participating in a conspiracy to assassinate NICOLÁS MADURO MOROS, the defendant. He was transferred to Boleíta Norte prison, where his torture continued. That torture included electric shock to Victim-7's arms, legs, and genitals; asphyxiation; beatings; deprivation of food and water; and forced injections of a substance that caused Victim-7 to experience seizures. On one occasion, CC-3 personally observed Victim-7 being electrocuted; laughed at and taunted Victim-7 during the electric shock; and directed other DGCIM officers in connection with the electric shock. While at Boleíta Norte prison, Victim-7 also witnessed the abuse of other American prisoners. After spending approximately eight and a half months at Boleíta Norte prison, in or about October 2022, Victim-7 was released and returned to the United States.

38. In or about August 2023, a United States citizen was detained by DGCIM while traveling to Venezuela to see family ("Victim-8"). Almost immediately, DGCIM officers attacked Victim-8 from behind, severely injuring Victim-8's back such that Victim-8 required a lengthy hospital stay. While in the hospital, Victim-8 was guarded by DGCIM around the clock. Eventually, DGCIM transported Victim-8 to Boleíta Norte prison via ambulance. While en route, DGCIM officers put a gun in his mouth and told Victim-8 to say goodbye to everyone he knew. The DGCIM officers electrocuted Victim-8's testicles and put a pressure device on his ankles, causing him to faint several times during the journey. In Boleíta Norte prison, DGCIM officers subjected Victim-8 to repeated beatings and other abuse on the orders of CC-3. On one occasion, one of Victim-8's torturers told him that the only reason he was alive was because CC-3 had

learned that Victim-8 was a United States citizen and, therefore, realized that Victim-8 could be useful in a prisoner exchange with the United States.

39. In or about July 2024, NICOLÁS MADURO MOROS, the defendant, declared victory following the sham 2024 presidential election in Venezuela. From in or about July 2024 through MADURO MOROS's illegitimate "inauguration" in or about January 2025, another period of political unrest gave rise to atrocities at the hands of Venezuelan authorities. For example, on or about January 29, 2025, another United States citizen was arrested by the DGCIM ("Victim-9") after officers came to his home looking for someone else. DGCIM officials placed Victim-9 in a room in the basement of DGCIM, where they handcuffed him behind his back and placed a hood over his head. For two days they beat him with their fists to the face, head, and stomach approximately every half an hour. The beatings caused permanent injury to Victim-9's eye. After spending approximately one year in custody, on or about January 15, 2026, Victim-9 was driven to the airport to be released. There, Victim-9 and other Americans met CC-3, who threatened them, saying they were not allowed to say the Venezuelan government had hurt them or had otherwise subjected them to abuse.

## STATUTORY ALLEGATIONS

### COUNT ONE
### (Narco-Terrorism Conspiracy)

40. Paragraphs 1 through 39 of this Superseding Indictment are realleged and incorporated by reference as though fully set forth herein.

41. From at least in or about 1999, up to and including in or about 2025, in an offense begun and committed out of the jurisdiction of any particular State or district of the United States, NICOLÁS MADURO MOROS and CILIA ADELA FLORES DE MADURO, the defendants, and others known and unknown, at least one of whom has been and will be first brought to and arrested

in the Southern District of New York, intentionally and knowingly combined, conspired, confederated, and agreed together and with each other to violate Title 21, United States Code, Section 960a.

42. It was a part and an object of the conspiracy that NICOLÁS MADURO MOROS and CILIA ADELA FLORES DE MADURO, the defendants, and others known and unknown, would and did engage in conduct that would be punishable under Title 21, United States Code, Section 841(a), if committed within the jurisdiction of the United States, to wit, the distribution of, and possession with the intent to distribute, five kilograms and more of mixtures and substances containing a detectable amount of cocaine, knowing and intending to provide, directly and indirectly, something of pecuniary value to a person and organization that has engaged and engages in terrorist activity (as defined in Title 8, United States Code, Section 1182(a)(2)(B)), and terrorism (as defined in Title 22, United States Code, Section 2656f(d)(2)), to wit, the following organizations that have been designated by the United States Secretary of State as FTOs pursuant to Section 219 of the INA, during times relevant to this Superseding Indictment: FARC, FARC-EP, Segunda Marquetalia, ELN, TdA, the Sinaloa Cartel, CDN, also known as the Zetas, and each organization's members, operatives, and associates, having knowledge that such organizations and persons have engaged and engage in terrorist activity and terrorism, where (i) the prohibited drug activity and the terrorist offense violated the criminal laws of the United States; (ii) the offense, the prohibited drug activity, and the terrorist offense occurred in and affected foreign commerce; (iii) an offender provided something of pecuniary value for a terrorist offense that caused and were designed to cause death and serious bodily injury to nationals of the United States while the nationals were outside of the United States; and (iv) an offender was brought into and found in the

United States after the conduct required for the offense occurred, in violation of Title 21, United States Code, Section 960a.

(Title 21, United States Code, Section 960a; and Title 18, United States Code, Section 3238.)

**COUNT TWO**
**(Conspiracy to Commit Torture)**

The Grand Jury further charges:

43. Paragraphs 1 through 39 of this Superseding Indictment are realleged and incorporated by reference as though fully set forth herein.

44. From at least in or about 1999, up to and including in or about 2025, in an offense committed outside the United States, NICOLÁS MADURO MOROS and CILIA ADELA FLORES DE MADURO, the defendants, and others known and unknown, at least one of whom is present in the United States and has been first brought to and arrested in the Southern District of New York, intentionally and knowingly combined, conspired, confederated, and agreed together and with each other to commit acts under the color of law, specifically intended to inflict severe physical and mental pain and suffering (other than pain and suffering incidental to lawful sanctions) upon another person within the defendants' and their co-conspirators' custody and control, in violation of Title 18, United States Code, Sections 2340(1) and (2), and 2340A(a) and (b).

45. It was a part and an object of that conspiracy that NICOLÁS MADURO MOROS and CILIA ADELA FLORES DE MADURO, the defendants, and others known and unknown, inflicted severe physical and mental pain and suffering to repress and punish political opposition, silence dissent and perceived dissent, preserve and protect the power and authority of the members

of the conspiracy, and intimidate, harass, and neutralize their opponents, including through kidnappings.

(Title 18, United States Code, Sections 2340A(c) and 3238.)

**COUNT THREE**
**(Cocaine Importation Conspiracy)**

The Grand Jury further charges:

46. Paragraphs 1 through 39 of this Superseding Indictment are realleged and incorporated by reference as though fully set forth herein.

47. From at least in or about 1999, up to and including in or about 2025, in an offense begun and committed out of the jurisdiction of any particular State or district of the United States, NICOLÁS MADURO MOROS and CILIA ADELA FLORES DE MADURO, the defendants, and others known and unknown, at least one of whom has been first brought to and arrested in the Southern District of New York, intentionally and knowingly combined, conspired, confederated, and agreed together and with each other to violate provisions of Title 21, United States Code, Chapter 13, Subchapter II.

48. It was a part and an object of the conspiracy that NICOLÁS MADURO MOROS and CILIA ADELA FLORES DE MADURO, the defendants, and others known and unknown, would and did knowingly and intentionally import into the United States and into the customs territory of the United States from a place outside thereof a controlled substance, in violation of Title 21, United States Code, Sections 952(a) and 960(a)(1).

49. It was further a part and an object of the conspiracy that NICOLÁS MADURO MOROS and CILIA ADELA FLORES DE MADURO, the defendants, and others known and unknown, would and did manufacture, distribute, and possess with intent to distribute a controlled substance, intending, knowing, and having reasonable cause to believe that such substance would

be unlawfully imported into the United States and into waters within a distance of 12 miles of the coast of the United States, in violation of Title 21, United States Code, Sections 959(a) and 960(a)(3).

50. It was further a part and an object of the conspiracy that NICOLÁS MADURO MOROS and CILIA ADELA FLORES DE MADURO, the defendants, and others known and unknown, would and did, on board an aircraft registered in the United States, manufacture, distribute, and possess with intent to distribute a controlled substance, in violation of Title 21, United States Code, Sections 959(c) and 960(a)(3).

51. The controlled substance that NICOLÁS MADURO MOROS and CILIA ADELA FLORES DE MADURO, the defendants, conspired to (i) import into the United States and into the customs territory of the United States from a place outside thereof, (ii) manufacture and distribute, intending, knowing, and having reasonable cause to believe that such substance would be unlawfully imported into the United States and into waters within a distance of 12 miles of the coast of the United States from a place outside thereof, and (iii) manufacture, distribute, and possess on board an aircraft registered in the United States, was five kilograms and more of mixtures and substances containing a detectable amount of cocaine, in violation of Title 21, United States Code, Section 960(b)(1)(B).

(Title 21, United States Code, Section 963; and Title 18, United States Code, Section 3238.)

**COUNT FOUR**
**(Possession of Machineguns and Destructive Devices)**

The Grand Jury further charges:

52. Paragraphs 1 through 39 of this Superseding Indictment are realleged and incorporated by reference as though fully set forth herein.

53. From at least in or about 1999, up to and including in or about 2025, in an offense begun and committed out of the jurisdiction of any particular State or district of the United States, and for which at least one of two or more joint offenders has been first brought to and arrested in the Southern District of New York, NICOLÁS MADURO MOROS and CILIA ADELA FLORES DE MADURO, the defendants, during and in relation to a drug trafficking crime for which they may be prosecuted in a court of the United States, to wit, the controlled substance offenses charged in Counts One and Three of this Superseding Indictment, knowingly used and carried firearms, and, in furtherance of such crimes, knowingly possessed firearms, and aided and abetted the use, carrying, and possession of firearms, to wit, machineguns that were capable of automatically shooting more than one shot, without manual reloading, by a single function of the trigger, as well as destructive devices.

(Title 18, United States Code, Sections 924(c)(1)(A), 924(c)(1)(B)(ii), 3238, and 2.)

**COUNT FIVE**
**(Conspiracy to Possess Machineguns and Destructive Devices)**

The Grand Jury further charges:

54. Paragraphs 1 through 39 of this Superseding Indictment are realleged and incorporated by reference as though fully set forth herein.

55. From at least in or about 1999, up to and including in or about 2025, in an offense begun and committed out of the jurisdiction of any particular State or district of the United States, NICOLÁS MADURO MOROS and CILIA ADELA FLORES DE MADURO, the defendants, and others known and unknown, at least one of whom has been first brought to and arrested in the Southern District of New York, intentionally and knowingly combined, conspired, confederated, and agreed together and with each other to violate Title 18, United States Code, Section 924(c).

56. It was a part and an object of the conspiracy that NICOLÁS MADURO MOROS and CILIA ADELA FLORES DE MADURO, the defendants, and others known and unknown, during and in relation to a drug trafficking crime for which they may be prosecuted in a court of the United States, to wit, the controlled substance offenses charged in Counts One and Three of this Superseding Indictment, knowingly used and carried firearms, and, in furtherance of such crimes, knowingly possessed firearms, and aided and abetted the use, carrying, and possession of firearms, to wit, machineguns that were capable of automatically shooting more than one shot, without manual reloading, by a single function of the trigger, as well as destructive devices, in violation of Title 18, United States Code, Sections 924(c)(1)(A) and 924(c)(1)(B)(ii).

(Title 18, United States Code, Sections 924(o) and 3238.)

## **FORFEITURE ALLEGATIONS**

57. As a result of committing the controlled substance offenses charged in Count One and Count Three of this Superseding Indictment, NICOLÁS MADURO MOROS and CILIA ADELA FLORES DE MADURO, the defendants, shall forfeit to the United States, pursuant to Title 21, United States Code, Sections 853 and 970, any and all property constituting, or derived from, any proceeds the defendants obtained, directly or indirectly, as a result of the offenses, and any and all property used, or intended to be used, in any manner or part, to commit, and to facilitate the commission of the offense charged in Count One and Count Three of this Superseding Indictment.

58. As a result of committing the torture offense charged in Count Two of this Superseding Indictment, NICOLÁS MADURO MOROS and CILIA ADELA FLORES DE MADURO, the defendants, shall forfeit to the United States, pursuant to Title 18, United States Code, Sections 981(a)(1)(C) and 981(a)(1)(G) and Title 28, United States Code, Section 2461(c), any and all property, real or personal, which constitutes or is derived from proceeds traceable to

the commission of said offense; any and all assets, foreign and domestic, of the defendants; any and all assets, foreign and domestic, affording the defendants a source of influence over any entity or organization engaged in planning or perpetrating said offense; any and all assets, foreign and domestic, acquired or maintained with the intent and for the purpose of supporting, planning, conducting or concealing said offense; and any and all assets, foreign and domestic, derived from, involved in, or used or intended to be used to commit said offense, including but not limited to a sum of money in United States currency representing the total amount of proceeds traceable to the commission of the offense charged in Count Two of this Superseding Indictment and the defendants' assets.

59. As a result of committing the firearms offenses charged in Counts Four and Five of this Superseding Indictment, NICOLÁS MADURO MOROS and CILIA ADELA FLORES DE MADURO, the defendants, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 924(d), all firearms and ammunition involved in and used in the commission of the offenses charged in Counts Four and Five of this Superseding Indictment.

**Substitute Assets Provision**

60. If any of the above-described forfeitable property, as a result of any act or omission of NICOLÁS MADURO MOROS and CILIA ADELA FLORES DE MADURO, the defendants:

a. cannot be located upon the exercise of due diligence;

b. has been transferred or sold to, or deposited with, a third person;

c. has been placed beyond the jurisdiction of the Court;

d. has been substantially diminished in value; or

e. has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p) and Title 28, United States Code, Section 2461(c), to seek forfeiture of any other property of the defendants up to the value of the above forfeitable property.

(Title 18, United States Code, Section 924;
Title 21, United States Code, Sections 853 and 970; and
Title 28, United States Code, Section 2461.)

[redacted]
FOREPERSON

JAMES M. MCDONALD
United States Attorney